# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA RISING TOGETHER, FAITH IN FLORIDA, UNIDOSUS, EQUAL GROUND EDUCATION FUND, HISPANIC FEDERATION, and PODER LATINX, | Case No. 4:21-cv-201 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| LAUREL M. LEE, in her official capacity as the Secretary of State of Florida, and PENNY OGG, in her official capacity as Supervisor of Elections for Highlands County, Florida, SHIRLEY GREEN KNIGHT, in her official capacity as the Supervisor of Elections for Gadsden County, Florida, MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for Osceola County, Florida, and CRAIG LATIMER, in his official capacity as the Supervisor of Elections for Hillsborough County, Florida, on behalf of themselves and all those similarly situated, | |
| Defendants. | |

## INTRODUCTION

1.     The human body relies on a beating heart to survive.  Voting is "the beating heart of democracy."  *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1215 (N.D. Fla. 2018).  The right to vote is a "precious" right, *Harper v. State Bd. of Elections*, 383 U.S. 663, 670 (1966), "of the most fundamental significance under our constitutional structure," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted).  Florida's recent legislation attacking the voting rights of its Black and Latino residents is like a virus attacking the human heart. Without a remedy to undo the effects, our democracy will die.

2.     Florida has a long history of imposing racially discriminatory voting requirements.  In recent decades, many courts have recognized this history in striking down Florida voting laws because they discriminated against Black and Latino residents.

3.     Unfortunately, the Florida legislature's efforts to discriminate against Black and brown Floridians continue to this day.  The state has engaged in repeated efforts over the last decade to discourage or prevent Black and Latino residents from voting.  These efforts include the enactment of HB 1335 in 2011, which targeted early voting, third-party voter registration efforts, and other mechanisms that mobilized Black and Latino residents to vote, and SB 7066 in 2019, which imposed onerous, wealth-based restrictions on returning citizens in an effort to blunt the effect

2

of a state constitutional referendum—supported by an overwhelming majority of Floridians—re-enfranchising them.

4.     SB 90, the target of this lawsuit, continues the legislature's discriminatory tradition.  Enacted earlier this month, SB 90 contains a series of measures that prohibit or restrict access to the ballot and voting mechanisms that Black and Latino voters used to great effect in the 2020 elections.  The diverse components of SB 90 are linked because they target these voting practices, including unprecedented use of mail ballots, unprecedented use of secure drop boxes, and significant organized efforts to support voters who encounter long lines or other obstacles to in-person voting.

5.     The Florida legislature enacted SB 90 against a backdrop of record turnout among Black and Latino voters during the 2020 general election.  In part through a massive investment of time and resources by organizations such as Plaintiffs Florida Rising Together, Hispanic Federation, Faith in Florida, Equal Ground, UnidosUS, and Poder Latinx, a record 1.38 million Black voters and 1.8 million Latino voters participated in the 2020 General Election.  Efforts to facilitate return of ballots (by promoting use of mail ballots and secure drop boxes and assisting voters with return of ballots) and to provide assistance to voters on election day directly resulted in this record turnout.

6.     SB 90 contains a series of provisions targeting precisely those strategies and mechanisms successfully employed by Plaintiffs and other similar organizations in the 2020 election to mobilize Black and Latino voters.  While SB 90 imposes unjustified burdens on all voters, it places disproportionate burdens on Black voters, Latino voters, disabled voters, and voters who face greater challenges in exercising the right to vote, even in the best of circumstances.  SB 90 imposes specific obstacles on voters' ability to cast ballots through in person voting, mail voting, and the use of secure drop-boxes for early voting.

7.     For example, SB 90 makes voting by mail more burdensome.  Prior to the 2020 election, white voters were more likely than voters of color to vote by mail. But in 2020, Black and Latino voters voted by mail to an unprecedented degree.  In the 2020 General Election, approximately 40 percent of all votes cast by Black voters were cast by mail (double the percentage in 2016), and approximately 41% of all votes cast by Latino voters were cast by mail, an increase of more than 50% from 2016 levels.  The 2020 election thus represented the beginnings of a change in the historical distrust of mail voting in the Black and Latino communities.  The unprecedented usage of vote-by-mail by voters of color in 2020 and the change in the attitude of those voters toward this method of voting was widely reported both at the time of the election and during the debate on SB 90, and the Florida legislature was aware of it in adopting the bill.  In prior decades, when white voters were more

likely to vote by mail, and before voters of color voted by mail in unprecedented numbers in the 2020 election, the Florida legislature repeatedly made it easier to vote by mail.  SB 90 abruptly reverses course, requiring for the first time that voters provide a driver's license number, Florida identification card number, or the last four digits of a social security number to request a mail ballot, documentation that Florida legislators must have known voters of color disproportionately lack.

8.     SB 90 also curtails the availability of secure drop boxes, a method used by Black and Latino voters in the 2020 General Election to an unprecedented degree. Plaintiffs and other similar organizations encouraged Black and Latino voters to use secure drop boxes during the 2020 elections to facilitate voting amid a pandemic that fell hardest on people of color and to address longstanding patterns of long lines and poor mail service in  communities of color.  The unprecedented use of drop boxes (along with increased voting by mail) was critical in reducing the lines and wait times for in-person voting in Black and Latino communities.  By enacting SB 90, the Florida legislature limited the use of secure drop boxes to the times and hours of early voting, and prohibited Supervisors of Elections ("SOEs") from operating drop boxes after business hours, including, potentially, on the Sunday before Election Day when many voters of color had previously cast their ballots.  By making it harder for many voters to use secure drop boxes, the restrictions will increase the number of

voters who will vote in-person, which will increase the length of voting lines, particularly in Black and Latino communities.

9.     SB 90 also places new restrictions on third-party voter registration drives, requiring civic organizations to tell any voters they seek to register that their registration may not arrive in time to be valid, regardless of the organization's intention or ability to process and return registrations, or its record in timely submitting registrations to state or local officials.  These voter registration efforts have been critical to the expansion of Black and Latino voting in Florida.  SB 90's compelled disclaimer is intended to and will have a chilling effect on third-party voter registration campaigns and their ability to register qualified voters.

10.     SB 90 also prohibits churches and organizations such as the Plaintiffs from providing assistance to voters waiting in line to vote.  During the 2020 election, Plaintiffs and other similar organizations afforded assistance to voters (primarily Black, Latino, disabled, and elderly voters) who encountered long lines at in-person polling sites; for example, Plaintiffs Hispanic Federation and Faith in Florida provided assistance (including water, food, chairs, and umbrellas) to voters in Black and Latino communities to enable them to wait in sometimes hours-long lines.  By enacting SB 90, the Florida legislature attacks critical efforts to mobilize unprecedented turnout from Black and Latino voters during the 2020 Election.  SB 90 criminalizes such efforts:  Under SB 90, anyone who provides assistance to a

voter waiting in line faces prosecution, punishable by a fine of up to $1,000, up to a year in prison, or both.

11.     The legislature offered no plausible rationale for the new restrictions imposed by SB 90.  SB 90's sponsors identified no specific issues or flaws that SB 90 aimed to fix.  To the contrary, legislators and state officials universally acknowledged that Florida's 2020 election ran remarkably smoothly. Indeed, Florida Governor DeSantis (who signed SB 90) touted the 2020 Florida election as "the smoothest, most successful election of any state in the country."[1]  The Florida Supervisors of Elections, in assessing the 2020 General Election, stated that "In 2020, Florida was universally praised for our exemplary conduct of elections – from the very highest offices at the federal and state level to our most important stakeholders, voters."[2]

12.     The bill's lead sponsor, Senator Dennis Baxley, confirmed the absence of any legitimate state interest justifying SB 90's restrictions on voting.  When pressed for a justification for measures making voting more difficult, Senator Baxley stated: "Some people ask why and I say why not?  Let's try it."[3]

---

[1] Press Release, Governor Ron DeSantis, Governor Ron DeSantis Highlights Proposed Legislation to Strengthen Election Integrity and Transparency Measures (Feb. 19, 2021), https://flgov.com/2021/02/19/governor-ron-desantis-highlights-proposed-legislation-to-strengthen-election-integrity-and-transparency-measures/.

[2] Fla. Supervisors of Elections, Florida Supervisors of Elections Statement on PCB-PIE 21-05 (Mar. 22, 2021), https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/FSE_Statement_032221.pdf.

[3] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021).

13.     Other sponsors invoked fanciful theories or hypothetical examples of fraud.  But the bill sponsors provided no evidence of any actual fraud or abuse in any actual Florida election that SB 90's provisions would address.  Florida's 67 Supervisors of Elections, who were surveyed regarding fraud or issues in the 2020 General Election, identified very few instances of possible fraud or irregularities over the past four years.[4]  The legislature thus enacted a series of burdensome rules with no plausible purpose other than to prevent voters—and Black and Latino voters in particular—from voting.

14.     Given the absence of any plausible justification for SB 90, Florida's long history of imposing racially discriminatory voting restrictions, and the fact that many of SB 90's provisions target voting practices successfully employed during the 2020 election by Black, Latino, and disabled voters or organizations such as Plaintiffs that mobilize or assist such voters, SB 90 was intended to and will place a discriminatory burden on voters of color, especially Black and Latino voters.

15.     Indeed, SB 90 is the classic case of "solutions in search of a problem" that has been found to indicate impermissible race-based voter suppression.  *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 238 (4th Cir. 2016).

---

[4] Patricia Mazzei & Nick Corasaniti, Florida Republicans Pass Voting Limits in Broad Elections Bill, N.Y. TIMES (Apr. 29, 2021), https://www.nytimes.com/2021/04/29/us/politics/florida-voting-rights-bill.html.

16.    This Complaint challenges the following provisions of SB 90 that, individually and cumulatively, make voting more burdensome, particularly for Black, Latino, and disabled voters:

- **Secure Drop Box Restriction** (SB 90 Section 28). Reducing the availability, hours and days of secure drop boxes, which are relied on particularly by voters who work during the day and by those seeking to avoid excessive lines at polling places.

- **Voter Registration Disclaimer** (SB 90 Section 7). Requiring third-party voter registration organizations to inform registrants, at best misleadingly, that their completed registrations might not arrive in time to be valid, a measure which will have a chilling effect on independent voter registration efforts.

- **Vote-By-Mail Application Restriction** (SB 90 Section 24). Requiring a driver's license, ID card, or social security number for requesting a mail ballot, which will reduce the availability and use of mail ballots at precisely the time other elements of SB 90 are creating obstacles to in-person voting.

- **Line Warming Restriction** (SB 90 Section 29). Barring and imposing criminal penalties for "engaging in any activity with the intent to influence or effect of influencing a voter," which will in effect ban

9

persons from providing food, blankets, water, chairs, or umbrellas or from providing translation or other assistance to voters, disproportionately Black and Latino, waiting on line to vote due to crowding at their polling places. The Line Warming Restriction also disproportionately impacts disabled voters unable to stand in line without assistance.

17.    Each of these changes individually imposes an unjustified burden on voting. Cumulatively, they impose a significant burden, in some cases leading to the wholesale disenfranchisement of voters. By restricting access to vote-by-mail ballots and restricting the availability of drop boxes, SB 90 will force more voters to the polls, on election day and during early voting times, making already long lines in Black and Latino neighborhoods even longer. At the same time, SB 90 undermines voter registration efforts and makes in-person voting more onerous by prohibiting persons (including Plaintiffs and their members) from offering food, water, or other assistance to voters standing in long lines. While for some this may be a mere inconvenience, for Black and Latino voters and members of other historically disenfranchised communities, who already must contend with unusually long lines, these impacts could be intolerable, particularly when many of the voters who relied most heavily on the methods of voting SB 90 takes away, including elderly and disabled voters, are those least able to weather long lines without

assistance.  The Florida legislature identified no state interest sufficient to justify these added burdens.

18.    In addition to impermissibly burdening voters and discriminating against voters on the basis of race or ethnicity, the challenged provisions of SB 90 violate numerous provisions of federal law. For example:

- The Vote-By-Mail Application Restriction and the Secure Drop Box Restriction place disproportionate burdens on voters of color, intentionally denying them an equal opportunity to participate in the political process.  They thus violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution.

- The Line Warming Restriction interferes with the ability of voters, like Plaintiffs' members, to seek assistance in voting from a person of their choosing.  It thus violates Section 208 of the Voting Rights Act, 52 U.S.C. § 10508. It also violates the First Amendment to the U.S. Constitution, by limiting protected election-related expressive activities.  *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988).

- Even apart from their racially discriminatory motive and impact, the challenged provisions of SB 90 also place an unjustified burden on the ability of all Florida voters to exercise their fundamental right to vote.

11

Any state restriction on the right to vote "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (internal quotation marks omitted). SB 90 imposes severe burdens on the right to vote without any legitimate justification, and thus violates the First and Fourteenth Amendments to the Constitution.

- The Voter Registration Disclaimer constitutes an infringement on free speech, prohibited by the First Amendment to the Constitution, by compelling Plaintiffs and similar organizations to make statements to potential registrants that they do not believe and that will undermine their efforts to engage voters in the political process. Laws regulating protected speech or compelling speech are subject to strict scrutiny, but the Voter Registration Disclaimer is not narrowly tailored and does not serve any compelling state interest.

19.    For all of these reasons, SB 90 violates the U.S. Constitution and federal law and endangers the right to vote of all Floridians, and in particular voters of color. The Court should enjoin the Vote-By-Mail Application Restriction, the Secure Drop Box Restriction, the Voter Registration Disclaimer, and the Line Warming Restriction.

## THE PARTIES

### Plaintiffs

20.    Plaintiff FLORIDA RISING TOGETHER ("FRT") is a 501(c)(3) organization with a mission to increase the voting and political power of marginalized and excluded constituencies.  FRT's principal office is in Miami, and the organization engages with voters throughout the state, most extensively in Orange, Hillsborough, Osceola, Pinellas, Miami-Dade, Broward, Palm Beach, Duval, Leon, Gadsden, and Seminole Counties.  Founded in January 2021 as the merger and continuation of New Florida Majority and Organize Florida, FRT's central focus is to expand democracy by ensuring that every eligible voter in the state, regardless of party affiliation, is able to exercise his or her fundamental and constitutionally protected right to vote.  To achieve its goal, FRT conducts massive voter registration, voter education, voter engagement, and election protection programs.

21.    During the 2020 primary and general elections, FRT's predecessor organization, New Florida Majority, ran the largest independent voter education and mobilization campaign in Florida led by Latina and Black women. Specifically, the organization engaged in 18 million calls, had over 1 million conversations with voters, sent over 3 million pieces of voter education mail, placed approximately 9,000 radio ads with voting information in English, Spanish, and Haitian Creole, and

turned out more than 2 million voters of color, 44% of whom chose to vote by mail. FRT's 2020 voter education materials highlighted information related to drop boxes including, but not limited to, their locations, hours of operation, and how to use them.

22.    FRT aims to rapidly expand outreach to voters to educate them on SB 90's sweeping changes to Florida's election laws.  FRT is concerned that the communities it serves will be confused about how to participate in future elections, and may even refrain from voting altogether.  As a result, FRT is already planning to shift how it engages with voters at every stage of the voting process, from registration to education and assistance at polling places.  This will require new voter education materials as well as updated training sessions for staff and volunteers in its election protection program, all of which will entail significant time to develop and costs to promulgate.

23.    Plaintiff FAITH IN FLORIDA is a 501(c)(3) organization with a mission to build a powerful, multicultural, nonpartisan network of over 800 congregation community organizations in Florida that address systemic racial and economic issues, including voter education, voter registration, and voter engagement throughout the State of Florida.

24.    Faith in Florida has staff organizers and regularly conducts voting-related activities in 30 counties throughout the state, including Miami-Dade, Broward, Palm Beach, Leon, and Hillsborough Counties, and maintains satellite

offices in Miami and Miami Gardens.  The organization also conducts legislative advocacy to protect and advance voting rights throughout the state.

25.     In prior elections, including in 2020, Faith in Florida worked very closely with SOEs to make sure that drop boxes were placed in practical and accessible locations for community members.  In addition, Faith in Florida widely distributed information on delivering ballots and where drop boxes were located. Faith in Florida also provided ponchos and umbrellas to voters in lines during prior elections, including in 2020.  The organization also provided food and drinks to voters who waited in particularly long lines to make their experiences more comfortable.  These activities are intended to encourage voters to remain in line and cast their ballots, but Faith in Florida does not seek to influence how voters vote.

26.     Due to SB 90, Faith in Florida will have to start its voting work earlier, more than double its voter education and voter engagement efforts, and update all of its voter education materials.  For example, it will expand from four months of voter education to a full year, its staff will have to triple to cover more ground in less time, and it will have to create new voter education materials, including bilingual materials, and trainings, to include training of new staff and current staff on the changes in the law.  And SB 90 will significantly interfere with and may altogether preclude Faith in Florida's voter assistance efforts to voters in long lines.

27.     Plaintiff UnidosUS is a nonprofit organization and the nation's largest Latino civil rights and advocacy organization.  UnidosUS has offices in Florida and has 17 member-affiliate organizations based or working in Broward, Collier, DeSoto, Flagler, Glades, Hardee, Hendry, Highlands, Hillsborough, Indian River, Lake, Lee, Manatee, Marion, Miami-Dade, Monroe, Palm Beach, Pasco, Polk, Putnam, Orange, Osceola, Sarasota, Seminole, and Volusia Counties.  UnidosUS works to build a stronger America through a unique combination of research, advocacy, programs, and supporting the work of community-based Affiliate member organizations across the State of Florida and the nation, to simultaneously challenge the social, economic, and political barriers that affect Latinos in the United States. UnidosUS also conducts voter registration by community canvassing in high-traffic commercial areas or events, placement of digital ads, mailers and contacting voters directly.   In addition, UnidosUS provides support and technical assistance to Affiliated non-profit members to conduct voter registration with their existing members.

28.     During the 2020 elections, UnidosUS was responsible for 71,160 voter registrations, 25,459 vote-by-mail ballots cast and 60,012 pledges to vote. UnidosUS's Get Out the Vote campaign during the 2020 elections resulted in 167,784 (c)(3) mailers, 208,069 vote reminder telephone calls, 251,174 SMS texts reminders and 38,854 vote-by-mail chase calls.   UnidosUS's voter education

program included providing ballot box location information to voters needing to return vote-by-mail ballots as well as direct mailing over 10,000 vote-by-mail request forms directly to voters who could not navigate their respective county websites to request a vote-by-mail ballot online. UnidosUS's activities targeting vote-by-mail education and mobilization toward Latino communities resulted in over 29,000 vote-by-mail requests from voters. As a result of Defendants' failure to ensure access to vote-by-mail ballots and assistance to voters waiting in line with a specific focus on limited English proficient voters, UnidosUS is diverting its limited resources from other projects to translate instructions to voters regarding the changes made by the passage of SB 90 and provide Spanish-language assistance to Spanish-speaking Florida voters.

29.   Plaintiff EQUAL GROUND EDUCATION FUND ("EG") is a 501(c)(3) organization with a mission to register, educate, and increase engagement among Black voters in Florida's I-4 corridor. EG's principal office is in Orlando, but the organization engages voters throughout the state, most extensively in Orange, Pinellas, Seminole, and Volusia Counties. Founded in May 2019 to give the rising American electorate greater influence on issues that affect them, EG focuses on ensuring equal access to democracy in underserved communities. To achieve its goal, EG conducts extensive voter education, voter registration, and voter

engagement work directly through its staff and in alliance with hundreds of faith partners throughout the state.

30.     During the 2020 primary and general elections, EG launched extensive voter registration and voter engagement efforts in numerous counties across the state of Florida.  Specifically, EG collected 2,800 in-person voter registration applications in a one-month span before the COVID-19 pandemic halted its canvassing operation. The organization continued to facilitate online voter registration and provide voter education by partnering with faith-based institutions and organizations.  EG also worked with partners to host a robust Souls to the Polls program in 21 Florida counties.  Through this program, EG coordinated drop box locations and availability for people with limited access to drop box options.  EG also transported voters to polling precincts and provided food, music, and live entertainment near polling locations to assist voters waiting in long lines.

31.     Due to SB 90, EG is currently strategizing shifts in staffing, funding, and programming.  It anticipates creating new voter education guides, staff trainings, and community events to update voters on the changes wrought by SB 90.  EG also foresees SB 90's restrictions on drop boxes and voter assistance near a polling place having a massive impact on its Souls to the Polls programming.  As a result, the organization is planning to significantly alter its Souls to the Polls efforts and line warming traditions.

32.    Plaintiff HISPANIC FEDERATION ("HF") is a 501(c)(3) nonprofit, nonpartisan, community organizing, and advocacy organization with an office in central Florida.  HF's mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions through work in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement.  HF works locally, state-wide, and nationally to strengthen Latino nonprofits, promote public policy advocacy, and bring to scale a portfolio of innovative community programs through three essential service pillars: membership services, advocacy services, and community assistance programs.

33.    HF carries out its voter engagement work through all three essential service pillars.  This work assists the Hispanic electorate register to vote, apply for vote-by-mail ballots, and cast ballots during election day and early voting.   In addition, HF assists Florida voters waiting in long lines within 150 feet of poll sites and early voting locations to engage them while waiting to fulfill their civic duty despite extended wait times and any disabilities they may have.  The voter assistance strategy includes voter protection, specifically in communities of color and low voting propensity, and provides entertainment for families with children, snacks, soft drinks, water, and phone charge stations.  HF's Florida voter engagement work is

conducted in Duval, Alachua, Seminole, Volusia, Lake, Orange, Osceola, Polk, Hillsborough, Pinellas, Manatee, Sarasota, Broward, Miami-Dade Counties.

34.     In furtherance of its mission, HF fortifies a network of grassroots nonprofits through capacity-building grants that support core operational needs, graduate-level management classes, leadership development trainings, board recruitment and placement, executive fundraising workshops, and other technical assistance seminars.  HF's nonprofit members use this support to assist Hispanic voters with registering to vote, applying for and delivering vote-by-mail ballots, and other voter engagement activities.  For example, the voter engagement work of HF's nonprofit partner, Justice should be for All, assists senior voters, many of whom no longer drive and therefore lack a Florida driver's license and have difficulty waiting in long lines to vote without assistance.

35.     HF's Florida voter engagement work is focused on advancing the interests and aspirations of Latinos and their community-based organizations through coalition-building, policy research, public education, advocacy, voter mobilization, and regranting.  HF has offered more than 100 civic engagement trainings for Latino agencies, including trainings in Florida, so that they can become community-based centers of voter registration and outreach.  HF launched a partnership program in 2012, *Movimiento Hispano*, a collaborative representing

nearly 1,000 councils, labor chapters, and community-based organizations that are able to reach and conduct voter registration, education, and turnout.

36.     HF's community assistance program provides direct voter engagement services to ensure all citizens are actively engaged in our democratic process.  HF's non-partisan efforts not only increase Latino voter registration and participation throughout the nation but also encourage active involvement in the issues that affect Latino voters, their families, and their neighborhoods.  HF carries out this work through promoting and staffing a voter information hotline, operating a team of canvassers, sending voter education text messages about the vote-by-mail process, having election protection workers on the ground during early voting and on election day, and assessing the voting habits and obstacles of the Latino electorate.  For example, HF observed long lines in Hispanic precincts in Miami-Dade, Orange, and Broward counties during the 2018 election, long lines in Miami-Dade County in the 2020 election and predicts that SB 90 will result in Hispanic precincts having longer lines in future elections, especially due to new restrictions on drop box availability. HF also observed an increase in Hispanic vote-by-mail use in 2020 compared to 2018.  HF's "*Get Out the Vote*" campaigns explain the importance of voting and encourage Latinos to head to the polls.

37.     HF works to mobilize and educate Hispanic voters about the voting process and devotes staff and financial resources toward ensuring that the Hispanic

electorate has access to information necessary to vote.  In response to SB 90, HF will dedicate a portion of its limited staff time and resources to reeducating voters on how to overcome new restrictions on requesting and casting vote-by-mail ballots despite new identification requirements and restrictions on drop box availability, and on overhauling, and in some cases, dismantling its programming as a result of new restrictions on assisting voters.  HF will also have to retrain its workers on new disclaimer language when registering voters and on new restrictions for assisting voters within 150 feet of polling sites and drop boxes.  To do so, HF will have to divert funds and staff time from its other election activities toward educational activities such as sending additional rounds of text messages and revising educational materials about the vote-by-mail process to include the new restrictions on applying for vote-by-mail ballots and new limitations on the availability of drop boxes, holding additional community educational forums, and providing one-on-one support to voters who interact with its hotline; and this will still not be enough to reeducate the community on the changes that have been made to the traditional system that was in place for decades.  For example, Hispanic seniors and Puerto Rican voters in Florida are less likely to possess a Florida driver's license or state ID card, or to possess or know their social security number, which will require more of HF's voter education and outreach resources to overcome the new restrictions on requesting vote-by-mail ballots.

38.    In past elections, HF's voting assistance program has included providing funding to partner organizations to provide language assistance to Spanish-speaking voters waiting in line to vote at polling sites and early voting locations.   The Line Warming Restriction in SB 90 will require HF to make numerous changes to its voting assistance program, including potentially increasing the resources devoted to its voter assistance hotline and using canvassers to promote the hotline so voters can call HF agents to get answers to voting-related questions in lieu of having someone accompany them to the polling place, and diverting resources and training time to train canvassers in the new rules and restrictions on voter assistance.

39.    Plaintiff PODER LATINX is a fiscally sponsored project of Tides Advocacy, a California nonprofit public benefit corporation.  Poder Latinx is a social justice, organizing, and civic engagement organization whose mission is to build a political wave where Latinx communities, inclusive of immigrants and people of color, are decision-makers in our democracy and play a vital role in the transformation of our country.  Poder Latinx works locally and statewide in Florida, Georgia, and Arizona to expand the electorate by conducting year-round civic engagement activities, community empowerment and leadership development and issue-based organizing with a focus on three key issues: immigrant justice, climate justice and economic justice.  Poder Latinx carries out its mission to expand the

23

electorate by registering people to vote through in-person activities, via digital campaigns, and telephone banking. Poder Latinx's civic engagement work is focused on educating voters on how to vote, the accepted types of identification necessary to vote, how to request vote-by-mail ballots and how to return their ballots. Poder Latinx's voter registration, voter education and civic engagement work is carried out throughout the state of Florida with a specific focus on Orange, Osceola, Polk, Lake, Volusia, Seminole, Lee and Palm Beach Counties.

40.     Poder Latinx also engaged in election protection activities by having bilingual poll monitors in Orange and Osceola County at precincts with high populations of Latino voters during the 2020 elections. Poder Latinx's election protection program included providing "Know Your Rights" information to voters, handing out food and drinks to voters waiting in line and providing assistance to voters with a special focus on assisting Spanish-language dominant voters. Poder Latinx's "Get Out the Vote" campaign focuses on the importance of voting and ensuring that voters know how to vote.

41.     During the 2020 election cycle, Poder Latinx's civic engagement program targeting voters was responsible for 1,560,722 calls, 4,873,989 text messages, and registered over 40,516 new voters in Florida. Poder Latinx focused on vote-by-mail ballot education during the 2020 election, because many voters were unable to leave their homes due to the COVID-19 pandemic and due to age or

disability had to learn for the first time how to request a ballot and had to rely on community or family members to drop off their ballots.  Poder Latinx's voter education work was also aimed at ensuring voters knew about ballot box availability. Poder Latinx is particularly concerned about how the lack of access to ballot boxes will impact Florida communities because so many voters used this option during the 2020 election.

42.    In response to the changes made by SB 90, Poder Latinx will have to divert limited resources and staff to update their staff training materials as well as update materials to educate voters about the changes made to the law that will impact ballot delivery options and ballot box access and require the use of Florida identification numbers or social security numbers to request a vote-by-mail ballot. In addition, Poder Latinx is grappling with how to address the new requirement to provide voters notice of a potential delay in delivery of a voter registration application, which will undoubtedly require additional training and resources to counter the chilling effect this required notice will have on voters seeking to register to vote for the first time.

**Defendants**

43.    Defendant LAUREL M. LEE is sued in her official capacity as Florida Secretary of State.  Defendant Lee is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law.  Pursuant to Fla. Stat. § 97.012 (2020), the

Secretary of State is the chief elections officer of the State and is responsible for the administration of state laws affecting voting, including the registration and oversight of third-party voter registration organizations. *See* Fla. Stat. § 97.0575 (2020). Defendant Lee receives "administrative support" from the Florida Department of State's Division of Elections "to ensure that Florida has fair and accurate elections."[5] The Division of Elections, established by statute as a division of the Department of State, Fla. Stat. § 20.10(a)(2) (2020), is charged with implementing and enforcing Section 28 of SB 90, the Secure Drop Box Restriction, Fla. Stat. Ann. § 101.69(3) (West 2021). Accordingly, Defendant Lee, through the Division of Elections, is responsible for assessing fines against SOEs who violate Section 28's restrictions on drop-box availability.

44.     Defendant PENNY OGG is the Supervisor of Elections for Highlands County and is named herein in her official capacity as Supervisor of Elections.  As Supervisor of Highlands County, Defendant Ogg is charged by law with enforcing the Secure Drop Box Restriction, Fla. Stat. Ann. 101.69(2) (West 2021), with enforcing the identification requirements in the Vote-By-Mail Application Restriction, Fla. Stat. Ann. § 101.62 (West 2021), and with enforcing the Line Warming Restriction, Fla. Stat. Ann. § 102.031(4)(c) (West 2021).  Pursuant to

---

[5] Fla. Dep't of State, Div. of Elections, *About Us*, https://dos.myflorida.com/elections/about-us/ (last visited May 17, 2021).

Federal Rule of Civil Procedure 23, Defendant Ogg is sued as a representative of a class of all Florida Supervisors of Elections.

45.     Defendant SHIRLEY GREEN KNIGHT is the Supervisor of Elections for Gadsden County and is named herein in her official capacity as Supervisor of Elections.  As Supervisor of Highlands County, Defendant Knight is charged by law with enforcing the Secure Drop Box Restriction, Fla. Stat. Ann. 101.69(2) (West 2021), with enforcing the identification requirements in the Vote-By-Mail Application Restriction, Fla. Stat. Ann. § 101.62 (West 2021), and with enforcing the Line Warming Restriction, Fla. Stat. Ann. § 102.031(4)(c) (West 2021). Pursuant to Federal Rule of Civil Procedure 23, Defendant Knight is sued as a representative of a class of all Florida Supervisors of Elections.

46.     Defendant MARY JANE ARRINGTON is the Supervisor of Elections for Osceola County and is named herein in her official capacity as Supervisor of Elections.  As Supervisor of Osceola County, Defendant Arrington is charged by law with enforcing the Secure Drop Box Restriction, Fla. Stat. Ann. 101.69(2) (West 2021), with enforcing the identification requirements in the Vote-By-Mail Application Restriction, Fla. Stat. Ann. § 101.62 (West 2021), and with enforcing the Line Warming Restriction, Fla. Stat. Ann. § 102.031(4)(c) (West 2021). Pursuant to Federal Rule of Civil Procedure 23, Defendant Arrington is sued as a representative of a class of all Florida Supervisors of Elections.

47.    Defendant CRAIG LATIMER is the Supervisor of Elections for Hillsborough County and is named herein in his official capacity as Supervisor of Elections.  As Supervisor of Hillsborough County, Defendant Latimer is charged by law with enforcing the Secure Drop Box Restriction, Fla. Stat. Ann. 101.69(2) (West 2021), with enforcing the identification requirements in the Vote-By-Mail Application Restriction, Fla. Stat. Ann. § 101.62 (West 2021), and with enforcing the Line Warming Restriction, Fla. Stat. Ann. § 102.031(4)(c) (West 2021). Pursuant to Federal Rule of Civil Procedure 23, Defendant Latimer is sued as a representative of a class of all Florida Supervisors of Elections.

## JURISDICTION AND VENUE

48.    Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by Sections 2 and 208 of the Voting Rights Act, 52 U.S.C. §§ 10301, 10508; and under the First, Fourteenth and Fifteenth Amendments of the United States Constitution.

49.    The Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States, and specifically, laws and Constitutional provisions protecting the right to vote.  Plaintiffs bring this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States and federal law.  Plaintiffs bring this

action to secure equitable relief under federal law providing for the protection of voting rights, pursuant to 28 U.S.C. §§ 2201 and 2202.

50.     This Court has personal jurisdiction over Defendants, who are sued only in their official capacities as officers of the State of Florida or its political subdivisions.

51.     Venue is proper in this Court under 28 U.S.C. § 1391(b).  Defendant Lee resides and does business in Leon County, Florida and Defendant Knight resides and does business in Gadsden County, Florida.  In addition, Plaintiffs Florida Rising Together, Faith in Florida, and Hispanic Federation conduct voter engagement activities in this district that are now prohibited or restricted as a result of the enactment of SB 90, and thus, a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

52.     This Court has the authority to enter a declaratory judgment and to provide preliminary injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

### A.     Florida's History of Racially Discriminatory Voting Practices

53.     The passage of SB 90 is the latest chapter in Florida's long history of racially discriminatory voting restrictions that dates back over 100 years.  As federal courts in Florida have repeatedly recognized, "Florida has a history of discrimination

against Black citizens with respect to the franchise." *Nipper v. Chiles*, 795 F. Supp. 1525, 1535 (M.D. Fla. 1992).  The devices employed over time "to disfranchise or discriminate against [B]lack citizens included: (1) the expungement of [B]lack voters from the voting lists in the 1880s; (2) a poll tax, enacted in 1889; (3) a multiple ballot statute, enacted in 1889; (4) the direct primary (also known as the 'white primary'), adopted in 1901, whereby [B]lacks were excluded from participating in nominating the Democratic Party candidate; and, (5) a requirement that officeholders post bonds, adopted in 1885." *Id.*

54.    As the Court stated in *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992): "A longstanding general history of official discrimination against minorities has influenced Florida's electoral process. . . . As recently as 1967, § 350.20, Fla. Stat. provided in part: 'The Florida Public Service Commissioners may prescribe reasonable rules and regulations relating to the separation of white and colored passengers in passenger cars being operated in this state by any railroad company or other common carrier.'   Additionally, § 1.01(6), Fla. Stat. (1967) provided that 'the words "Negro," "colored," "colored persons," "mulatto," or "persons of color," when applied to persons, include every person having one-eighth or more of African or Negro blood.'"

55.    Despite becoming the most urbanized southern state with the most northern immigrants by 1920, Florida remained a segregated, largely one-party

plutocracy until the early 1960s, and Black citizens remained largely disfranchised until the passage of the federal Voting Rights Act in 1965.

56.    Starting in 1972, multiple counties in Florida were required under Section 5 of the Voting Rights Act to seek federal clearance for changes to their election laws; these requirements remained in place until the Supreme Court's 2013 decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), ended the pre-clearance requirement.  Florida's racially discriminatory practices, including practices similar to those included in SB 90, required federal intervention at least five times during this period.[6]  For example, in 1985, the Department of Justice objected to a restriction on assisting voters casting absentee ballots as a violation of Section 208 of the Voting Rights Act,[7] while in 1998 the Department declined to preclear a requirement to include a social security number on submitted absentee ballots because of the requirement's racially discriminatory impact.[8]  And in 2012, the United States sued the state to stop a voter purge that this Court found likely discriminated against

---

[6] Civil Rights Div., U.S. Dep't of Justice, *Jurisdictions Previously Covered by Section 5*, https://www.justice.gov/crt/jurisdictions-previously-covered-section-5 (last updated Sept. 11, 2020).

[7] Letter from W. Bradford Reynolds, Assistant Attorney General, Civil Rights Div., U.S. Dep't of Justice, to Jim Smith, Attorney General, State of Florida (Jan. 15 1985), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1010.pdf.

[8] Letter from Bill Lane Lee, Acting Assistant Attorney General, Civil Rights Div., U.S. Dep't of Justice, to Robert A. Butterworth, Attorney General, State of Florida (Aug. 14, 1998), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1030.pdf.

naturalized citizens. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012).

57.     Even while subject to Section 5's pre-clearance requirement, the state continued to block Black residents from exercising political power by such devices as at-large elections.  Since 1983, scores of legal actions have been brought against the state, county, or municipal governments of Florida, under the Fourteenth Amendment, the Fifteenth Amendment, and/or the Voting Rights Act.  At least 57 such actions have resulted in findings of discrimination, including 37 under Section 2 of the Voting Rights Act and six under Section 5.

58.     The new century did not bring any abatement in Florida's efforts to discriminate against Black residents.  For example, in 2000 the state improperly removed at least 1,100 eligible voters from the voting rolls after identifying them as convicted felons.[9]  As a result, many eligible voters were turned away at the polls.[10] Statewide, of the voters dropped from the rolls in this voter purge, 41% were Black. In Miami-Dade County, "more than 65 percent of the names on the purge list were Blacks, who represented only 20.4 percent of the population."[11]  After a lawsuit, a

---

[9] *Study Shows 1,100 Voters Wrongly Purged from Rolls*, Tampa Bay Times (Sept. 9, 2005) https://www.tampabay.com/archive/2001/05/27/study-shows-1100-voters-wrongly-purged-from-rolls.

[10] Katie Sanders, *Florida Voters Mistakenly Purged in 2000*, Tampa Bay Times (June 14, 2012), https://www.tampabay.com/news/politics/stateroundup/florida-voters-mistakenly-purged-in-2000/1235456/.

[11] U.S. Comm'n on Civil Rights, *Voting Irregularities in Florida During the 2000 Presidential Election* (June 2001), https://www.usccr.gov/pubs/vote2000/report/exesum.htm.

court ordered Florida to revamp its program for identifying potential voters with felony convictions, and to restore hundreds of voters to the voting rolls.[12]

59.    Indeed, ever since the chaos of the 2000 presidential election, Florida has been ground zero for restricting access to the polls. After Congress passed the Help America Vote Act of 2002, 42 U.S.C. § 15301 *et seq*., ostensibly intended to streamline statewide voter registration systems, Florida implemented rigid matching requirements for voter registration that could pointlessly disenfranchise eligible voters based on a typo or other minor mismatch error.  In 2006 and 2007, Florida's law disenfranchised tens of thousands of otherwise eligible voters, disproportionately voters of color.  *See Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1176 (11th Cir. 2008) (Barkett, J., concurring in part and dissenting in part).  Even though Latino communities comprised only 15 percent of the applicant pool and Blacks only 13 percent, 65 percent of the rejected applicants were Latino (39 percent) or Black (26 percent). *See id.* at 1176 n.4.

60.    While there were some reforms in the early 2000s (such as expansions in early voting and court injunctions allowing increased opportunities for voter registration, which allowed Black and Latino voters to vote in high numbers), those

_____

[12] Katie Sanders, *Florida Voters Mistakenly Purged in 2000*, TAMPA BAY TIMES (June 14, 2012), https://www.tampabay.com/news/politics/stateroundup/florida-voters-mistakenly-purged-in-2000/1235456/.

measures quickly came under attack once it became clear that voters of color were making use of them.

61.     In particular, in 2008, Black and Latino voters had record turnout, and Black voters used early voting at high rates: "More than half of African-American votes in Florida were cast during the early voting period" in 2008.[13]

62.     Florida lawmakers responded in 2011 with HB 1355, which cut early voting—and eliminated early voting the final Sunday before election day, when "Souls to the Polls" programs had expanded Black voter turnout.  HB 1355 also placed onerous restrictions on third party voter registration efforts and created additional hurdles for voters who had moved—measures that all were intended to have and had a disparate impact on voters of color.  Invoking the then-active Voting Rights Act preclearance requirement, the United States Department of Justice successfully moved to block the rules from taking effect in Collier, Hendry, Hardee, Hillsborough, and Monroe Counties.  *See Florida v. United States*, 885 F. Supp. 2d 299, 303, 305-06 (D.D.C. 2012) (per curiam) (holding that "the State has failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters").

---

[13] Michael Ellement, Note, *Blocking the Ballot: Why Florida's New Voting Restrictions Demonstrate A Need for Continued Enforcement of the Voting Rights Act Preclearance Requirement,* 62 CATH. U. L. REV. 541, 556 (2013).

63.    Social scientists concluded that HB1355 resulted in a precipitous drop in voter registrations leading into the 2012 elections, particularly among Black voters.[14]

64.    Florida's voting laws continue to show a particularized pattern of disenfranchisement of voters. *See Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1326-27 (11th Cir. 2019) (finding Florida's signature match requirement likely unconstitutional and upholding a district court injunction allowing up to 48 hours for a voter to cure a signature mismatch); *Rivera Madera v. Detzner*, 325 F. Supp. 3d 1269, 1278-84 (N.D. Fla. 2018) (requiring Florida to provide Spanish language voting materials, as its failure to do so violated the Voting Rights Act); *League of Women Voters*, 314 F. Supp. 3d at 1210 (finding Florida's bar on use of university or college campuses as early voting sites unconstitutional).

65.    And when Florida's citizens voted overwhelmingly to end felony disenfranchisement—a relic of the Reconstruction Era that disproportionately impacts Black and Latino voters—the Florida legislature quickly took steps to limit the vote's impact and preserve as much as possible the racially discriminatory practice.   Prior to 2019, Florida's constitution permanently disenfranchised all citizens who had been convicted of any felony offense unless the Clemency Board

---

[14] Michael C. Herron and Daniel A. Smith, *The Effects of House Bill 1355 on Voter Registration in Florida*, 13 ST. POL. & POL'Y Q. 279, 297 (2013).

restored their voting rights—making Florida one of only four states to impose a lifetime voting ban for a felony conviction.  Disenfranchisement based on criminal conviction, which has been called the "new Jim Crow," is "inextricably tied to the United States' history of racial discrimination," and Florida adopted this constitutional provision "in the post-Civil War era as a means to disenfranchise former slaves who had been granted the right to vote under the Reconstruction Amendments."[15]  By 2016, the provision disenfranchised an estimated 1.6 million Floridians. In 2018, Florida voters addressed this longstanding discrimination by approving Amendment 4, which automatically restored voting rights to as many as 1.4 million Floridians who had completed the terms of their sentence.

66.     The Florida legislature responded with SB 7066, prohibiting returning citizens from voting unless they pay off all legal financial obligations imposed by a court pursuant to a felony conviction, even if they cannot afford to pay.  According to a 2020 report issued by The Sentencing Project, nearly 900,000 Floridians who would otherwise have been eligible to vote under Amendment 4 were disenfranchised by the law.  In all, more than 1.1 million Floridians are unable to vote because they have felony convictions or owe court debts, making Florida the nation's disenfranchisement leader.  Reportedly, about 15 percent of the state's

---

[15] Dalia Figueredo, *Affording The Franchise: Amendment 4 & The Senate Bill 7066 Litigation*, 72 FLA. L. REV. 1135, 1136 (2020).

Black voting-age population is disenfranchised because of a conviction history, compared to about 6 percent for the state's non-Black population.[16]

67.     Until very recently, the ability of Black voters and other qualified voters in Florida to cast ballots was also threatened by unchecked discretion held by election officials to reject vote-by-mail ballots from eligible voters deemed "noncompliant."  As this Court has held, this absolute power to throw out votes was facially unconstitutional because it unduly burdened the fundamental right of Florida citizens to vote and have their votes counted.  *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022 (N.D. Fla. 2018) ("The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes constitutional muster.  The answer is simple.  It does not."), *appeal dismissed as moot*, 950 F.3d 790 (11th Cir. 2020).

68.     In sum, the Florida legislature has a long and sordid history of passing legislation that is intended to disenfranchise or severely burden Black and Latino voters.  The enactment of disenfranchising legislation has frequently been in direct

---

[16] Christopher Uggen et al., The Sentencing Project, *Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Conviction* 17 (Oct. 15, 2020), https://www.sentencingproject.org/wp-content/uploads/2020/10/Locked-Out-2020.pdf#page=17.

response to successful efforts of Black and Latino voters to mobilize and turn out for elections.

**B.      Legislative History of SB 90**

69.      The Florida 2020 General Election was heralded for being one of the smoothest elections in Florida's history by state officials.

- According to the Florida Association of Supervisors of Elections, "In 2020, Florida was universally praised for our exemplary conduct of elections – from the very highest offices at the federal and state level to our most important stakeholders, voters."[17]

- According to Governor Ron DeSantis, the November 2020 General Election in Florida was "the smoothest, most successful election of any state in the country."[18]

- According to Representative Blaise Ingoglia: "In [the] last election cycle Florida administered one of the smoothest elections.   It was

---

[17] Fla. Supervisors of Elections, Florida Supervisors of Elections Statement on PCB-PIE 21-05 (Mar. 22, 2021), https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/FSE_Statement_032221.pdf.

[18] Press Release, Governor Ron DeSantis, Governor Ron DeSantis Highlights Proposed Legislation to Strengthen Election Integrity and Transparency Measures (Feb. 19, 2021), https://flgov.com/2021/02/19/governor-ron-desantis-highlights-proposed-legislation-to-strengthen-election-integrity-and-transparency-measures/.

heralded as the standard on how elections should be run across the United States."[19]

- According to Secretary of State Laurel Lee, the 2020 General Election in Florida "ran as smoothly as possible and inspired confidence on the part of Florida's voters."[20]

- According to Senator Dennis Baxley: "We have a very high customer satisfaction rate right now with Floridians on how the election was run."[21]

70.    Among other successes of the 2020 election in Florida, Black and Latino voters achieved record turnout due to the massive investment of time and resources by organizations such as Plaintiffs.  A record 1.38 million Black voters and 1.8 million Latino voters participated in the 2020 General Election.

71.    In response to this unprecedented Black and Latino turnout, and in spite of the fact that Florida's election was well-administered, safe and secure, the Florida legislature, with the support of Florida's governor, began work to change Florida's election procedures to make it harder for Black and Latino persons to vote.

---

[19] Fla. H.R. Comm. on Pub. Integrity and Elections (Apr. 19, 2021).

[20] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021).

[21] *Id.*

72.    The bill that became SB 90 began as two separate bills to revise the electoral code in the wake of the 2020 elections.  SB 90 was introduced in the Florida Senate on February 3, 2021, and HB 7041 was introduced in the Florida House of Representatives March 23, 2021.

73.    Throughout the debate on SB 90 and HB 7041, legislators were expressly warned that the bills would create obstacles to voting and would suppress votes:

- Senator Randolph Bracy warned his colleagues that Florida "has had the worst record of voter suppression in the country by far," and characterized SB 90 as an effort by "a party that's in control doing whatever they can to keep it." [22]

- Senator Bracy further warned that SB 90 "is clearly going to reduce vote-by-mail in Democratic counties."[23]

- Senator Perry Thurston described the bill as part of Florida's "sordid history of us trying to stop people from voting, trying to make it harder for people to vote."[24]

---

[22] *Id.*

[23] *Id.*

[24] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

40

- The Florida Supervisors of Elections warned lawmakers that "several of the proposed provisions in the bill will negatively impact the voter experience" and that "calling for unnecessary election reforms . . . risks destroying the voter confidence that we have worked so hard to earn."[25]

74.    Several legislators specifically advised their colleagues that the bills were targeting voting practices increasingly relied upon by Black and Latino voters:

- Senator Bobby Powell advised the Senate Rules Committee that the restrictions on voting by mail would impact Black voter turnout.[26]

- Senator Lori Berman, during Senate floor debate on SB 90, cited analysis of Florida voting data from the Stanford-MIT Health Elections Project that concluded that Black voters were the group with the greatest increase in mail voting in the 2020 elections, and warned that the bill would have a "disparate impact on Black voters."[27]

- Senator Victor Torres warned that as a result of SB 90: "Seniors, minority groups including those of the Latino community, and residents

---

[25] Fla. Supervisors of Elections, Florida Supervisors of Elections Statement on PCB-PIE 21-05 (Mar. 22, 2021), https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/FSE_Statement_032221.pdf.

[26] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

[27] Fla. S. Floor Debate (Apr. 22, 2021).

who have physical disabilities will find more barriers to casting their vote and less opportunities to participate in the election process."[28]

- Senator Gary Farmer told the Senate Committee on Ethics and Elections that the identification requirements in SB 90 would disproportionately impact Black and Latino voters because they tend to disproportionately lack the required identification.[29]

- Representative Christopher Benjamin pointed out that the restrictions on line warming and collecting ballots would have a disparate impact on the Black community.[30]

75.    Numerous advocacy organizations also advised the legislature of the discriminatory impact of the bill. For example:

- Ida V. Eskamani, on behalf of Plaintiff Florida Rising Together, informed the Senate Government Oversight Committee that SB 90 represented "one of the most serious attempts to restrict the rights of certain Americans to vote since the days of Jim Crow," and described the bill as "voter suppression" directed at "Seniors and veterans,"

---

[28]Fla. S. Comm. on Ethics and Elections Hearing (Apr. 26, 2021).

[29] *Id.*

[30] Fla. H.R. Floor Debate (Apr. 28, 2021).

"people with disabilities", "folks with health ailments, and also folks that are already marginalized."[31]

- LatinoJustice and Advancement Project wrote to the Florida Senate April 26, 2021, advising that the proposals to require identification for vote-by-mail applications, the restrictions on line warming, and the restrictions on returning ballots would disproportionately impact Black and Latino voters.

- Brad Ashwell of All Voting is Local testified that SB 90 "really can't be seen as anything other than an attack on voting rights" and pointed out that "seniors and veterans with disabilities … will be disproportionately impacted by this bill."[32]

- Carrie Boyd, of SPLC Action Fund, informed the Senate Rules Committee that SB 90 "will undoubtedly make it extremely difficult for older people and people with disabilities to vote."[33]

76.    In both the House and the Senate, legislators were presented with amendments that would have reduced the racially discriminatory impact of SB 90. For example:

---

[31] Fla. S. Comm. on Gov't Oversight and Accountability Hearing (Mar. 10, 2021).

[32] *Id.*

[33] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

- Senator Gary Farmer offered an amendment in the Senate Rules Committee that would have deleted the ban on providing line assistance, allowing the practice of "giving water or sustenance to those who are waiting in line."[34]

- Representative Omari Hardy offered an amendment allowing voters to use their name, address, and date of birth to obtain a mail ballot.[35]

- Representative Dotie Joseph offered an amendment to allow completed ballots to be returned by anyone registered to vote at the same address as the voter.[36]

- Representative Anna Eskamani offered an amendment that would have allowed line warming by volunteers with a nonprofit organization or civic group.  Another amendment would have relaxed the restrictions on returning sealed, completed, mail ballots. [37]

- Several amendments were offered to reduce the restrictions on secure drop boxes.

All of these amendments were defeated.

---

[34] *Id.*

[35] Fla. H.R. Floor Debate (Apr. 27, 2021).

[36] Fla. H.R. Floor Debate (Apr. 29, 2021).

[37] *Id.*

44

77.    The Florida legislature's decision to change Florida's election laws, despite the fact that those laws succeeded in enabling a safe and secure 2020 election, was not made in a vacuum.  Legislatures across the country, particularly legislatures with Republican majorities, began in the immediate aftermath of the 2020 election to  debate new laws that would make voting more difficult, particularly for Blacks, Latinos, and other minorities.  The backdrop for these efforts was false accusations and wild conspiracy theories that spread both during and after the 2020 November election, almost all of which were aimed at disputing the validity of votes made in Black, Latino, and other minority communities.

78.    Florida was no exception.  The Florida legislature hurriedly began to develop SB 90 notwithstanding that Donald Trump won Florida and in the absence of any credible allegations of voter fraud in the state.  Indeed, the sponsors of SB 90 explicitly stated that the bill was motivated, not by issues that arose in the 2020 Florida election, but by the unsupported allegations of fraud in other parts of the country.  Senator Baxley stated at one hearing that "We are doing this bill because it becomes clear as you look across the country that there is a lot of confusion from many people on different fronts."[38]  Senator Baxley added "We had a lot of things

---

[38] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

happening across the country this year for whatever reasons."[39]  During full Senate consideration of SB 90, Senator Baxley explained that the bill was needed even in the absence of any Florida-specific issues to address "some [issues] going on around the country, different places, and we want to be proactive and prevent things from going awry, rather than waiting to have some kind of debacle to recover from."[40]

79.     Throughout the debate and enactment of SB 90, bill sponsors struggled to set forth a rationale justifying sweeping changes to Florida's election code.  For example:

- Bill sponsors were not able to identify any specific evidence of abuses or voter fraud that the provisions of SB 90 or HB 7041 were designed to address.

- Defendant Secretary of State Laurel Lee testified before the Senate Committee on Ethics and Elections that she was unaware of any examples of a vote-by-mail ballot being sent to the wrong individual who used the ballot to vote.[41]

---

[39] *Id.*

[40] Fla. S. Floor Debate (Apr. 22, 2021).

[41] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021).

- When challenged to identify "anybody doing irregularities to necessitate this bill," Senator Baxley did not offer any examples of such irregularities.[42]

- When asked by Senator Linda Stewart "have we ever had any widespread issues with voter fraud on the vote-by-mail ballots," Senator Baxley conceded that "I don't know of widespread complaints."[43]

80.   Senator Baxley similarly conceded that there is no problem with security of election drop boxes requiring a legislative remedy. Senator Baxley, asked to identify "a single instance of a VBM drop box being tampered with," responded: "I'm not trying to present a case that there's a problem" and "I've never made the case that there's box tampering."[44]

81.   Indeed, Senator Baxley essentially conceded that the issue SB 90 was intended to address was purely hypothetical. During one Committee hearing, Senator Randolph Bracy held a colloquy with Senator Baxley to try to clarify Senator Baxley's position on the need for SB 90:

---

[42] *Id.*

[43] Fla. S. Comm. on Gov't Oversight and Accountability Hearing (Mar. 10, 2021).

[44] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

Senator Bracy:

"I just want to clarify that you're saying that you agree that there is not a problem.  There never has been.  That is what the supervisors of elections have said and yet you believe we need to change.  Make these changes to drop boxes and the voting hours because of what could happen.  Even though there never had been a problem in the history of this state when it comes to drop boxes.  I just want to clarify that is what you're saying."

Senator Baxley:

"Substantively, yeah."[45]

82.     Representative Blaise Ingoglia, the lead House sponsor of HB 7041, who represents portions of Hernando County, similarly admitted that he knew of no instances of voter fraud, but was in favor of SB 90 regardless of the facts.  When asked if there was illegal ballot collection in Florida, Representative Ingoglia stated "I don't know, but I'm sure it was going on."  Representative Ingoglia went on to state that "Just the fact that they weren't caught doesn't necessarily mean that it's not happening."[46]

83.     Over the last decade, Florida has experienced almost no voter fraud.  According to the Heritage Foundation, since 2010, there have been only seventeen (17) criminal convictions, one (1) official finding and one (1) civil penalty for

---

[45] *Id.*

[46] Patricia Mazzei & Nick Corasaniti, Florida Republicans Pass Voting Limits in Broad Elections Bill, N.Y. Times (Apr. 29, 2021), https://www.nytimes.com/2021/04/29/us/politics/florida-voting-rights-bill.html.

election fraud.[47]  Since 2010, almost 49 million ballots have been cast, resulting in a fraud rate of 0.00000035%.  Not a single instance of voter fraud has been documented in Florida in the 2020 election.

84.     In fact, the only substantiated allegation of fraud connected with the 2020 election stems from the arrest of former Republican Senator Frank Artiles, "accused of recruiting and paying a no party candidate in Miami-Dade's Senate District 37 to siphon votes away from the Democratic candidate"—a type of fraud SB 90 does virtually nothing to address. [48]

85.     During the consideration of HB 7041, the House Public Integrity and Elections Committee surveyed all 67 County Supervisors of Elections to obtain their assessment of suspected voter fraud in Florida.  The SOEs reported 386 *suspected* cases of voter fraud over the last four years, estimated to constitute a rate of possible fraud of 0.0001%.[49]  In contrast, in Pinellas County alone, approximately 28,000 voters lack a driver's license, state ID card, or social security number on file in the voter registration system.[50]  SB 90 precludes all of these voters—in the name of

---

[47] The Heritage Found., Election Fraud Cases, https://www.heritage.org/voterfraud/search?state=FL (last visited May 17, 2021).

[48] Lawrence Mower, *Mail Ballots, Drop Boxes Targeted In Voting Bill Passed By Legislature*, MIAMI HERALD (Apr. 29, 2021), https://www.miamiherald.com/article251051919.html.

[49] Fla. S. Floor Debate (Apr. 21, 2021).

[50] Mitch Perry, *In St. Pete, Voting And Civil Rights Advocates Speak Out Against Florida Elections Bill*, BAY NEWS 9 (May 11, 2021), https://www.baynews9.com/fl/tampa/politics/2021/05/11/voting-and-civil-rights-advocates-speak-out-against-florida-elections-bill; Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

combatting this miniscule, unconfirmed threat of fraud—from obtaining a mail ballot.

## C.    SB 90 Was the Culmination of a Flawed and Rushed Process

86.    SB 90 was enacted as a result of a rushed process that afforded little opportunity for public participation.

87.    Despite the fact that the legislature met during a time of COVID restrictions, neither the House nor the Senate allowed members of the public to testify remotely from their homes.  Members of the public were required to travel to the Leon County Civic Center and testify from a remote viewing room.  During hearings in both Chambers, time for public comment was severely limited.  For example, public comment during the Senate Rules Committee consideration of SB 90 was limited to one minute per commenter, with members of the public abruptly cut off when their minute expired.[51]  Ida Eskamani, commenting on behalf of Plaintiff Florida Rising Together, was among the witnesses cut off after one minute of testimony.[52]  At the Hearing of the House Committee on State Affairs on April 19, 2021, debate on the bill was limited to 30 seconds per member, and no live public testimony was permitted at all.[53]

---

[51] Fla. S. Comm. on Rules (Apr. 14, 2021).

[52] *Id.*

[53] Fla. H.R. Comm. on State Affairs (Apr. 19, 2021).

88.     The final days of the passage of SB 90 gave way to a chaotic process that allowed little time for public testimony or for legislative consideration.  For example, at 1:33am on April 27, 2021, Rep. Ingoglia introduced a "strike all" amendment to SB 90 to be considered on the House Floor, essentially replacing the entirety of SB 90 with new and expanded text.  This amendment was considered and adopted that same day.  The debate was so rushed that legislators were afforded only a few minutes to introduce, explain, debate and vote on each proposed amendment.[54] Representative Omari Hardy said of this rushed process:

> "It's very interesting that we should be given just five minutes to open, question, debate, and close amendments on this bill which is about the heart of our democracy in this state, one of the most important states in the United States of America. I can't begin my discussion of this amendment without expressing how I feel about having this debate essentially canceled or truncated because we happened to have filed lots of amendments on this very objectionable piece of legislation."[55]

89.     The House passed an amended version of SB 90 on April 28, and formally sent it to the Senate for consideration.  On April 29, the Senate considered another "strike all" amendment offered by Senator Hutson; the amendment was passed by the Senate a few hours later.

---

[54] Fla. H.R. Floor Debate (Apr. 27, 2021).

[55] *Id.*

90.     When the House considered the Senate bill on April 29, 2021, it had little time to review a bill that contained significant changes.  Representative Tracie Davis pointed out that there had been "less than three hours" to review "a 48 page document." [56]  Representative Joseph Geller observed that members "barely know what's coming back" in the Senate bill, and asserted that "The Senate sends some stuff over. We barely have time to find out what it is, whether it's right, whether it's a good idea." [57]  Representative Geller said that most members had no idea what was in the bill they were preparing to vote for.

91.     The bill passed the House April 29 after one hour of debate, and was signed by the Governor May 6.

**D.     The Impact of SB 90**

92.     SB 90 includes numerous provisions that impact or burden the right to vote, and particularly the right to vote of historically disenfranchised voters and disabled voters.  This Complaint challenges four of these provisions: (i) the Secure Drop Box Restriction; (ii) the Voter Registration Disclaimer; (iii) the Vote-By-Mail Application Restriction, and (iv) the Line Warming Restriction.

---

[56] Fla. H.R. Floor Debate (Apr. 29, 2021).

[57] *Id.*

93.   **Secure Drop Box Restriction.**  SB 90 significantly restricts the use of secure drop boxes for early return of mail ballots.

94.   Voting via secure drop boxes in the November 2020 General Election was widely praised as a core element of an efficiently run election.  Defendant Secretary of State Laurel Lee testified to the Senate Committee on Ethics and Elections that one of the elements of the success of the 2020 General Election was informing voters concerned that their ballots might not arrive in time to be counted if sent by regular mail that "if they were concerned that they'd waited too long, they could drop them off, that there were multiple methods to return those ballots."[58] According to Craig Latimer, the President of the Florida Supervisors of Elections: "In 2020 our voters overwhelmingly appreciated the peace of mind that came from dropping their mail ballot off in a secure drop box, because they knew that by using the drop box instead of a mailbox, their ballot would be received on time."[59]

95.   Of the 4.85 million mail ballots cast in Florida in 2020, approximately 31 percent (1.5 million) were cast in secure drop boxes.[60]

---

[58] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021)..

[59] Lawrence Mower, *Election Supervisors Say New Florida Law Makes It Harder To Use Mail Ballots, Drop Boxes*, Miami Herald (Apr. 30, 2021), https://www.miamiherald.com/news/politics-government/state-politics/article251063359.html.

[60] Fla. Supervisors of Elections, Florida Supervisors of Elections Statement on PCB-PIE 21-05 (Mar. 22, 2021), https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/FSE_Statement_032221.pdf.

96.     According to Mark Earley, Supervisor of Elections of Leon County, "Supervised drop boxes are the gold standard of the chain of custody for receiving voter ballots."[61]

97.     The reliance on secure drop boxes in the 2020 election was of particular significance and importance to the Black and Latino communities.  In the November 2020 General Election, Floridians voted by mail in record numbers.  Of 11.1 million votes cast, 4.85 million were cast by mail, a record in percentage and in absolute numbers of votes.  Approximately 550,000 Black voters and 740,000 Latino voters voted by mail in the 2020 election, and a large percentage of these ballots were returned to drop boxes.

98.     The widespread use of mail voting, and in particular the use of secure drop boxes, was recognized as a major factor that helped reduce the long lines at polling places on election day in Black and Latino communities, a problem widely noted in the 2016 and 2018 elections.  For example, according to Representative Christopher Benjamin, "in 2020, we had unprecedented numbers of Black voters participate in our elections. They used drop boxes. . . We used people to assist our

---

[61] Fla. S. Comm. on Gov't Oversight and Accountability Hearing (Mar. 10, 2021).

elderly in getting their votes to the drop boxes or getting them to the polls. . . we know that [restricting drop boxes] will have a disparate impact on folks like me."[62]

99.   Prior to enactment of SB 90, Florida law required SOEs to allow voters to return their mail ballots to secure drop boxes "at the main office of the supervisor, at each branch office of the supervisor and at each early voting site."  Fla. Stat. § 101.69(2) (2020).

100.  Supervisors also had the discretion to place secure drop boxes at any other site that could qualify as an early voting site—such as a city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center—provided that any such site be staffed by the supervisor's office or by a law enforcement officer. *Id.*

101.  Prior to enactment of SB 90, Supervisors had the discretion to allow access to secure drop boxes 24 hours a day.  Moreover, drop boxes were available the Sunday before election day, a critical day for early voting, and a boon to voters who wanted to cast a mail ballot and be confident that their ballot would arrive in time to be counted.

---

[62] Fla. H.R. Floor Debate (Apr. 28, 2021).

102.   SB 90 made several changes to restrict the use of secure drop boxes. For example, SB 90 requires election supervisors to operate most drop boxes only during the hours of operation for in-person early voting, *see* Fla. Stat. Ann. § 101.69(2)(a) (West 2021), which is between 8 and 12 hours a day.  Counties may only make a secure drop box available for voting outside of early voting hours if the drop box is at the Supervisor's main office or permanent branch office. *See id.*  Since most counties only have a single such office, this means that most counties will have only a single drop box available beyond early voting hours.

103.   This is particularly burdensome for voters who cannot get time off of work to vote, since they may be unable to access the drop box during business hours. As stated by Representative Patricia Williams, the Secure Drop Box Restriction and other provisions of SB 90 "deter[] people of color from voting.  Number one, because we work more, our hours are longer. . . The number of hours we work, because of the drop box that would not be there 24 hours as it normally would be, that deters us from voting." [63]

104.   SB 90 also prohibits election supervisors from operating drop boxes on the Sunday before election day, unless they elect to also have early voting on that Sunday or to divert staff to monitoring drop boxes at SOE offices during the critical

---

[63] *Id.*

final preparations for election day.  Fla. Stat. Ann. § 101.69(2)(a) (West 2021); *see* Fla. Stat. § 101.657(1)(d) (2020).   This restriction will significantly diminish programs like those of Plaintiff Equal Ground, which engages in "Souls to the Polls" campaigns on the Sunday before Election Day to encourage people to drop their ballots in secure drop boxes after Sunday church services.

105.   Also, SB 90 requires that all secure drop boxes be "monitored in person by an employee of the supervisor's office."  Fla. Stat. Ann. § 101.69(2)(a) (West 2021).  As a practical matter, this will severely limit the number of drop boxes available to voters, due to the costs of continuously staffing drop boxes.  Plaintiff Hispanic Federation predicts that having fewer drop boxes with more limited hours of operation will exacerbate long wait times in Latino precincts at early voting sites and on election day.

106.   If any supervisor leaves a drop box accessible for ballot receipt other than in the manner prescribed by SB 90, the supervisor is subject to a civil penalty of $25,000.  Fla. Stat. Ann. § 101.69(3) (West 2021).  The Division of Elections, tasked with providing "administrative support" to Defendant Lee "to ensure that Florida has fair and accurate elections,"[64] is authorized to enforce the penalty provision.  *Id.*

---

[64] Fla. Dep't of State, Div. of Elections, *About Us*, https://dos.myflorida.com/elections/about-us/ (last visited May 17, 2021).

107.   SB 90's restrictions will discourage the use of drop boxes, defeating their purpose of reducing the volume of in-person voters crowding into early voting sites and reducing hours-long lines on Election Day.

108.   The Secure Drop Box Restriction imposes a particular burden on voters of color and others who disproportionately rely on secure drop boxes to vote after work, to vote on the Sunday before Election Day, or to avoid disproportionately long lines at their local precincts during in-person voting.  The use of drop boxes has become increasingly important as the mail service becomes less reliable, particularly in communities of color.  As Representative Geraldine Thompson, a Black member of Florida's House, observed: "[B]ecause it was people like me who used drop boxes in the last election more than they ever had and who made their voices heard, we are today considering a bill that would restrict the use of drop boxes."[65]

109.   During the legislative debate over SB 90, the bill's lead sponsor confirmed the absence of any legitimate justification for the restrictions on secure drop boxes: "I'm not trying to present a case that there's a problem" and "I've never made the case that there's box tampering."[66]  No state interest outweighs the burden on voting imposed by the Secure Drop Box Restriction.

---

[65] Fla. H.R. Floor Debate (Apr. 28, 2021).

[66] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

110.   **Voter Registration Disclaimer.**   Section 7 of SB 90 requires third party voter registration organizations to inform registrants that their registrations may not arrive on time to enable them to vote, a disclaimer that is intended to and will have a chilling effect on third party voter registration organizations.

111.   Independent voter registration organizations, like Plaintiffs Florida Rising Together, Equal Ground, Hispanic Federation, and Poder Latinx have engaged in extensive voter registration drives in recent years, and particularly during the 2018 and 2020 General Elections.

112.   These voter registration efforts are particularly important to reaching historically disenfranchised voters, including Black and Latino voters, and helping them exercise their right to vote.

113.   In part as a result of these efforts, voter registration among Florida's Black and Latino voters has risen significantly over the last several years, culminating in a record turnout in the 2020 General Election.

114.   Under Florida law the activities of independent voter registration organizations are governed by an extensive regulatory regime.  They are required to register with the Division of Elections, provide information on their officers, registered agents, and the individuals registering voters for the organization, and provide a sworn statement from each individual registering voters for the

organization that they will obey all state laws governing voter registration. *See* Fla. Stat. § 97.0575(1)(a)-(d) (2020).

115. SB 90 imposes a series of changes that will drastically impair the ability of organizations to register new voters, in particular Black and Latino voters. SB 90 revises Fla. Stat. § 97.0575(3)(a) to require that an organization deliver a completed registration to the County SOE where the applicant resides or to the Division of Elections within "14 days after complet[ion] by the applicant, but not after registration closes for the next ensuing election." Fla. Stat. Ann. § 97.0575(3)(a) (West 2021). Moreover, SB 90 also requires the organization to (i) inform the applicant that the organization might not deliver the completed application on time; and (ii) inform the applicant of other ways to register to vote. *See id.*

116. These compelled statements, forcing the organization to suggest that it may not return the registrations on time, directly discourages the activity of such organizations.

117. During the debate on SB 90, legislators were advised of the impact of this forced disclaimer. Representative Geraldine Thompson informed the House of Representatives that "[W]e're shaking confidence in voter registration by having to inform people that the ballot might not get there in time."[67]

---

[67] Fla. H.R. Floor Debate (Apr. 28, 2021).

118.   Senator Shevrin Jones, during Senate floor debate on SB 90, advised that this provision "will likely have a chilling effect on the willingness of potential electors to participate in voter registration drives."   Senator Jones offered an amendment striking this language, specifically informing his colleagues that "we know that minorities are more likely to vote through third party voter organizations." The amendment was defeated.[68]

119.   **Vote-By-Mail Application Restriction.**  Section 24 of SB 90 imposes a series of restrictions on requesting mail ballots.

120.   The legislature, after years of making voting by mail easier, enacted these new restrictions after an election in which Black and Latino voters made unprecedented use of mail ballots—specifically, 40 percent of Black voters voted by mail in the 2020 election, double the percentage from 2016, and Latino voters almost doubled their use of mail ballots over the same period from 26.7% in 2016 to 42.1% in 2020.

121.   Under prior Florida law, a voter could request a vote-by-mail ballot by phone, by mail, or in person, without providing identification.  *See* Fla. Stat. § 101.62(1)(a)-(b) (2020).  A written request with a signature was required if the voter was requesting that the ballot be sent to an address other than the one at which

---

[68] Fla. S. Floor Debate (Apr. 22, 2021).

they were registered.  *See id.* § 101.62(1)(b).  Identification was needed only when a voter directed the SOE to accept a request by a member of the voter's immediate family or a legal guardian, in which case the application had to contain the voter's name, address, and date of birth, and the requestor's name, address, driver's license number if available, and the requestor's relation to the voter.  *See id.*

122.    Similarly, prior to the enactment of SB 90, vote-by-mail ballots, once returned, were checked by the SOE or the County Canvassing Board ("CCB") to verify that the signature on the vote-by-mail ballot matched the signature in the registration books and that the voter was "duly registered in the County." Fla. Stat. § 101.68(2)(c)(1) (2020).  If the SOE or the CCB found that a signature was missing or did not match the signature on file, the SOE notified the voter and the voter had an opportunity to provide a cure affidavit with a valid signature and one of several forms of identification.  Fla. Stat. § 101.68(4)(a)-(d) (2020).

123.    The processes for applying for and reviewing vote-by-mail ballots were praised widely by the Secretary of State and Florida lawmakers as an essential element of the success of the 2020 Elections in Florida.  Defendant Secretary of State Lee testified to the Senate Committee on Ethics and Elections that the signature match is "to verify that their ballot is coming from the intended voter," that the number of signature mismatches was "very low," and that the very low number was

"a credit to the work" of the Supervisors of Elections.[69]  Moreover, for the past several years, the Secretary of State has offered training on signature matching to local officials to ensure it is conducted in a rigorous and objective manner.  Secretary Lee did not identify any issue or problem with voting by mail that would require additional restrictions or precautions.

124.   SB 90 imposes onerous new requirements on voters applying for a vote-by-mail ballot.  Under Section 24 of SB 90, both the voter seeking a vote-by-mail ballot and anyone making a request for a vote-by-mail ballot on behalf of the voter must provide their Florida driver's license number, their Florida identification card number, or the last four digits of the voter's and the requestor's social security numbers.  *See* Fla. Stat. Ann. §§ 101.62(1)(b), (3) (West 2021).  SB 90 requires SOEs to verify that the information provided with a vote-by-mail request matches the information in the county's voter registration records.  *See id.* § 101.62(1)(b).  SB 90 expressly bars SOEs from providing vote-by-mail ballots to any voter unless these requirements are satisfied.  *See id.* § 101.62(7).

125.   These added requirements for voters to provide identifying information, and for SOEs to verify the identification, are completely unnecessary and will lead to the arbitrary rejection of mail ballot requests.  There has been no

---

[69] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021).

evidence of fraud or abuse from voters using vote-by-mail ballots, and no evidence of individuals impersonating other voters to obtain a vote-by-mail ballot—the specific kind of abuse that imposing this ID requirement or signature match requirement would theoretically address.  At numerous times during the hearings and floor consideration of SB 90, bill sponsors—pressed on whether they were aware of any abuses or irregularities related to voting by mail in 2020—could identify no such instances. During a Senate Ethics and Elections Committee hearing, Brad Ashwell, Florida State Director of All Voting is Local, specifically challenged the lead sponsor of SB 90, Senator Baxley, to "point out anybody doing irregularities to necessitate this bill."[70]  Senator Baxley failed to identify any specific instances of irregularities. Florida Secretary of State Laurel Lee, in her testimony before the Senate Committee on Ethics and Elections, stated she was not aware of any abuse with respect to mail ballots.[71]

126.   The Vote-By-Mail Application Restriction will prevent many voters in Florida from obtaining a vote-by-mail ballot, because many voters in Florida registered to vote without providing either a driver's license or ID card number or a social security number, and lack those documents.  Other voters will be barred from

---

[70] Fla. S. Comm. on Ethics and Elections Hearing (Feb. 16, 2021).

[71] *Id.*

obtaining a vote-by-mail ballot because they do not remember the document that they used when registering to vote.  For example, a new Florida voter may register using a social security number before obtaining a driver's license or ID card in the state.  Many years later, when applying for a vote-by-mail ballot, if that voter supplies her subsequently obtained driver's license number, the request will be rejected.  SB 90's ID requirement for requesting a vote-by-mail ballot will impose an unnecessary burden on voting for all voters, but will have a disproportionate effect on voters of color.

127.   Given the extensive reporting on the increasing use of mail ballots by Black and Latino voters during and after the 2020 election, the Florida legislature was aware of the increased use of mail ballots by Black voters, and was aware that imposing restrictions on mail ballots would likely impact Black voter participation. And the legislature was aware that the identification requirements pose a particular burden on voters who lack these forms of ID, including Black and Latino voters. According to the 2012 American National Elections Study, Black and Latino voters are more than twice as likely to lack photo IDs than white voters.  Black voters are less likely to have a driver's license or a state identification.  Throughout Florida, tens of thousands of voters lack photo IDs or social security numbers, and these voters are disproportionately Black and Latino.  In Pinellas County alone, 28,000

voters lack identification or social security numbers.[72]   Under the Vote-By-Mail Application Restriction, these voters will be unable to obtain vote by mail ballots.

128.   **Line Warming Restriction**.  Section 29 of SB 90 in effect criminalizes the practice of providing food, water, language assistance, and other assistance to voters waiting in line to vote.

129.   Plaintiff Hispanic Federation has since 2018 and Plaintiff Faith in Florida has since 2012 engaged in non-partisan efforts to support and encourage voters waiting in extended lines to remain in line.   These activities, commonly referred to as "Line Warming," have included providing food, water, chairs, umbrellas and other services.  Hispanic Federation has also in past elections offered language assistance to voters waiting in polling place lines.  In the 2020 General Election, Plaintiff Faith in Florida engaged in line warming activities such as providing food and water to voters to alleviate their exhaustion while waiting in particularly long lines at polling places.  In prior years, Plaintiff Faith in Florida provided voters with ponchos and umbrellas to encourage voters to remain in line in rainy conditions.  In 2020, Plaintiff Equal Ground's get out the vote efforts included bringing people to the polls as well as providing food, water, and entertainment for

---

[72] Mitch Perry, *In St. Pete, Voting and Civil Rights Advocates Speak Out Against Florida Elections Bill*, Bay News 9 (May 11, 2021), https://www.baynews9.com/fl/tampa/politics/2021/05/11/voting-and-civil-rights-advocates-speak-out-against-florida-elections-bill; Fla. S. Comm. on Rules Hearing (Apr. 14, 2021).

voters waiting in line at polling places.  In prior elections, Plaintiff Hispanic Federation provided entertainment for families with children, snacks, soft drinks, water, and phone charge stations to encourage voters to remain in line to vote.

130.   Prior to SB 90, Florida law barred "solicitation" of voters within 150 feet of a polling place.  Solicitation was defined as "seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph [exempting exit polling]; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item."  Fla. Stat. § 102.031(4)(b) (2020).

131.   "Solicitation" prior to enactment of SB 90 did not encompass providing of food, water, chairs, umbrellas, or other support intended to encourage voters not to leave voting lines and make it easier for them to stay in line and cast a ballot.

132.   SB 90 added language to Fla. Stat. § 102.031 expanding the definition of "soliciting" or "solicitation" to include "engaging in any activity with the intent to influence or effect of influencing a voter."  Fla. Stat. Ann. § 102.031(4)(b) (West 2021).  There is no definition of what "influencing a voter" means, and nothing in the law restricts it to attempting to influence how a voter votes.  Thus, this provision would have the effect of barring activities, such as the programs implemented by Plaintiffs Hispanic Federation, Faith in Florida, and Equal Ground in the 2020

elections (and which they intend to offer in future elections), to provide food, water or other support to voters to encourage them to remain in line and exercise their right to vote.  It would similarly bar the language assistance that Hispanic Federation has offered in past elections and intends to offer again.

133.   Line warming was particularly important in mobilizing the Black vote in the 2020 General Elections.  Representative Christopher Benjamin during House Floor Debate on SB 90 described the numerous efforts to turn out the Black vote in the 2020 General Elections, including using "volunteers to tend to people in the lines," and that banning line warming will have a "disparate impact" on Black voters.[73]

134.   Similarly, Senator Audrey Gibson observed during Senate Floor debate:

> "Restricting food and water, it's totally obvious why that happens. Because many of us engaged, in our minority communities in particular, may have food trucks or activities of food near – it'll be more than 150 feet, but we may take a plate over to those who are 150 feet away from the entrance to the polling place."[74]

135.   Several amendments were offered to SB 90, in Committee and on the floor, to remove the Line Warming Ban.  These amendments were all rejected.[75]

---

[73] Fla. H.R. Floor Debate (Apr. 28, 2021).

[74] Fla. S. Floor Debate (Apr. 29, 2021).

[75] Fla. S. Comm. on Rules Hearing (Apr. 14, 2021); Fla. H.R. Floor Debate (Apr. 29, 2021).

136.   In enacting SB 90, the Florida legislature was aware that historically, voting lines in precincts with larger numbers of Black and Latino voters have had longer wait times than other precincts, and that churches and community organizations that support Black and Latino voters have traditionally provided support to voters in line, including distributing food, water, chairs, and umbrellas, providing language assistance, and assisting elderly and disabled voters who may not be able to stand in line for long periods of time.   Thus, the Line Warming Restriction will disproportionately impact Black and Latino voters.

## THE NEED FOR SECTION 3(C) RELIEF

137.   Over time, the Florida legislature and the Defendants have employed a variety of devices to restrict voters of color's access to the franchise, up to and including the recent enactment of SB 90.

138.   Plaintiffs are "aggrieved persons" within the meaning of Section 3(c) of the Voting Rights Act, 52 U.S.C § 10302(c).

139.   In the absence of relief under Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), the Florida legislature will continue to violate the Voting Rights Act and the voting guarantees of the Fourteenth Amendment in the future.

## DEFENDANT CLASS ACTION ALLEGATIONS

### Defendant Class Supervisors of Elections

140.   This action is brought against Defendants Ogg, Knight, Arrington and Latimer as representatives of a defendant class comprised of all county Supervisors of Elections in the State of Florida.  Supervisors of Elections, including Defendants Ogg, Knight, Arrington and Latimer, are charged by law with the duty to implement the Secure Drop Box Restriction, the Vote-By-Mail Application Restriction and the Line Warming Restriction.

141.   The persons comprising the class are so numerous that joinder of all members is impractical.  Joining 67 individual County Supervisors of Elections from across the state would cause inefficient and duplicative proceedings that would be difficult and impracticable to manage.  The questions of law common to the class are whether the Secure Drop Box Restriction, the Vote-By-Mail Application Restriction and the Line Warming Restriction violate the First, Fourteenth and Fifteenth Amendments to the U.S. Constitution and Sections 2 and 208 of the Voting Rights Act, as alleged in this Complaint.  Questions of fact common to the class include the impact of the challenged restrictions on Florida voters.

142.   The defenses Defendants Ogg, Knight, Arrington and Latimer are likely to assert are typical of the defenses of the class.  Defendants Ogg, Knight, Arrington and Latimer and the class member County Supervisors of Elections are

public officers with identical public duties under Florida election law, the Voting Rights Act, and the U.S. Constitution.

143.   Defendants Ogg, Knight, Arrington and Latimer as Supervisor of Elections of their respective Counties, will fairly and adequately protect the interests of the class.   Because Defendants Ogg, Knight, Arrington and Latimer are empowered with the same election law enforcement and oversight functions as every other county Supervisor of Elections, they can fairly and adequately protect the interests of the defendant class of Supervisors.   As public officers, Defendants Ogg, Knight, Arrington and Latimer can be expected to litigate this action with the vigor and forthrightness required of a representative party.

144.   This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1)(A) in that the prosecution of separate actions against individual members of the class would create a risk of inconsistent or varied adjudication with respect to individual members of the class which would establish incompatible standards of conduct for the Defendants.

145.   A defendant class is independently appropriate under Federal Rule of Civil Procedure 23(b)(1)(B) because adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede the ability of the other nonparty members to protect their interests.   All of

the proposed defendant class members have identical election-related responsibilities under SB 90. Thus, if this case were brought only against Defendants Ogg, Knight, Arrington and Latimer, all County Supervisors of Elections in the proposed defendant class would risk running afoul of federal law if they continued to apply and enforce any of the challenged restrictions enjoined by any court order in this case.

146.   In the alternative, this action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) in that the relief Plaintiffs seek— namely, an injunction prohibiting application or enforcement of the challenged restrictions—is identical as to each member of the defendant class and makes final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Section 2 of the Voting Rights Act**
**52 U.S.C. § 10301,** *et seq.*
**(Intentional Racial Discrimination and Discriminatory Results)**
**(Secure Drop Box Restriction, Vote-By-Mail Application Restriction, and Line Warming Restriction)**
**Against Supervisor Defendant Class (All Provisions)**
**Against Defendant Lee (Secure Drop Box Restriction)**

147.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

148.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), provides in pertinent part:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

149.   In direct violation of Section 2, SB 90: (1) restricts the availability of secure drop boxes for early voting (the Secure Drop Box Restriction); (2) requires that voters provide state identification or the last four digits of their Social Security number in order to request a vote-by-mail ballot (the Vote-By-Mail Application Restriction); and (3) prohibits Plaintiffs Florida Rising Together, Faith in Florida, Equal Ground, UnidosUS, Hispanic Federation and other civic and religious organizations from providing food, water, and other necessities to voters within the no-solicitation zone surrounding polling places (the Line Warming Restriction).

150.   SB 90 violates Section 2 of the Voting Rights Act because these provisions were adopted for the purpose of denying voters of color full and equal access to the political process.

151.   These provisions would violate Section 2 even in the absence of discriminatory intent, because, by their discriminatory impact, they will "result in a denial or abridgement" of the right of voters of color to vote and to participate equally in the democratic process.

152.   A voting qualification, prerequisite, practice, or procedure violates Section 2 "if, based on the totality of circumstances," election processes "are not equally open to participation" by protected classes of citizens, in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

153.   SB 90 violates Section 2 of the Voting Rights Act because, given the "totality of circumstances," including the long history of racial discrimination in Florida, the challenged provisions, individually and cumulatively, will disproportionately deny voters of color, including Black and Latino voters, an equal opportunity to participate in the political process and to elect representatives of their choice.

154.   The members of the Supervisor Defendant Class are charged with the implementation and enforcement of the Secure Drop Box Restriction, the Vote-by-Mail Application Restriction, and the Line Warming Restriction, and Defendant Lee is charged with enforcement of the Secure Drop Box Restriction through the assessment of fines against Supervisors who violate it.  Accordingly, the Supervisor Defendant Class must be enjoined from implementing or enforcing the challenged restrictions, and Defendant Lee must be enjoined from assessing fines for violation of the Secure Drop Box Restriction.

74

## SECOND CLAIM FOR RELIEF
**Fourteenth Amendment**
**U.S. Const. amend., XIV; 42 U.S.C. § 1983**
**(Intentional Racial Discrimination)**
**(Secure Drop Box Restriction, Vote-By-Mail Application Restriction, and
Line Warming Restriction)**
**Against Supervisor Defendant Class (All Provisions)**
**Against Defendant Lee (Secure Drop Box Restriction)**

155.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

156.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…."

157.   The Secure Drop Box Restriction, the Vote-By-Mail Application Restriction, and the Line Warming Restriction violate the Fourteenth Amendment to the United States Constitution because they were purposefully enacted and operate to deny, abridge, or suppress the right to vote of otherwise eligible voters on account of race or color.

158.   The facts alleged herein reveal that race was a motivating factor in the enactment of SB 90, which was adopted with the racially discriminatory intent to

raise obstacles to voting for people of color, including Black and Latino voters. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

159.   Florida's long history of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of SB 90, the bill's legislative history, and the tenuous and pretextual nature of the stated justifications for the bill raise a strong inference that it was enacted with a discriminatory purpose in violation of the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF
**Fifteenth Amendment**
**U.S. Const. amend., XV; 42 U.S.C. § 1983**
**(Intentional Racial Discrimination in Voting)**
**(Secure Drop Box Restriction, Vote-By-Mail Application Restriction, and Line Warming Restriction)**
**Against Supervisor Defendant Class (All Provisions)**
**Against Defendant Lee (Secure Drop Box Restriction)**

160.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

161.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage… subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…."

162.   Section 1 of the Fifteenth Amendment to the United State Constitution prohibits states from denying or abridging the right of American citizens to vote on account of their race or color.

163.   SB 90 violates the Fifteenth Amendment to the United States Constitution because Defendants intentionally enacted and intend to administer and enforce the Secure Drop Box Restriction, the Vote-By-Mail Application Restriction, and the Line Warming Restriction to deny and abridge the right to vote on account of race or color.

**FOURTH CLAIM FOR RELIEF**
**First and Fourteenth Amendments**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983**
**(Undue Burden on the Right to Vote)**
**(Secure Drop Box Restriction, Vote-By-Mail Application Restriction, and Line Warming Restriction)**
**Against Supervisor Defendant Class (All Provisions)**
**Against Defendant Lee (Secure Drop Box Restriction)**

164.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

165.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws….."

166.   The right to vote is a fundamental constitutional right protected by both the First and Fourteenth Amendments to the United States Constitution.

167.   State election laws may not place burdens upon the constitutional right to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

168.   Any burden on the constitutional right to vote—even a slight one— "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."  *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (internal quotation marks omitted).

169.   The more a challenged law burdens the right to vote, the more strictly must it be scrutinized.  *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318-19 (11th Cir. 2019).

170.   The Secure Drop Box Restriction, the Vote-By-Mail Application Restriction and the Line Warming Restriction individually and collectively impose severe burdens or, at a minimum, significant burdens, on the voting rights of eligible Floridians, including on Plaintiffs and members of Plaintiffs' organizations.

171.   Given that the sponsors of SB 90 were unable to point to any substantial evidence of the problems the challenged provisions purportedly address, none of the burdens the law imposes are necessary to achieve, nor are they reasonably related to, any sufficiently weighty legitimate state interest.  These burdens accordingly lack any constitutionally adequate justification and the challenges provisions of SB 90 must be enjoined.

**FIFTH CLAIM FOR RELIEF**
**Freedom of Speech/Expression and Unconstitutional Overbreadth and**
**Vagueness**
**U.S. Const. amend. I; 42 U.S.C. § 1983**
**(Line Warming Restriction)**
**Against Supervisor Defendant Class**

172.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

173.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…."

174.   Plaintiffs Hispanic Federation, Faith in Florida, Equal Ground, and Poder Latinx enjoy rights under the First Amendment to the United States

Constitution, as applied to the states by the Fourteenth Amendment, to engage in protected speech and expression.

175.   Plaintiffs regularly engage, and intend to continue engaging, in protected speech by communicating with voters waiting in long polling place lines to convey a message about the importance of staying in line, the value of each individual's vote, and each individual's inherent value as a person and a participant in our democracy.

176.   Plaintiffs also provide food, water, seating, and other support to voters waiting in long lines at polling places as an expressive manifestation of Plaintiffs' central message concerning the importance of voting.

177.   Plaintiffs' "line warming" activities fall squarely within the protections of the First Amendment.  Encouraging participation in the political process in the face of obstacles is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 421-23 (1988).

178.   SB 90's Line Warming Restriction is squarely aimed at the line warming activities of Plaintiffs and similar organizations and individuals and unconstitutionally targets protected speech and expression, and must therefore be enjoined.

179.   The Line Warming Restriction is also impermissibly overbroad.

80

180. A statute is overbroad and thus facially invalid if it prohibits a substantial amount of protected speech, even if some of the speech it proscribes may permissibly be restricted. *See United States v. Williams*, 553 U.S. 285, 292 (2008); *NAACP v. Button*, 371 U.S. 415, 433 (1963); *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940).

181. Plaintiffs' line-warming activities involve speech and expressive conduct that is protected by the First Amendment. Nonetheless, that speech and conduct appear to be banned by SB 90's Line Warming Restriction.

182. Whatever activity (if any) might fall within the legitimate sweep of the Line Warming Restriction, a substantial number of the Line Warming Restriction's applications, including to Plaintiffs' line-warming speech and expressive conduct, are unconstitutional. The Line Warming Restriction must therefore be invalidated as overbroad. *See United States v. Stevens*, 559 U.S. 460, 473 (2010).

183. The Line Warming Restriction is also unconstitutionally vague.

184. The Due Process Clause of the Fourteenth Amendment incorporates the "fundamental principle in our legal system" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). Laws must be drafted so that regulated parties "know what is required of them so they may act accordingly." *Fox Television Stations*, 567 U.S.

81

at 253.  And "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *Id.*

185.  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  *Id.* at 253-54; *see Button*, 371 U.S. at 432 ("[S]tandards of permissible statutory vagueness are strict in the area of free expression.").

186.  The Due Process Clause "requires the invalidation of laws that are impermissibly vague."  *Fox Television Stations*, 567 U.S. at 253.

187.  The Line Warming Restriction prohibits "engaging in any activity with the intent to influence or effect of influencing a voter."  But it fails to define "activity" or "influence," two general words with myriad conceivable meanings and applications.  Nor does it clarify what conduct has the "effect of influencing a voter," nor how one would determine that a voter has been influenced.

188.  As a result of the Line Warming Restriction's vagueness, Plaintiffs will be unable to determine whether, for example, tasking volunteers with urging voters to stay in line and vote or offering food, water, seating, and other items to voters would be a directive to violate the law, putting volunteers at risk of criminal prosecution.  And local law enforcement will be unable to determine whether such conduct requires their intervention, inviting confusion and chaos at polling places.

189.   The inevitable result of the Line Warming Restriction's irredeemable vagueness is the chilling of protected political speech and expression.

190.   Because the Line Warming Restriction fails to adequately identify the speech and conduct it prohibits, and because its lack of constitutionally necessary "precision and guidance" invites arbitrary, selective, and discriminatory enforcement, the Line Warming Restriction is unconstitutionally vague and must be enjoined.  *See Fox Television Stations*, 567 U.S. at 253.

**SIXTH CLAIM FOR RELIEF**
**Violation of Section 208 of the Voting Rights Act of 1965, 52 U.S.C. § 10508**
**Preemption**
**(Line Warming Restriction)**
**Against Supervisor Defendant Class**

191.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

192.   Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union."  The Voting Rights Act defines "vote" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly."  52

U.S.C. § 10310(c)(1).  Section 208 thus guarantees any voter who requires aid in casting an absentee ballot the right to assistance by a person of their choice, other than an agent of the voter's employer or union.

193.   The Line Warming Restriction conflicts directly with and violates Section 208 and is therefore preempted and invalid.

194.   The Line Warming Restriction bars assisting a voter by providing a chair or bringing water.  If a voter requests assistance from a friend or family member in order to continue waiting on line to vote, the Line Warming Restriction bars the chosen person from assisting the voter and, indeed, criminalizes such assistance.  The voter has thus been deprived of her right to assistance by the person of her choice under Section 208.

195.    The Line Warming Restriction also bars providing language assistance to voters waiting in line.  If a voter requests assistance from a volunteer who has offered language assistance, of the kind that Plaintiff Hispanic Federation has offered in past elections and intends to provide in the future, the Line Warming Restriction makes it unlawful for the volunteer to provide the requested assistance, because doing so might influence the voter to remain in line and cast a ballot.  The voter has thus been deprived of her right to assistance by the person of her choice under Section 208.

196.   The Line Warming Restriction criminalizes the precise conduct that is contemplated and encouraged by Section 208, depriving voters of their federally guaranteed right to assistance in casting their ballot.  Accordingly, the Line Warming Restriction is preempted and invalidated by federal law.

### SEVENTH CLAIM FOR RELIEF
**Freedom of Speech and Compelled Speech**
**U.S. Const. amend. I; 42 U.S.C. § 1983**
**(Voter Registration Disclaimer)**
**Against Defendant Lee**

197.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

198.   42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws…."

199.   Plaintiffs Florida Rising Together, UnidosUS,  Faith in Florida, Equal Ground, Hispanic Federation, and Poder Latinx enjoy rights under the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, to engage in protected speech and expression, including political speech.

200.   In engaging in organized voter registration activities, Plaintiff Florida Rising Together, Equal Ground, UnidosUS, Faith in Florida, Hispanic Federation, and Poder Latinx engage in speech and expression protected by the First Amendment.

201.   Plaintiffs' voter registration activities, including their conversations with voters in the course of those activities, constitute speech and expressive conduct intended to share Plaintiffs' belief in the importance of participation by all eligible citizens, including marginalized and excluded constituencies, in the democratic process.  Advocating for that belief by working to persuade Floridians to vote and to assist eligible voters in registering to vote is core political speech and expression. *See Meyer*, 486 U.S. at 421-23.

202.   Restrictions on protected political speech and expression violate the First Amendment when they "significantly inhibit" election-related speech and association and are "not warranted by the state interests … alleged to justify [the] restrictions."  *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 (1999). Laws that burden core political speech are subject to "exacting scrutiny" and will be upheld only if the restrictions are "narrowly tailored to serve an overriding state interest."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995).

203.   The Voter Registration Disclaimer infringes on Plaintiffs' First Amendment rights because it chills the protected speech and expression that occurs

during voter registration activities.  By requiring Plaintiffs to warn voters that Plaintiffs "might not deliver" their registration forms in time to be processed, the Voter Registration Disclaimer will dissuade eligible voters from registering to vote with Plaintiffs by giving them the incorrect impression that Plaintiffs cannot be trusted to handle their registration materials.  In fact, Plaintiffs take great care and pride in their secure and efficient collection and submission of voter registration applications in compliance with Florida law, and have been successfully doing so under the very tight deadlines that have applied in recent election cycles.

204.   The intent and effect of the Voter Registration Disclaimer is to diminish and impair Plaintiffs' ability to engage in protected political speech and expression by assisting eligible Floridians with voter registration.

205.   The Voter Registration Disclaimer is not warranted by any sufficiently weighty state interest.  The State lacks any legitimate interest in sowing doubt and uncertainty among eligible Florida voters about the trustworthiness and reliability of third-party voter registration organizations like Plaintiffs.  And any valid interest the State may have in ensuring that such organizations promptly submit voter registration materials can be accomplished by other means consistent with the U.S. Constitution, including the fines for late submission that are already part of Florida law.

206. The Voter Registration Disclaimer therefore represents an unconstitutional restriction on political speech and expression and should be enjoined.

207. The Voter Registration Disclaimer also unconstitutionally compels Plaintiff Florida Rising Together, Equal Ground, UnidosUS, Faith in Florida, Hispanic Federation, and Poder Latinx and other third-party voter registration organizations to engage in speech in violation of their First Amendment rights.

208. Plaintiffs enjoy rights under the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, to be free from government mandates to engage in speech and expression of the government's choosing.

209. "Some of [the Supreme] Court's leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). A law that "compel[s] individuals to speak a particular message" is a content-based regulation of speech and is therefore "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

210. The Voter Registration Disclaimer unconstitutionally forces Plaintiffs and other persons and entities engaging in voter registration to speak for the

government by making a disclaimer or warning that Plaintiffs would not otherwise recite.  The disclaimer constitutes speech (specifically, confusing, misleading, and dissuading speech); Plaintiffs object to the government imposing such speech upon them; and the speech will be readily associated with Plaintiffs and tied to their name when Plaintiffs involuntarily warn voters that they "might not deliver" their voter registration forms timely and effectively.

211.   The Voter Registration Disclaimer compels Plaintiffs to undermine their own credibility by forcing Plaintiffs to tell potential voters that, in effect, Plaintiffs cannot be trusted with their registration forms.  Such statements will be inaccurate because Plaintiffs take great care and pride in their secure and efficient collection and submission of voter registration applications in compliance with Florida law.

212.   The Voter Registration Disclaimer is not narrowly tailored to serve any compelling or overriding state interest.  To the extent the government believes that the Voter Registration Disclaimer is needed, the government must speak for itself. The State may not coopt Plaintiffs and other civic organizations to speak in furtherance of the State's own attempts to discourage voter registration.  Because the Voter Registration Disclaimer forces Plaintiffs to deliver that message on the State's behalf without a sufficiently compelling reason, the Voter Registration Disclaimer violates the First Amendment and should be enjoined.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

    a. Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, declaring that the Secure Drop Box Restriction, the Vote-By-Mail Application Restriction, the Line Warming Restriction, and the Voter Registration Disclaimer are illegal and unconstitutional in violation of Sections 2 and 208 of the Voting Rights Act of 1965, 52 U.S.C. §§ 10301 and 10508, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution;

    b. Preliminarily and permanently enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Secure Drop Box, the Vote-By-Mail Application Restriction, the Line Warming Restriction, and the Voter Registration Disclaimer;

    c. Retain jurisdiction and subject Defendants to a preclearance requirement pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c);

    d. Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and;

    e. Grant such other and further relief as may be just and equitable.

Dated: May 17, 2021                    Respectfully submitted,

                                       s/    *Kira Romero-Craft*

JOHN A. FREEDMAN*                      KIRA ROMERO-CRAFT
JEREMY C. KARPATKIN                    Florida Bar No. 49927
ELISABETH S. THEODORE*                 MIRANDA GALINDO*
SAM I. FERENC*                         LatinoJustice, PRLDEF
Arnold and Porter Kaye Scholer LLP     523 W Colonial Dr.
601 Massachusetts Ave., NW             Orlando, FL 32804
Washington, D.C. 20001-3743            (321) 418-6354
202-942-5000                           Kromero@latinojustice.org
John.Freedman@arnoldporter.com         Mgalindo@latinojustice.org
Jeremy.Karpatkin@arnoldporter.com
Elisabeth.Theodore@arnoldporter.com    BRENDA WRIGHT*
Sam.Ferenc@arnoldporter.com            STUART NAIFEH*
                                       DEMOS
                                       80 Broad St, 4th Flr
JEFFREY A. MILLER*                     New York, NY 10004
Arnold and Porter Kaye Scholer LLP     (212) 633-1405
3000 El Camino Road                    bwright@demos.org
Five Palo Alto Square, Suite 500       snaifeh@demos.org
Palo Alto, CA 94306-3807
(650)-319-4500                         JUDITH BROWNE DIANIS*
Jeffrey.Miller@arnoldporter.com        GILDA R. DANIELS
                                       JORGE VASQUEZ*
AARON STIEFEL*                         SABRINA KHAN*
Arnold and Porter Kaye Scholer LLP     ESPERANZA SEGARRA
250 West 55th Street                   Florida Bar No. 527211
New York, NY 10019-9710                SHARION SCOTT*
(212) 836-8000                         ADVANCEMENT PROJECT
Aaron.Stiefel@arnoldporter.com         1220 L Street, N.W., Suite 850
                                       Washington, DC 20005
                                       (202) 728-9557
*Attorneys for Plaintiffs*             Jbrowne@advancementproject.org
                                       Gdaniels@advancementproject.org
*Application for admission pro hac*    Jvasquez@advancementproject.org
*vice forthcoming*                     Skhan@advancementproject.org
                                       Esegarra@advancementproject.org
                                       Sscott@advancementproject.org

                                       91