# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## TALLAHASSEE DIVISION

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., *et al.*, | |
| Plaintiffs, | |
| v. | |
| LAUREL M. LEE, in her official capacity as Secretary of State of Florida, *et al.*, | Case No. 4:21-cv-186-MW-MAF |
| Defendants, | 4:21-cv-187 |
| | 4:21-cv-201 |
| and | 4:21-cv-242 |
| NATIONAL REPUBLICAN SENATORIAL COMMITTEE, *et al.*, | |
| Intervenor-Defendants. | |

## SECRETARY OF STATE'S OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF HER MOTIONS TO DISMISS

## I.     Introduction

Sometimes what we want to hear the least is what we need to hear the most. The Plaintiffs need to hear and understand that Article I, Section 4 of the U.S. Constitution entrusts the Florida Legislature with setting the "times, places and manner" of elections; that Article III, Section 1 and Article VI, Section 1 of the Florida Constitution does much the same; that "[c]ommon sense, as well as

constitutional law, compels the conclusion that government must play an active role in structuring elections," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); and that Chapter 2021-11, Laws of Florida (the "2021 Law") is the kind of reasonable, non-discriminatory law that falls within the Florida Legislature's constitutional purview. *See Burdick*, 504 U.S. at 433; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

Even Plaintiffs seemingly acknowledge the reasonableness of the 2021 Law as a whole. After all, the three amended complaints[1] before this Court challenge only five of the thirty-two sections in the 2021 Law: sections 7, 24, 28, 29, and 32. *See* **Exhibit A** (Chpt. 2021-11, Laws of Fla. (2021)).[2] Section 7 requires that third-party voter registration groups inform people that "the organization might not deliver the application to the division [of elections] or the [relevant] supervisor of elections . . . in less than 14 days or before registration closes for the next ensuing election," that people can themselves deliver applications "in person or by mail," or that they can "register online" with the State. It also requires that a third-party voter registration organization deliver an absentee ballot application within 14-days—up from 48 hours—to the county where the applicant resides. Section 24 asks that

---

[1] The Secretary's motion to dismiss the NAACP Plaintiffs' amended complaint is not moot as the NAACP Plaintiffs amended their original complaint prior to the filing of the initial motion to dismiss. *See* Amended Complaint, Case No. 187 (ECF No. 45).

[2] The corresponding statutory citations for these five sections of the 2021 Law are, respectively, Fla. Stat. §§ 97.0575, 101.62, 101.69, 102.031, and 104.0616.

voters make two requests for vote-by-mail ballots every four years (instead of one) after the 2022 election cycle; it also asks that voters use verifying information such as the last four digits of their social security number when making the requests. Section 28 makes changes to the State's drop box provision—a provision implemented for the first time throughout the State during the 2020 election cycle. Section 29 revises the State's existing non-solicitation provision so that "engaging in any activity with the intent to influence or effect of influencing a voter" is prohibited, which in no way deprives voters of water (among other things) as some allege. And section 32 places a commonsense limitation on ballot collection, making State law consistent with an ordinance long implemented in Miami-Dade County.

While Plaintiffs only challenge five sections of the 2021 Law, they take aim at these five sections through several theories of harm, spread over a dozen counts, many of which miss the mark for one reason or another. The Secretary thus moves to dismiss Counts I (Undue Burden) and IV (Vague and Overbroad) in Case No. 186 (the *LWV* case); Counts I (Section 2, Voting Rights Act, Intentional Race Discrimination and Discriminatory Results), II (Fourteenth Amendment, Intentional Race Discrimination), III (Fifteenth Amendment, Intentional Race Discrimination), IV (Undue Burden), V (Vague and Overbroad), and VI (Section 208, Voting Rights Act) in Case No. 201 (the *Florida Rising* case); and Counts I (Vagueness) and IV (Section 208, Voting Rights Act) in Case No. 242 (the *Harriet Tubman* case).

Given the overlap in the three amended complaints, the Secretary groups the allegations into five categories for the sake of brevity and clarity: (1) Undue Burden, (2) Intentional Discrimination, (3) Discriminatory Effect, (4) Vagueness and Overbreadth, and (5) Section 208 of the Voting Rights Act.

## II.    Legal Standards for a Motion to Dismiss

Standing under Article III of the U.S. Constitution presents a threshold jurisdictional determination, placing the burden squarely on the Plaintiffs to "clearly . . . allege facts demonstrating" standing.[3] *Warth v. Seldin*, 422 U.S. 490, 518 (1975). The Plaintiffs must thus establish for *each* of their claims the "irreducible constitutional minimum[s]" of (1) an injury that is concrete and particularized, or actual or imminent; (2) caused by the Defendant; and (3) redressable, at least in part, through a favorable decision for the Plaintiffs and against the Defendant. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Failure to establish standing provides grounds to dismiss under Federal Rule of Civil Procedure 12(b)(1).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). Facts not alleged cannot be assumed. *Id.* at

---

[3] For additional arguments regarding Plaintiffs' standing, see the Secretary's and Plaintiffs' briefs in response to this Court's order to show cause. *See* Case No. 186 (ECF Nos. 128, 163); Case No. 201 (ECF No. 115); Case No. 242 (ECF No. 65); *see also* Case No. 187 (ECF Nos. 148, 166).

563 n.8. Allegations must amount to "more than labels and conclusions." *Id.* at 555.

"[F]ormulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Twombly*, 550 U.S. at 555).

Judged against these standards, this Court should grant the Secretary's Omnibus Motion to Dismiss.

### III.  **Argument**

#### A.  **This Court should dismiss the undue burden claims because the right to vote is either not implicated or the Plaintiffs fail to focus on the electorate as a whole.[4]**

This Court should dismiss the counts claiming an undue burden on the right to vote under Rule 12(b)(6).  The *Anderson/Burdick* test applies to claims of an undue burden under the First and Fourteenth Amendments.  That test asks courts to "weigh 'the character and magnitude of the asserted injury to the right [to vote] . . . that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). *Anderson/Burdick* is not, however, a constitutional catch-all.  That test requires

---

[4] Specifically, this Court should dismiss Count I in the *LWV* case and Count IV in the *Florida Rising* case.

courts to first "identify a burden before [they] can weigh it." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir. 2020). The courts, however, must be mindful that all voters "must tolerate the 'usual burdens of voting.'" *Brnovich v. Democratic Nat'l Comm.,* 210 L. Ed. 2d 753, 773 (2021) (quoting *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.)).

Once a court identifies a burden on the right to vote, the court "consider[s] the laws and their reasonably foreseeable effect on *voters generally*," not on a subset of the electorate, *Crawford*, 553 U.S. at 206 (Scalia, J., concurring); "weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence." *Id.* at 207. In addition, the *Anderson/Burdick* test requires courts to "look[] at the whole electoral system," considering provisions that make voting easier, and should avoid "substitution of judicial judgment for legislative judgment" along the way. *Luft v. Evers*, 963 F.3d 665, 671-72 (7th Cir. 2020) (citing *Burdick*, 504 U.S. at 434, 439); *cf. Brnovich*, 210 L. Ed. 2d at 774 (holding that, in the context of Section 2 of the VRA, courts must consider the opportunities to vote provided by the entire system of voting).

The *LWV* and *Florida Rising* Plaintiffs allege that changes to the process for requesting vote-by-mail ballots, adjustments to the drop box statute, the prohibition

from "engaging in any activity with the intent to influence or effect of influencing a voter," and the limitation on ballot collection (including the newly required disclaimer warning that ballots may not be returned within 14 days) act in concert to unduly burden voting rights.[5] Not so.

          1.   The Vote-by-mail Regulation Does Not Implicate the Right to Vote.

The vote-by-mail request changes, adjustments to the drop box statute, and the ballot collection provision all concern the same thing: voting by mail, asking for a vote-by-mail ballot, and then returning that ballot. Yet the U.S. Supreme Court held in *McDonald v. Board of Education Commissioners of Chicago* that, unless a restriction on vote-by-mail "absolutely prohibit[s]" someone from voting, the right to vote is not at stake. 394 U.S. 802, 809 (1969).

Specifically, in *McDonald*, pretrial detainees argued that their exclusion from four classes of people entitled to vote absentee in Illinois violated the Fourteenth Amendment's Equal Protection Clause. *Id.* at 803-05. The U.S. Supreme Court disagreed. *Id.* at 807. While the U.S. Supreme Court acknowledged that "voting rights[] classifications which might invade or restrain [voting rights] must be closely scrutinized and carefully confined," the unanimous Court held that Illinois's vote-by-mail provisions did not require that "exacting approach" because the detainees

_____

[5] *See, e.g.*, Case No. 186, ECF 124 ¶¶ 5-6; Case No. 201, ECF 59 ¶ 16.

had not shown that they were "absolutely prohibited" from voting. *Id.* at 807-808, 808 n.7 (citation omitted). In short, it was "not the right to vote that [was] at stake . . . but a claimed right to receive absentee ballots." *Id.* at 807. The same is true here.

In this case, it cannot be credibly alleged, nor has anyone actually alleged, that requiring voters to make two vote-by-mail requests every four years instead of one; over the phone if they wish; using the last four digits of their social security number along the way; and then returning a vote-by-mail ballot through the mail, in-person, with the help of a family member, or at one of the still-mandated drop box locations results in the electorate being "absolutely prohibited" from voting or even voting-by-mail. Thus, under *McDonald*, the right to vote is not implicated. Because the right to vote is not implicated, there is nothing to weigh under *Anderson/Burdick*. *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020); *Jacobson*, 974 F.3d at 1261.

The Plaintiffs might respond by urging this Court not to follow *McDonald* because it predates the *Anderson/Burdick* test. This Court should decline that invitation.

*McDonald* remains binding precedent that cannot be ignored. Importantly, *Anderson*, *Burdick*, and *Crawford* did not squarely address vote-by-mail issues; *McDonald* did. "If a precedent of [the U.S. Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions,"

which has not actually happened here,[6] "the [lower courts] should follow the case which directly controls, leaving to [the U.S. Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) ("[W]e are not at liberty to disregard binding case law that . . . has been only weakened, rather than directly overruled, by the Supreme Court.").

Regardless, *McDonald*'s logic holds firm even after *Anderson/Burdick*. In *Griffin v. Roupas*, a post-*Anderson/Burdick* case, the Seventh Circuit upheld a district court's motion to dismiss a claim on behalf of "working mothers who contend that because it is a hardship for them to vote in person on election day, the U.S. Constitution requires Illinois to allow them to vote by absentee ballot." 385 F.3d 1128, 1129 (7th Cir. 2004). Writing for the Seventh Circuit, Judge Posner, like the majority in *McDonald*, distinguished the right to vote from a claimed "blanket right of registered voters to vote by absentee ballot," *id.* at 1130, and concluded that "unavoidable inequalities in treatment, even if intended in the sense of being known

---

[6] Two subsequent U.S. Supreme Court cases citing *McDonald* have neither overruled nor limited *McDonald* to its facts. In *Goosby v. Osser*, the Court confronted allegations that "the Pennsylvania statutory scheme [at issue] absolutely prohibited [plaintiffs] from voting," thereby implicating the right to vote under *McDonald*. 409 U.S. 512, 521-22 (1973). And in *Hill v. Stone*, the Court simply summarized *McDonald*. 421 U.S. 289, 300 n. 9 (1975).

to follow ineluctably from a deliberate policy, do not violate equal protection." *Id*. at 1132. In *New Georgia Project*, the Eleventh Circuit similarly concluded that Georgia's vote-by-mail return deadline "does not implicate the right to vote at all" because "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots," and it thus avoided an absolute prohibition on voting. 976 F.3d at 1281.[7]

In sum, *McDonald* controls, and there is no undue burden claim for changes to the vote-by-mail request process or the vote-by-mail return process (the drop box statute and the ballot collection provisions).

### 2. The Plaintiffs Must Focus on Electorate as a Whole.

Assuming the Plaintiffs *could* claim an undue burden on the right to vote because of changes to the vote-by-mail process (*i.e.,* both the request and return of a vote-by-mail ballot) or the non-solicitation provision, they still have not done so. The *Anderson/Burdick* inquiry "consider[s] the laws and their reasonably foreseeable effect on *voters generally*," not on a subset of the electorate. *Crawford*, 553 U.S. at 206 (Scalia, J., concurring). Here the Plaintiffs focus on a narrow band of potential voters when alleging their claim.

---

[7] Discussing a procedural due process issue, but citing *McDonald*, Judge Lagoa further explained that "the Supreme Court has unambiguously held that the right to vote *absentee* is not a fundamental interest that triggers Fourteenth Amendment protections." *New Ga. Project*, 976 F.3d at 1288 (Lagoa, J., concurring).

The *LWV* Plaintiffs allege, for example, that the drop box provision burdens "Floridians . . . who struggle to vote on election day or during early voting hours due to personal circumstances, including restrictive work or class schedules, family care responsibilities, disabilities, health conditions, or other personal circumstances." Case No. 186, ECF 124 ¶ 88. As to the non-solicitation provisions, they further allege harm to "senior voters, voters with disabilities, or any voter who is forced to wait in long lines at polling places." Case No. 186, ECF 124 ¶ 120. So the entire electorate is not the subject of the allegations.

The *Florida Rising* Plaintiffs allege that the drop box rules are "particularly burdensome for voters who cannot get time off of work to vote," even though those voters could presumably vote in-person during weekends in the early voting period at one of the locations which are usually centrally located near business districts. *See* Case No. 201, ECF 59 ¶ 116. Of the vote-by-mail rules generally, they plead that "voters will be barred from obtaining a vote-by-mail ballot because they do not remember the document that they used when registering to vote[,]" although those voters could presumably use their driver's license number, Florida identification number, or social security number to update the necessary information. *Id.* ¶ 151. Finally, as to the non-solicitation rules, the *Florida Rising* Plaintiffs allege that they will be barred from providing a list of items, including "food, water, chairs, umbrellas . . . . ponchos . . . . and entertainment" to voters waiting in line to vote and

11

who, presumably, will for some reason choose not to vote unless such items are specifically provided to them by the *Florida Rising* Plaintiffs. *Id.* ¶ 154. *Florida Rising* thus slices the electorate into smaller and smaller subsets.

In sum, the Plaintiffs do not seek to vindicate the rights of the voters generally as *Anderson/Burdick* requires. Rather, the Plaintiffs speculate that the 2021 Law burdens a certain subset of the electorate already being subjected to a confluence of personal and professional circumstances. The burdens on these vulnerable voters, the Plaintiffs allege, outweigh the State's interests. Yet "weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence."[8] *Crawford*, 553 U.S. at 207 (Scalia, J., concurring).

> **B.    This Court should dismiss the intentional race-based discrimination claims under the Fourteenth and Fifteenth Amendments, and Section 2 of the Voting Rights Act.[9]**

This Court should also dismiss the intentional racial discrimination claims under Rule 12(b)(6). Claims of racial discrimination under the Fourteenth and

---

[8] The Secretary further emphasizes that the non-solicitation provisions of the 2021 Law are not directed at the voters at all but instead at those "engaging in any activity with the intent to influence or [that has the] effect of influencing a voter." **Exhibit A** at § 29 (Pg. 25). Plaintiffs fail to allege how limitations on their activities—not the voters—affect the right to vote.

[9] Specifically, this Court should dismiss Counts I, II, and III in the *Florida Rising* case.

Fifteenth Amendments to the U.S. Constitution "require[] proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). Section 2 of the Voting Rights Act, codified at 52 U.S.C. § 10301, requires Plaintiffs to either demonstrate proof of intent or demonstrate "that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race."[10] *Chisom v. Roemer*, 501 U.S. 380, 394 (1991). The test for intent in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* governs all intent claims at issue here. 429 U.S. 252, 265 (1977).[11] *Arlington Heights* requires courts to assess:

> (1) [T]he impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.

---

[10] The Secretary assumes for the purposes of this filing that Section 2 of the Voting Rights Act allows for an intent claim. She reserves her right to argue in this and other cases that the plain language of Section 2 allows for only an effect claim if it allows for a cause of action at all. *See Brnovich*, 210 L. Ed. 2d at 786 (Gorsuch, J. concurring)

[11] Because Plaintiffs cannot prove *effect* because any alleged burdens of Florida's election laws amount to no more than "the usual burdens of voting", *Brnovich*, 210 L. Ed. at 773, 778-79, 781; *see also infra*, the analysis of discriminatory intent is unnecessary, *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). In so far as it *is* necessary, Plaintiffs' intent claims are also mostly complaints about "the usual burdens of voting." *Cf. Brnovich*, 210 L. Ed. at 773, 778-79, 781.

*Greater Birmingham Ministries*, 992 F.3d at 1321-22. The key question that the *Arlington Heights* factors seek to answer is whether "the legislature as a whole was imbued with racial motives." *See Brnovich*, 210 L. Ed. 2d at 785. Plaintiffs in *Florida Rising* have not alleged enough to show that requisite intent.

1. The impact of the challenged law.

As the U.S. Supreme Court explained, for discriminatory impact from a challenged provision to carry the day, Plaintiffs must couple impact with sufficient allegations to "establish 'a pattern, unexplainable on grounds other than race.'" *Greater Birmingham Ministries*, 992 F.3d at 1322 (citing *Arlington Heights*, 429 U.S. at 266).

The *Florida Rising* complaint largely provides bare legal conclusions regarding the "Impact of SB 90," stating that "SB 90 includes numerous provisions that impact or burden the right to vote of historically disenfranchised voters and disabled voters," Case No. 201, ECF 59 at ¶ 105. The *Florida Rising* Complaint's factual allegations are incapable of showing a "clear pattern, unexplainable on grounds other than race" that would qualify as the "rare" case where discriminatory impact alone could be determinative. *Greater Birmingham Ministries*, 992 F.3d at 1322; *see also Brnovich*, 210 L. Ed. 2d at 785.

## 2. The historical background.

The historical background inquiry focuses not on "an unlimited look-back to the past discrimination" that, "in the manner of original sin, condemn[s] governmental action that is not itself unlawful." *Greater Birmingham Ministries*, 992 F.3d at 1323-26. Instead, there must be some tie to the 2021 Law. *Id.*

The Plaintiffs, however, choose to dwell on the distant past.

The *Florida Rising* Plaintiffs claim, in an effort to tie Florida's history to the 2021 Law, that "[t]he passage of SB 90 is the latest chapter in Florida's long history of racially discriminatory voting restrictions that dates back over 100 years." *Id.* ¶ 65. They proceed to detail the obviously discriminatory laws from the 1880s and 1890s without providing facts that link that sordid history to the 2021 Law or those who passed it. *See Id.* ¶¶ 65-71.

At best, the relevant historical background alleged in *Florida Rising's* amended complaint points to no intentional discrimination. Claims about high Black and Latino use of vote-by-mail ballots in 2020 ask this Court to infer that the Florida Legislature changed the rules because, during *one* election in the midst of a global pandemic, more people overall, including Black and Latino voters, used vote-by-mail ballots; and that Blacks and Latinos in this State form a monolithic voting block that votes against the political party that currently has majorities in the Florida Legislature. *See, e.g.*, *id.* ¶¶ 5-8, 82, 110. Statements about minority party voters

disproportionately using vote-by-mail as compared to majority party voters also proves inconsequential because "partisan motives are not the same as racial motives." *Brnovich*, 210 L. Ed. 2d at 785; *see also Greater Birmingham Ministries*, 992 F.3d at 1326-27 (noting "partisan reasons" fail to provide the requisite historical background for racial intent). Citations to past cases also fail because there is no demonstrated link to the 2021 Law. Some of these cases failed to find racial animus, and others included no discussion of racial discrimination claims at all. *See, e.g.*, Case No. 201, ECF 59 ¶¶ 76, 79 (citing *Democratic Exec. Comm. v. Lee*, in which plaintiffs "did not allege any intentional discrimination by relevant state actors," and *Rivera Madera v. Detzner* and *League of Woman Voters of Fla., Inc. v. Detzner*, which did not even present race-based claims).

3. Sequence of Events Leading to Passage and Any Procedural and Substantive Departures.

The sequence of events and departure from standard procedure inquiry, as pled, is insufficient. *Arlington Heights* tells us that "[t]he specific sequence of events leading up to the challenged decision also may shed *some* light on the decisionmaker's purposes." 429 U.S. at 267 (emphasis added). The word "some" means that, even if this Court found significant evidence of unexplainable procedural deviations, this factor alone cannot support a finding of intent. Regardless, for these two prongs of the *Arlington Heights* test, the Plaintiffs attribute most of the sequence of events and departure to changes made during a once-in-a-lifetime pandemic. *See,*

*e.g.*, Case No. 201, ECF 59 ¶¶ 7-8.  There is one notable exception: the claim that the "strike all" amendment was unusual or "flawed."  *See id.* ¶¶ 101-102.  That claim, however, is not true.

The Florida Legislature has frequently used the "strike all" (or "delete all") tool.  In 2021, the Florida Legislature was used the tool 359 times on 290 bills, *i.e.*, on 9.4% of all bills during the 2021 Regular Session, and 440 times on 326 bills, *i.e.*, on 9.3% of all bills during the 2020 Regular Session.[12]

### 4.    Contemporaneous Statements of Key Legislators.

The Plaintiffs also cannot show discriminatory intent through statements of "key legislators" supportive of the 2021 Law "made contemporaneously" with its passage.  *Greater Birmingham Ministries*, 992 F.3d at 1322.  Key legislators like Senate Sponsor Baxley are alleged to have said that "[w]e are doing this bill because it becomes clear as you look across the country that there is a lot of confusion from many people on different fronts."  Case No. 201, ECF 59 ¶ 91.  Senator Baxley is

---

[12] This Court may take judicial notice of public records at this stage. *See Universal Express, Inc. v. United States SEC*, 177 Fed. App'x. 52, 53 (11th Cir. 2006) (unpublished) ("Public records are among the permissible facts that a district court may consider."); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  This information is available from the Florida Legislature's website at https://www.flsenate.gov/Session/Bills/2021?chamber=both&searchOnlyCurrentVersion=True&isIncludeAmendments=False&isFirstReference=True&citationType=FL%20Statutes&pageNumber=1 (last visited Jun. 24, 2021), using the search terms "strike all" and "delete all".

also alleged to have said that the 2021 Law was needed to address "some [issues] going on around the country, different places, and we want to be proactive and prevent things from going awry, rather than waiting to have some kind of debacle to recover from." *Id.* (alteration in original). Statements like these demonstrate a proactive approach to dealing with election regulations—not an intent to discriminate. After all, the Florida Legislature "was not obligated to wait for something similar to happen closer to home." *Id*. at 783. The statements are also further evidence the State's commitment to the "integrity of its election procedures" moving forward, and its commitment to prevent voter fraud and to protecting voters against undue influence from third parties. *Brnovich*, 210 L. Ed. 2d at 762-63, 777, 782-83 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*)).

5. <u>Foreseeability and Knowledge of Disparate Impact.</u>

As alleged, there is no foreseeability or knowledge of a disparate impact either. This inquiry requires that a disparate effect be both "foreseeable" and "anticipated." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464-65 (1979). Importantly, "[d]isparate impact and foreseeable consequences, without more, do not constitute a constitutional violation." *Id*. at 464.

The Plaintiffs rely on two types of allegations in support of this prong of the *Arlington Heights* analysis. They rely on statements that amount to little more than legal conclusions; simply claiming that there exists a discriminatory impact (without

attempting to explain the nature of that impact) does not make it so. *See, e.g.*, Case No. 201, ECF 59 ¶ 169. Plaintiffs also rely on statements from those opposing the 2021 Law's passage, *see* Case No. 201, ECF 59 at ¶¶ 85-87; however, legislators are not required to take the word of their political opponents at face value especially when those opponents presented no objective evidence presented of a foreseeable and anticipated impact. *Cf. Crawford*, 553 U.S. at 204 (explaining that neutral "justifications should not be disregarded simply because partisan interests may have" played a role in passing a law). And, in any event, "partisan motives are not the same as racial motives." *Brnovich* 210 L. Ed. 2d at 785.

Notably, there are no allegations that any legislator voting for the 2021 Law "anticipated" there would be a disparate impact.

### 6. Less Discriminatory Alternatives.

The *Florida Rising* Plaintiffs, in their amended complaint, attempt to allege the existence of less discriminatory alternatives, *see* Case No. 201, ECF No. 59 ¶ 89, but do so without first properly pleading that the 2021 Law is discriminatory in the first instance. *See Greater Birmingham Ministries*, 992 F.3d at 1327 ("[W]ithout proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional" (citation omitted)).

Furthermore, a State is not required to show that "a less restrictive means would not adequately serve the State's objectives." *Cf. Brnovich*, 210 L. Ed. 2d at

781. Finally, the failure to adopt Plaintiffs' preferred solution does not mean that the Legislature failed to adopt alternatives that lessened any potentially discriminatory impact. *See Greater Birmingham Ministries*, 992 F.3d at 1327. For example, the Florida Legislature provided multiple ways for a voter to provide sufficient identification to receive a vote-by-mail ballot. *See id.* (a voter ID law that allows the use of many forms of ID, including options for a free ID does not show a failure to consider less discriminatory alternatives); *see also* Fla. Stat. § 101.62 (allowing a voter to provide a Florida driver license number, a Florida ID number, or the last four digits of their Social Security number).

In sum, given the dearth of factual allegations alleging the *Arlington Heights* factors, this Court should dismiss the intentional, racial discrimination claims.

### C. This Court should dismiss the discriminatory effect claims under Section 2 of the Voting Rights Act.[13]

Discriminatory effect claims under Section 2 of the Voting Rights Act fare no better for purposes of Rule 12(b)(6).[14] The Act provides in pertinent part that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which *results* in a denial or

---

[13] Specifically, this Court should dismiss Count I in the *Florida Rising* case.

[14] In fact, it is an open question whether there exists "an implied cause of action under §2" in the first instance. *Brnovich,* 210 L. Ed. 2d at 786 (Gorsuch, J. concurring). For the purposes of this motion, and this motion alone, the Secretary assumes *arguendo* that one exists.

abridgment of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a) (emphasis added). The discriminatory result "is established if, based on the *totality of circumstances*, it is shown that" the relevant group "ha[s] less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice."[15] *Id.* § 10301(b) (emphasis added). The U.S. Supreme Court recently emphasized two tasks critical for the "totality of circumstances" analysis: (1) disentangling the "usual burdens of voting" from *unusual* burdens, *Brnovich*, 210 L. Ed. 2d at 772-73, 778-79, 781, and then (2) weighing those burdens against the State's interests, recognizing that the Act "does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives." *Id*. at 781. In assessing the burden, the U.S. Supreme Court also stated that "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Id.* Considerations the U.S. Supreme Court specifically assessed included (1) "the size of the burden imposed by the challenged voting rule," (2) "the degree to which a voting rule departs from what was standard practice when Section 2 was amended in 1982," (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the

---

[15] Initially, the *Florida Rising* Plaintiffs never allege that the 2021 Law keeps them from electing candidates of their choice. This is fatal. *See Greater Birmingham Ministries*, 992 F.3d at 1329.

opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision," and (5) "the strength of the state interests served by a challenged voting rule." *Id*. at 772-74.

Here the Complaints fail to include enough non-speculative, non-conclusory allegations of discriminatory effect to survive *Twombly*, *Iqbal*, and the U.S. Supreme Court's test in *Brnovich*.

### 1.    The Size of the Burden Imposed.

Disentangling the "usual burdens of voting" from unusual burdens begins with an assessment of the "size of the burden." *Id*. at 772-73. This "highly relevant" size inquiry looks at how voters are burdened (from the minor inconvenience of walking to the mailbox or the significant burden of being required to enter, for example, a precinct in a gated community that excludes them) and how many voters are burdened (a small subset in one county or a large portion statewide). *Id.*; *see also id.* at 773 n.11, 782 n.19. But the *Florida Rising* Plaintiffs fail to plead sufficient facts concerning both qualitative and quantitative measures of size.

The Plaintiffs' qualitative allegations clearly do not pass muster. For example, Plaintiffs allege that requiring a third-party voter organization to return vote-by-mail applications to the county where the voter resides presents something more than a usual burden of voting for the voter. Case No. 201, ECF 59 ¶ 129. There are no facts alleging why that would be the case, beyond Plaintiffs' admission that

their own organizations find it "extremely difficult, if not impossible, to ensure that no applications are inadvertently sent to the wrong county when processing a high volume of applications[.]" *See id.* ¶ 132. This sounds more like an issue of institutional capacity for Plaintiffs than an unusual burden on the voters they assist. Regardless, if "[h]aving to identify one's own polling place and then travel there to vote does not exceed the usual burdens of voting," *Brnovich*, 210 L. Ed. 2d at 778, then Plaintiffs' allegation here cannot be qualitatively sufficient to state a claim. This is especially so when the totality of circumstances is considered—when one considers that voters may still register through other means, such as the State's online voter registration portal or by mailing back their registration to the appropriate county supervisor.[16]

The quantitative allegations are insufficient as well. The Plaintiffs state variations of the following: "SB 90 . . . places disproportionate burdens on Black voters [and] Latino voters." *E.g.*, Case No. 201, ECF No. 59 ¶ 6. This threadbare allegation provides no details about the number of voters affected or an explanation of which of the five challenged provisions of the 2021 Law is responsible for the alleged burden. Without a baseline of how the alleged burdens impact the overall

---

[16] As the "opportunities provided" by Florida's election system are part of the assessment of the "size of the burden imposed" by that system, the factors will be considered together. *See Brnovich*, 210 L. Ed. 2d at 774 ("[C]ourts must consider the opportunities provided by a State's entire system of voting *when assessing the burden imposed* by a challenged provision." (emphasis added)).

electorate, it is impossible to derive from that lack of baseline the *disparate* impact the minority voters face. The allegation is thus nothing more than a conclusory statement that fails to establish the size of any burden.

2. The Degree to which the Rules Depart from Standard Practice in 1982.

If the *Florida Rising* Plaintiffs had pled with specificity the size of the burdens imposed, then the "benchmark" against which those burdens should be judged is Florida's 1982 election code, since that was the legislation in effect when Congress last amended Section 2 of the Voting Rights Act. *Brnovich*, 210 L. Ed. 2d at 774; *id.* at 777 n.15 (when amending Section 2 in 1982 "Congress did not set its sights on every facially neutral time, place, or manner voting rule in existence."). Judged against that 1982 "benchmark," Florida's 2021 Law easily passes muster.

Like most states, in 1982 Florida allowed only in-person voting, Fla. Stat. § 101.011 *et seq.* (1973), with limited-excuse absentee voting, Fla. Stat. § 101.011 *et seq.*; *see* Fla. Stat. Ann. § 97.063 (1982).

Since 1982, however, Florida has made voting more convenient through the addition of mandatory and discretionary early voting days. Fla. Stat. § 101.657. In addition to permitting voting in-person on Election Day and during the mandatory (and additional discretionary) early voting period, Florida has since 1982 greatly expanded access to vote-by-mail ballots. Specifically, before 1996, Floridians hoping to use the convenience of vote-by-mail needed to have their ballots notarized

or signed by two witnesses who themselves were registered to vote in Florida; in 1996, the Florida Legislature lowered the requirement to a single witness signature, and in 2004 repealed the witness requirement altogether. Ch. 2004-232, § 1, Laws of Fla.; Ch. 96-57, § 4, Laws of Fla. *Id.* Only since 2001 have Floridians been able to vote-by-mail without a statutorily recognized justification for doing so. Ch. 2001-40, § 53, Laws of Fla. Now, no excuse vote-by-mail without the need for notaries or witnesses is permitted and the use of drop boxes (first used during the 2020 election cycle) are also now permitted. But safeguards for the vote-by-mail process must keep pace with these innovations. After all, as this Court previously recognized, Florida has a "rich history of absentee-ballot fraud, including at least two elections in which courts invalidated every single absentee ballot because of widespread fraud." *Fla. St. Conf. of NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008).

Thus, the 2021 Law imposes minimal, if any, burdens when compared to voting as it existed in Florida in 1982. The five sections being challenged—together with the other twenty-seven sections of the 2021 Law—work to ensure that voting remains safe *and* accessible in the State. Importantly, any departures from standard practice in 1982 *benefit* the very groups and voters that Plaintiffs purport to represent. The *Florida Rising* Plaintiffs do not plead otherwise; they instead measure the 2021 Law against the improper baseline of 2020, which is an extreme

outlier of an election held during a global pandemic. *See, e.g.*, Case No. 201, ECF 59 ¶ 7-8 (looking solely at 2020 data as if it is the relevant baseline).

3.  *The Size of any Disparity in a Rule's Impact on Members of Different Racial or Ethnic Groups.*

The size of any disparity is an important touchstone in the analysis because the "mere fact that there is some disparity does not necessarily mean that a system is not equally open [or] does not give everyone an equal opportunity to vote." *Brnovich*, 210 L. Ed. 2d at 774. Here, just as Plaintiffs failed to plead the size of any burden under the first factor, the *Florida Rising* Plaintiffs have failed to plead any facts that go to the *extent* of any disparity, often citing the statements of legislative opponents as if they were authoritative. *See, e.g.*, Case No. 201, ECF No. 59 ¶ 116 (claiming that the 2021 Law's regulations of drop boxes could be "particularly burdensome for voters who cannot get time off of work to vote," but relying only on statements made by bill opponents for the contention that the impact will be disparate); *id.* ¶ 129 (claiming that the 2021 Law "will drastically chill the efforts of organizations to register new voters, in particular Black and Latino voters[,]" but never explaining why it would impact minority voter registration efforts more than others or addressing the extent of the alleged disparity). Simply alleging that there *is* a disparity is facially deficient. *See id.* ¶¶ 86, 158 (again relying on claims made by legislative opponents as if they constitute factual evidence); *see*

*also Twombly*, 550 U.S. at 555 ("[L]abels and conclusions, and a formulaic recitation of the elements of a cause of action" are insufficient to state a claim).

4. The Strength of the State Interests Served by a Challenged Voting Rule.

Because every voting rule imposes some burden, it is important to consider the reason for the law in the first instance. *Brnovich*, 210 L. Ed. 2d at 774. "Rules that are supported by strong state interests are less likely to violate §2." *Id.* "[S]trong state interests" include, but are in no way limited to, preventing voter fraud, "[e]nsuring that every vote is cast freely, without intimidation or undue influence," *id.*, and maintaining the integrity of the election system as a whole, including confidence in the system.[17]  *Id.*

Strong interests are implicated here.  The State has a *per se* interest in preventing voter fraud because "a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Id.* at 783.[18] Because of that interest, the Florida Legislature "was not obligated to wait for something closer to home" before enacting the 2021 Law being challenged here. *Id.*

---

[17] There are a whole host of other state interests that the 2021 Law seeks to protect, including uniformity and efficiency.

[18] That said, there *is*, as this Court has previously found, evidence of election fraud in Florida, which will be presented to the Court at the appropriate time. *See  Fla. St. Conf. of NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008) (discussing Florida's "rich history of absentee-ballot fraud, including at least two elections in which courts invalidated every single absentee ballot because of widespread fraud").

The Carter-Baker Commission's report relied on by the U.S. Supreme Court explains why. *See id.* at 782-84. For example, the Commission found that "absentee balloting is vulnerable to abuse" and "third-party ballot collection can lead to pressure and intimidation." *Id*. at 782-83. The 2021 Law goes directly, at least in part, to the heart of the issues presented in the Carter-Baker Commission. The ballot harvesting provision seeks to limit the potential for third parties to pressure or intimidate voters into making certain voting selections. The non-solicitation rules do the same. And the voter identification and third-party voter registration rules are focused on guarding against the kind of election fraud the Commission warned against. All of the provisions in the 2021 Law challenged by Plaintiffs further Florida's important interests in, among other things, election integrity, preventing voter fraud, and promoting confidence in the electoral system as a whole. In short, the 2021 Law was a legitimate use of state power to further well-known and well-accepted state interests. These interests need not—yet will be—supported by evidence should this claim proceed beyond the pleading stage. *See, e.g.*, *id.*

In sum, the Plaintiffs have not adequately pled a discriminatory effect claim under Section 2 of the Voting Rights Act.

**D.** **This Court should dismiss the vagueness and overbreadth claims against the non-solicitation requirement.[19]**

The Plaintiffs similarly fail to state a claim for purposes of Rule 12(b)(6) when they allege that the 2021 Law violates vagueness and overbreadth doctrines under the First or Fourteenth Amendments, or both, because of its prohibition on "engaging in any activity with the intent to influence or effect of influencing a voter" within "150 feet of a drop box or the entrance to any [in-person] polling place," which also does not apply to nonpartisan assistance from supervisors or their staff. **Exhibit A** at § 29 (Pg. 24-25). The *Harriet Tubman* Plaintiffs' argument that the voter-registration disclaimer is void for vagueness because it "does not specify the penalties" for non-compliance also misses the mark.

**1.** Non-Solicitation Provision Establishes Reasonably Clear Lines for All to Follow.

A law is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment where it "fails to provide people with ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or because it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "[R]easonably clear lines" between proscribed

---

[19] Specifically, this Court should dismiss Count IV in the *League of Women Voters* case, Count V in the *Florida Rising* case, and Count I in the *Harriet Tubman* case.

and permitted conduct are all that is required to pass muster under the Due Process Clause. *Smith v. Goguen*, 415 U.S. 566, 574 (1974).

The Plaintiffs assert that Section 29 of the 2021 Law—the non-solicitation provision—is unconstitutionally vague because it fails to draw an absolute line separating proscribed from permitted speech and conduct within the 150-foot zone surrounding polling locations. *See, e.g.*, Case No. 186, ECF 124 ¶¶ 181-83; Case No. 201, ECF 59 ¶¶ 206-08; Case No. 242, ECF 44 ¶ 120. Their argument hinges on the use of the words "any activity" and "influence" which the *LWV* Plaintiffs argue "leave them to guess" "what activities are permitted or prohibited under the law," meaning that there is effectively no limit to the kinds of activities that could be criminalized within that 150-foot perimeter. Case No. 186, ECF 124 ¶ 119. They warn that "[t]he possibilities of prohibited activities are *virtually limitless*, ranging from speaking words to a voter to handing them water bottles or food." *Id.* ¶ 181 (emphasis added). These arguments do not withstand scrutiny.

The non-solicitation provision's text reveals that it cannot reasonably be interpreted to criminalize "any activity" within the no-solicitation zone—and the Plaintiffs point to no language beyond their capacious reading of the two words "any activity" that reasonably prohibits, *inter alia*, the nonpartisan provision of food or water, or a chair to someone with mobility challenges.

First, contrary to the Plaintiffs' decision to read "any activity" in isolation, the

canons of construction mandate that "[w]ords of a statute are not to be interpreted in isolation; rather a court must look to the provisions of the whole law and to its object and policy." *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1363 (Fed. Cir. 2005). When the phrase "any activity" is construed reasonably in the context of the surrounding text and the provision as a whole, the text is unambiguous in what it prohibits: partisan efforts of individuals or campaigns to pressure or influence voters' decisions within the no-solicitation zone.

Second, another commonly used linguistic canon confirms that Section 29's meaning is not vague. Specifically, when, as here, general terms or phrases are included in a series of more specific items, the general term should be interpreted to have meaning akin to the more specific surrounding terms and in light of its surrounding provisions, i.e., *noscitur a sociis*.[20] Using this canon, it is apparent that the non-solicitation provision does not in any way prohibit innocent, nonpartisan assistance such as the provision of food or water to voters waiting in line. Instead, the relevant provision targets partisan efforts to influence the decisions of voters near polling locations.

Notably, the "any activity" restriction itself is qualified by the important

---

[20] *See, e.g.*, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995); *Beecham v. United States*, 511 U.S. 371 (1994); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).

phrase "with the intent[21] to *influence* or effect of *influencing* a voter," demonstrating that the provision does not extend to ordinary, run-of-the-mill activities like innocently giving voters a drink of water—rather, the restriction narrowly targets activities that have a reasonable likelihood of swaying a voter's decision on how to vote. **Exhibit A** at § 29 (Pg. 24-25) (emphasis added).

It follows that, while merely giving bottles of water to voters waiting in line would not reasonably be viewed as an activity "with the effect of influencing a voter," if for example the bottles have campaign logos pasted on the front or are supplemented with campaign literature, that obviously transforms the activity into the kind of solicitation prohibited by statute. Certainly, the Florida Legislature did not need to engage in the unwieldy exercise of spelling out every potential way that individuals or political groups could influence or attempt to influence voters approaching a polling location—due process does not demand that level of enumeration to prohibit obviously unsuitable conduct in all its various permutations. Nor is that level of detail necessary to guard against the de minimis risk of

---

[21] The U.S. Supreme Court "has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). Accordingly, because the non-solicitation provision includes the scienter requirement of "intent to influence . . . a voter," any alleged vagueness that may exist with respect to that restriction is sufficiently alleviated.

inconsistent enforcement. Instead, because the non-solicitation provision identifies the prohibited conduct through its plain text and clear purpose, the provision is not unconstitutionally vague.

Third, even if the phrase "any activity" *is* vague when viewed in isolation, as Plaintiffs assert, the series of prohibited activities immediately preceding the provision, coupled with its broader context, reveals exactly the kinds of "activities" the statute prohibits, and manifests an unmistakable purpose of prohibiting partisan solicitation near polling locations, defeating Plaintiffs' vagueness arguments. This is because the relevant "any activity" language comes from the definition of the terms "solicit" and "solicitation" under the provision. Dictionary definitions confirm that to "solicit" is ordinarily understood to mean to entreat, approach with a request or plea, urge, or entice to action. *See, e.g.*, *Solicit, Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/solicit (last accessed June 22, 2021). Importantly, the word does not ordinarily include aiding or assisting someone as Plaintiffs allege, unless such assistance is intended or reasonably has the effect of influencing voters to change their vote. The items included in the non-solicitation provision's list of prohibited actions preceding the provision at issue here bolsters this interpretation. They include:

> seeking or attempting to *seek any vote*, fact, opinion, or contribution; distributing or attempting to distribute any *political or campaign material, leaflet, or handout*; conducting a *poll* . . . seeking or attempting to seek a *signature on any petition*; selling or attempting to

sell any item; and engaging in any activity with the intent to *influence* or effect of influencing a voter.

**Exhibit A** at § 29 (Pg. 24-25) (emphasis added).  Plaintiffs' Complaints perplexingly refuse to interpret the 2021 Law's addition in light of the preceding specific prohibitions, *see* Case No. 201, ECF 59 ¶ 155-57, presumably because doing so is fatal to their vagueness argument. Viewed within its proper context, the "any activity" provision does not reasonably mean what Plaintiffs assert it could mean, nor is it vague.  Instead, it is surrounded by a list of activities that include requesting votes, campaigning, distributing literature, and signature gathering for petitions— the statutory purpose is thus clear. Legislatures are presumed to not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), which is exactly what the Plaintiffs ask this Court to do:  they aim to expand the potential statutory meaning of "any activity" to prohibit a whole host of nonpolitical activities and assistance that are of a fundamentally different scope and character from the list of items immediately preceding that phrase.  This Court should reject this effort to go well beyond what the statutory text and purpose reasonably indicate.

Finally, contrary to Plaintiffs' foreboding, the carveout for supervisors' volunteers and employees bolsters the Secretary's interpretation because it confirms the exact kinds of activities the statute permits and thus does not aim to restrict: "providing *nonpartisan* assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters."  **Exhibit A** § 29 (Pg. 25).  Restricting

assistance within the zone to nonpartisan activities again bolsters Defendant's argument that the legislature was primarily concerned with restricting *partisan* activities, as evidenced by the kinds of activities prohibited by the previous clauses.

In sum, because Section 29's solicitation provision is not susceptible to the interpretations put forth by Plaintiffs, and given the U.S. Supreme Court's reluctance to declare statutes void for vagueness generally, *see Parker v. Levy*, 417 U.S. 733, 757 (1974), the Plaintiffs' vagueness claims should be dismissed.

> 2. Third-Party Registration Disclaimer Establishes Reasonably Clear Lines.

The *Harriet Tubman* Plaintiffs' challenge to the voter-registration disclaimer on vagueness grounds fails too. They argue that the disclaimer requirements do not "specify" the penalties. Case No. 242, ECF 4 at ¶ 118. But there are specific penalties within the statute.

Section 7 of the 2021 Law specifies in Section 97.0575(3)(a) that "the aggregate fine pursuant *to this paragraph* which may be assessed against a third-party voter registration organization, including affiliate organizations, for violations committed in a calendar year is $1,000." **Exhibit A** § 7 (Pg. 9) (emphasis added). That "paragraph" as amended includes the relevant disclaimer requirement that a "third-party voter registration organization must notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in

less than 14 days." *Id.* (Pg. 8). There is nothing vague about the consequences to third-party voter registration organizations for non-compliance; again, the aggregate maximum annual penalty explicitly established by statute for noncompliance is $1,000. *Id.* § 7 (Pg. 8-9). Period.[22] *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1311-12 (11th Cir. 2009) (holding potential defendants "have notice of the consequences of violating [the statute] because it clearly defines what conduct is prohibited and the potential range of fine that accompanies noncompliance").

### 3. The Overbreadth Claims Also Fail.

The First Amendment's overbreadth doctrine[23] prohibits regulation of substantially more protected speech than is necessary to achieve regulatory purposes. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). A regulation's overbreadth "must not only be real, but substantial as well, judged in relation to the

---

[22] The *Harriet Tubman* Plaintiffs' separate concern that the statute does not identify whether "individual volunteers" would face consequences for a violation under the law, Case No. 242, ECF 44 ¶ 118, is also unavailing because Section 7 only permits assessment of the aggregate fine "against a third-party voter registration organization." **Exhibit A** § 7 (Pg. 9) Far from being void for vagueness, the statute is clear that individual volunteers, including for such organizations, are not subject to penalties at all.

[23] In the Fourteenth Amendment context, the overbreadth doctrine is simply not applied. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."); *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984) ("[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad.").

statute's plainly legitimate sweep." *Id*. at 615. Overbreadth is, however, a "manifestly[] strong medicine" sparingly employed by courts "only as a last resort," *id.* at 613, meaning that "facial overbreadth adjudication is an exception" to the U.S. Supreme Court's "traditional rules of practice," *id.* at 615. Consequently, statutes should not be invalidated based on facial overbreadth whenever "a limiting construction has been or could be placed on the challenged statute." *Id.* at 613; *see also United States* v. *Thirty-seven Photographs*, 402 U.S. 363 (1971).

The U.S. Supreme Court's First Amendment precedents permit state governments to create so-called "nonpublic forums" where the government has significant flexibility to establish rules limiting speech, *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46-49 (1983), and which the government "may reserve . . . for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression" merely because of government opposition to the speaker's viewpoint, *id.* at 46. Courts thus routinely uphold speech restrictions at nonpublic forums like polling places as constitutional because they qualify as "government-controlled property set aside for the sole purpose of voting." *Minn. Voters Alliance v. Mansky,* 138 S. Ct. 1876, 1885-86 (2018); *see also Burson v. Freeman,* 504 U.S. 191, 193-94 (1992). Accordingly, the government "may impose some content-based restrictions on speech in nonpublic forums [like polling locations], including restrictions that exclude

political advocates and forms of political advocacy." *Mansky*, 138 S. Ct. at 1885-86.

The Plaintiffs' complaints hardly rise to the level of the exceptional kind of claims or "last resort," *Broadrick*, 413 U.S. at 613, that would justify invoking the overbreadth doctrine. Far from prohibiting substantially more speech than the Constitution permits, the complaints do not actually describe restrictions on protected speech at all. This is fatal to the overbreadth claims and warrants dismissal.

First, as described in the above analysis of vagueness, the 2021 Law does not prohibit the kinds of activities that Plaintiffs allege. Contrary to Plaintiffs' allegations, the non-solicitation provision does not "deter anyone who is not an employee or volunteer of the Supervisors of Elections' office from offering voter assistance at polling places—including handing out food or water—and impose burdens on voters who are already waiting in long lines."[24] Case No. 186, ECF 124 ¶ 153. Even if the non-solicitation provision does prohibit expressive conduct as the Plaintiffs allege, that speech would still not be protected from regulation because the statute clearly regulates polling locations, which are nonpublic forums subject to content-based speech restrictions, including political advocacy prohibitions. *See*

---

[24] This assumes that voters have a constitutional right to *receive* food, water, chairs, etc. in the first place while waiting in a public line to vote, which is conjectural at best. But even if such a constitutional right did exist, it would not be pursuant to the First Amendment, which means the overbreadth doctrine would not be applicable. *Salerno*, 481 U.S. at 745 ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.").

*Mansky*, 138 S. Ct. at 1885-86.  The statute plainly targets partisan activities with the intent or "effect of influencing a voter," which is essentially identical to political advocacy that the Supreme Court has said may be restricted in polling locations.  *See id.*  Thus, no matter how Plaintiffs frame it, the result is the same: the overbreadth doctrine is entirely inapplicable to the non-solicitation provision.

Lastly, the *LWV* Plaintiffs' complaint suffers from a separate but equally problematic defect: it focuses on the lack of express definition of the words "any activity" and imagines a parade of horribles stemming from its interpretation of the phrase, but never offers factual allegations in support of its contention that the non-solicitation provision is unconstitutionally overbroad.  Case No. 186, ECF 124 ¶ 180-84.  If ever there were an "unadorned" allegation, *Iqbal*, 556 U.S. at 678, that fails to provide any "grounds" for "entitlement to relief," *Twombly*, 550 U.S. at 555, this pure conclusory statement is it.

In sum, the overbreadth allegations must also be dismissed as a matter of law for failure to state a claim.

> ### E.    This Court should dismiss the claims under Section 208 of the Voting Rights Act.[25]

Claims that Section 208 of the Voting Rights Act preempts the 2021 Law

---

[25] Specifically, this Court should dismiss Count VI in the *Florida Rising* case and Count IV of the Harriet Tubman case.

because the Florida law allegedly "depriv[es] . . . Plaintiffs[] of rights and privileges" should also be dismissed. *See* Case No. 242, ECF No. 44 ¶ 159.

1.    The Plaintiffs Lack Standing to Sue the Secretary.

This Court should dismiss under Rule 12(b)(1) the Section 208 claims against the Secretary because the Plaintiffs fail to "clearly . . . allege facts demonstrating" that they have standing. *Warth*, 422 U.S. at 518.

Specifically, the *Florida Rising* Plaintiffs provide a single factual contention showing that the alleged Section 208 violations are fairly traceable to the Secretary. For instance, they claim (without support) that the 2021 Law prevents a volunteer from providing requested language assistance to voters who need such assistance at the polls. *See* Case No. 201, ECF No. 59 ¶ 216. They claim that the Secretary is implicated in this hypothetical scenario by her failure to issue "interpretive guidance" confirming that the 2021 Law "does not cover the nonpartisan provision of food, water, chairs, umbrellas, language assistance, or other support to voters in line"—in other words, the Secretary is somehow culpable because she has not restated what the statute already expressly says. *See id.* ¶ 218. This is a tacit admission of the fact that supervisors of election are responsible for supervising lines at the poll—not the Secretary.  Because Plaintiffs fail to adequately link the Secretary to the injuries they allege and the relief they seek under Section 208, their Section 208 claims against the Secretary must be dismissed for lack of standing. *See*

*Jacobson*, 974 F.3d at 1253.

## 2.    There is no Private Cause of Action.

Separately, and equally fatal to Plaintiffs' Section 208 claim, Section 208 does not provide a private right of action. The Voting Rights Act contains many sections dedicated to a remedial scheme to enforce its provisions. Some provisions are enforceable by the U.S. Attorney General, *see, e.g.*, 52 U.S.C. § 10504, and some provisions are enforceable by private litigants, *see, e.g.*, *id.* § 10302(a). Section 208 contains no remedial scheme whatsoever. *id.* § 10508.

The U.S. Supreme Court has articulated a four-part test to determine if a "private remedy is implicit in a statute not expressly providing one." *Cort v. Ash*, 422 U.S. 66, 78 (1975). "First, is the plaintiff one of the class for whose especial benefit the statute was enacted, that is, does the statute create a federal right in favor of the plaintiff?" *Id.* (internal quotation and citation omitted). "Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?" *Id.* "Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" *Id.* "And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Id.* "The Supreme Court has cautioned the judiciary to exercise restraint in implying a private right of action, and required that

affirmative evidence of congressional intent to create a private remedy must exist."
*McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1222 (11th Cir. 2002).

In this case, as an initial matter, the Plaintiffs are not the class of individuals that Congress contemplated in enacting Section 208 because none of them have had their right to receive necessary voting assistance unduly burdened by the series of speculative (and in many cases improbable) events they allege may take place in some future election. Second, although Congress's intent in Section 208 certainly was to allow needed assistance to voters who are disabled, blind, or illiterate, *see, e.g.*, JoNel Newman, *Ensuring That Florida's Language Minorities Have Access to The Ballot*, 36 Stetson L. Rev. 329, 354 (2007), the Plaintiffs provide no affirmative evidence of congressional intent to create a private remedy under Section 208. To the contrary, the legislative scheme as a whole demonstrates that Congress did not intend to create a private right of action: Congress unambiguously created private rights of action in various other sections of the Voting Rights Act but conspicuously excluded it from Section 208. Obviously then, "when Congress wished to provide a private [] remedy, it knew how to do so and did so expressly," counseling strongly against this Court "imply[ing] a private remedy." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571-72 (1979) (refusing to imply a private right of action under Section 17(a) of the Securities Exchange Act of 1934). By declining to do so under Section 208, Congress demonstrated that its intent was *not* to provide a private

remedy—inferring a right of action despite of this weighty evidence would fly in the face of the Supreme Court's admonition to exercise restraint in implying private rights of action, *McCulloch*, 298 F.3d at 1222. And fourth, because the U.S. Constitution gives states the power to regulate elections, *see Sugarman v. Dougall*, 413 U.S. 634, 647 (1973), regulation of absentee ballots and polling locations is a function traditionally relegated to state law, further counseling against inferring a cause of action based solely on federal law. *Cort*, 422 U.S. at 78.

The result is the same when judged against recent U.S. Supreme Court precedent that seemingly departs from the four-part test. Specifically, the U.S. Supreme Court has said in more recent cases that except when "congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Thompson v. Thompson*, 484 U.S. 174, 179 (1988). "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002). As detailed above, if Congressional intent serves as the lodestar, there is still no private cause of action here.

<ol start="3" type="1"><li>Section 208 Does Not Preempt Florida Law.</li></ol>

Turning to the merits, Section 208 provides that "[a]ny voter who requires

assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. Conflict preemption exists where a party's "compliance with both federal and state regulations is a physical impossibility," or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citations omitted). The Eleventh Circuit has affirmed its presumption of non-preemption when a state acts "in a field which the States have traditionally occupied," rooted in the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1328 (11th Cir. 2001) (citation omitted).

As the Senate Report's discussion of Section 208 states regarding its objectives and the issue of preemption of state legislation:

> The Committee recognizes the legitimate right of any State to establish necessary election procedures, subject to the overriding principle that such procedures shall be designed to protect the rights of voters. State provisions would be preempted *only to the extent* that they *unduly burden the right recognized in this section*, with that determination being a practical one dependent upon the facts.

S. Rep. No. 417, 97th Cong., 2d Sess. at 62-63 (emphasis added). Because regulating elections is a quintessential area of traditional state regulation, the

Plaintiffs must overcome a strong presumption against preemption. They cannot.

The Plaintiffs' complaints fail to plead sufficient facts to show that Section 32's limitation on ballot collection or Section 29's non-solicitation provision unduly burden the rights of disabled voters requiring assistance to receive assistance from a person of the voter's choice. Again, the Plaintiffs' reading of the non-solicitation provision is a wildly expansive interpretation divorced from the statutory text's actual limited prohibition of "solicitation" activities. Case No. 201, ECF No. 59 ¶ 153 (claiming without factual support that Section 29 "in effect criminalizes the practice of providing food, water, language assistance, and other assistance to voters waiting in line to vote"). So, there is no conflict whatsoever with the demands of Section 208 of the Voting Rights Act.

The same is true for the limitation on ballot collection. Compliance with Florida law does not "unduly burden" the right to be given assistance by a person of the voter's choosing because having a ballot delivered to a drop box is not assistance that is *necessary* to vote in the first place—returning ballots via the mail remains a perfectly feasible alternative for homebound voters. In any event, the provision does not make compliance with Section 208 "impossible." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 780 (8th Cir. 2009); *see also* 52 U.S.C. § 10508 (requiring assistance by "a person of the voter's choice," not assistance by the voter's *first* or even *preferred* choice).

45

Because Plaintiffs fail to state a claim of conflict preemption under Section 208, and because Section 208 does not provide for a private cause of action, Plaintiffs' Section 208 claim must be dismissed.

**IV.**     **Conclusion**

For the foregoing reasons, this Court should grant the Secretary's Motions to Dismiss in the cases pending before this Court.

Respectfully submitted by:

BRADLEY R. MCVAY (FBN 79034)
General Counsel
Brad.McVay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48302)
Deputy General Counsel
Ashley.Davis@dos.myflorida.com
Florida Department of State
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

 */s/     Mohammad Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
mjazil@holtzmanvogel.com
GARY V. PERKO (FBN 855898)
gperko@holtzmanvogel.com
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
119 S. Monroe St., Ste 500
Tallahassee, FL 32301
Phone: (850) 274-1690
Fax: (540) 341-8809

Phillip M. Gordon (VSB 95621)
pgordon@holtzmanvogel.com
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809
* Admitted *pro hac vice*.

Dated: July 30, 2021

## NORTHERN DISTRICT OF FLORIDA
## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(D), a conference was not conducted as the relief requested herein will determine the outcome of several of Plaintiffs' claims.

*/s/      Mohammad Jazil*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Local Rule 7.1(F), the attached Omnibus Memorandum in Support of the Secretary's Motions to Dismiss contains 11,235 words, excluding the case style, signature block, and any certificate of service.

*/s/      Mohammad Jazil*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

to all counsel of record through the Court's CM/ECF system on July 30, 2021.


/s/ *Mohammad Jazil*
Attorney for Defendant Secretary Lee