**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | |
|---|---|
| FLORIDA RISING TOGETHER, et al., | Case No. 4:21-cv-201-MW/MJF |
| Plaintiffs, | |
| v. | |
| LAUREL M. LEE, et al., | |
| Defendants. | |

**FLORIDA RISING TOGETHER PLAINTIFFS' OPPOSITION TO
DEFENDANT LEE'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ............................................................................. 1

BACKGROUND & PROCEDURAL HISTORY ................................. 2

LEGAL STANDARD ....................................................................... 2

ARGUMENT ................................................................................... 3

I.    PLAINTIFFS HAVE STATED AN UNDUE BURDEN CLAIM UNDER *ANDERSON-BURDICK* ................................................... 3

II.   PLAINTIFFS HAVE STATED A CLAIM UNDER THE EQUAL PROTECTION CLAUSE AND UNDER THE FIFTEENTH AMENDMENT ......................................................................... 8

III.  PLAINTIFFS HAVE STATED A CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT ................................................. 18

      A.   *Brnovich* Does Not Require Plaintiffs to Prove Their Case at the Pleading Stage ........................................................... 19

      B.   Plaintiffs Have Alleged Facts Plausibly Asserting a Section 2 Results Claim .................................................................. 21

      C.   Plaintiffs Have Sufficiently Alleged Intentional Discrimination in Violation of Section 2 ............................................... 23

IV.   THE LINE WARMING RESTRICTION VIOLATES THE FIRST AMENDMENT AND FOURTEENTH AMENDMENT AND IS PREEMPTED UNDER VOTING RIGHTS ACT SECTION 208 ............... 24

      A.   Plaintiffs Have Adequately Pleaded that the Line Warming Restriction is Unconstitutionally Vague ..................................... 24

      B.   Plaintiffs Have Adequately Pleaded that the Line Warming Restriction Violates the First Amendment As Applied To Their Conduct ............... 28

      C.   Plaintiffs Have Adequately Pleaded that the Line Warming Restriction is Unconstitutionally Overbroad .................................... 29

      D.   The Line Warming Restriction is Preempted Under Section 208 ......... 30

CONCLUSION .............................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)............................................................3

*Arizona v. United States*,
    567 U.S. 387 (2012)..........................................................33

*Arkansas United v. Thurston*,
    No. 5:20-cv-5193, 2021 WL 411141 (W.D. Ark. Feb. 5, 2021).....................32

*Bickley v. Caremark RX, Inc.*,
    461 F.3d 1325 (11th Cir. 2006)..........................................20

*Brnovich v. Democratic National Comm.*,
    141 S. Ct. 2321 (2021)................................................*passim*

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973).........................................................29

*Burdick v. Takushi*,
    504 U.S. 428 (1992)...........................................................3

*Burson v. Freeman*,
    504 U.S. 191 (1992)........................................................29

*Cowen v. Ga. Sec'y of State*,
    960 F.3d 1339 (11th Cir. 2020)...........................................6

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)........................................................4, 7

*Democracy N.C. v. N.C. State Bd. of Elections*,
    476 F. Supp. 3d 158 (M.D.N.C. 2020)....................................32

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019).........................................3, 8

*Duke v. Cleland*,
    5 F.3d 1399 (11th Cir. 1993) ................................................................6

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .................................................................24, 25

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018) ..........................................................28

*Frank v. Walker*,
    819 F.3d 384 (7th Cir. 2016) ................................................................8

*Goosby v. Osser*,
    409 U.S. 512 (1973) ..............................................................................5

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    997 F.3d 1363 (11th Cir. 2021) ............................................................8

*Harvard v. Inch*,
    411 F. Supp. 3d 1220 (N.D. Fla. 2019) ................................................3

*Hill v. Stone*,
    421 U.S. 289 (1974) ..............................................................................5

*Hunt v. Aimco Props., L.P.*,
    814 F.3d 1213 (11th Cir. 2016) ............................................................2

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ..............................................................................9

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ........................................4, 7, 8

*McDonald v. Bd. of Election Comm'rs of Chi.*,
    394 U.S. 802 (1969) .........................................................................4, 5

*Minnesota Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ........................................................................27

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996) ............................................................................32

*N.C. State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ................................................................8

*New Ga. Project v. Raffensperger*,
   976 F.3d 1278 (11th Cir. 2020) ..........................................................5

*Nick v. Bethel*,
   No. 3:07-cv-98, 2008 WL 11456134 (D. Alaska July 30, 2008) ......................33

*O'Brien v. Skinner*,
   414 U.S. 524 (1974) ......................................................................4, 5

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ..............................................................5

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ...............................................................32

*Priorities USA v. Nessel*,
   462 F. Supp. 3d 792 (E.D. Mich. 2020) ........................................32, 33

*Reno v. Am. Civil Liberties Union*,
   521 U.S. 844 (1997) ........................................................................25

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ....................................................................19, 22

*United States v. Stevens*,
   559 U.S. 460 (2010) ........................................................................28

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) (en banc) .......................................8, 17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................................9, 23

*Washington v. Davis*,
   426 U.S. 229 (1976) ..........................................................................9

**Statutes**

52 U.S.C. § 10301(a) .......................................................18, 19, 20, 21

52 U.S.C. § 10301(b) ...............................................................19, 21

52 U.S.C. § 10302(b) ................................................................................32

52 U.S.C. § 10508 ..............................................................................30, 33

Fla. Stat. § 97.012(1) ..............................................................................31

Fla. Stat. § 97.012(15) .............................................................................31

Fla. Stat. § 102.031(4)(b) .......................................................23, 24, 27, 29

Fla. Stat. § 102.031(4)(b) (2020) ............................................................24

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 8 .............................................................2

Federal Rule of Civil Procedure 12 ................................................*passim*

Federal Rule of Civil Procedure 12(b)(6) ................................................2

**INTRODUCTION**

Secretary Laurel M. Lee's ("Secretary Lee") motion (ECF 122-1) is entirely without merit. It is little more than a rehash of the motion previously filed on June 25 (ECF 49), and barely acknowledges that Plaintiffs amended the Complaint (ECF 59) specifically to address Secretary Lee's prior motion. This latest motion is also only a partial motion to dismiss, raising arguments against Counts I-VI of this action, but not addressing Counts VII and VIII.

Secretary Lee's motion misapplies the standard of review for a Rule 12 motion, misconstrues the claims in the Complaint, and badly misstates the law. Here, the Complaint alleges more than sufficient facts to establish each of the violations that Defendants contest. Most of the arguments regarding the Voting Rights Act Claim (Count I) and the Equal Protection and Fifteenth Amendment Claims (Counts II and III) concern sufficiency of pleading and were cured by the Amended Complaint. Defendant Lee's arguments concerning the *Anderson-Burdick* claim (Count IV), the overbreadth and vagueness of SB 90 Section 29 (Count V), and preemption under Section 208 of the Voting Rights Act (Count VI) are all wrong as a matter of law. For these reasons, the motion should be denied.

## BACKGROUND & PROCEDURAL HISTORY

SB 90 was enacted and became effective on May 6, 2021, and was designed to immediately impose substantial restrictions on the ability of eligible persons to register to vote and cast ballots, with a disproportionate impact on Black and Latino voters. Plaintiffs are eight organizations that, among other things, directly work to educate, mobilize, and support Black and Latino voters. Plaintiffs challenge provisions in four sections of SB 90—Sections 7, 24, 28 and 29. ECF 59.

On June 25, 2021, Secretary Lee moved to dismiss, primarily for purported deficiencies in pleading. ECF 49. In response, Plaintiffs filed an amended complaint that specifically addressed purported pleading deficiencies. ECF 59. On July 12, the Court denied Secretary Lee's motion to dismiss as moot in light of the amended complaint. ECF 63. This amended complaint ("Complaint") supersedes the original complaint and, as discussed below, cures any purported deficiencies the Secretary identified in the June 25 motion. Nonetheless, on July 30, 2021, Secretary Lee renewed her motion, largely recycling her June 25 filing. ECF 122-1.

## LEGAL STANDARD

In the Eleventh Circuit, in weighing a Rule 12(b)(6) motion, a court must "accept[] the allegations in [a] complaint as true and constr[ue] them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). Further, under Rule 8, a Plaintiff must "merely [allege] a short and

plain statement of the claim that is plausible on its face—one that calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of alleged violations." *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1234 (N.D. Fla. 2019) (internal quotation marks and citations omitted). Here, the Complaint alleges more than sufficient facts to establish each of the violations that Defendants contest.

## ARGUMENT

## I.   PLAINTIFFS HAVE STATED AN UNDUE BURDEN CLAIM UNDER *ANDERSON-BURDICK*

Plaintiffs have sufficiently pleaded that the Secure Drop Box Restriction, Vote-By-Mail Application Restriction, Voter Registration Delivery Restriction, and Line Warming Restriction violate the First and Fourteenth Amendments under the *Anderson-Burdick* doctrine (Count IV), which requires a court "to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

The Eleventh Circuit has made clear that "[a] law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate

interests of sufficient weight still must justify that burden." *Id.* at 1318-19 (citations omitted).  Indeed, "[h]owever slight" a burden on voting "may appear," "it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1215-16 (N.D. Fla. 2018) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (internal quotation marks omitted)).

Secretary Lee seeks to evade this well-established framework by citing a non-controlling concurrence in *Crawford* and *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), a case that predates *Anderson* and *Burdick* and that was decided on motions for summary judgment, not a motion to dismiss.  Secretary Lee's primary argument for dismissing Plaintiffs' undue burden claim is that the challenged restrictions purportedly "do[] not implicate the right to vote" and thus should be assessed under *McDonald*.  ECF 122-1 at 7-10.  This contention ignores the numerous allegations in the Complaint that explain why each of the challenged provisions implicates the right to vote.  *See, e.g.*, ECF 59 ¶¶ 6, 16-18, 105-61.

The Supreme Court has held that *McDonald* must be construed narrowly, and subsequent case law demonstrates that *McDonald* creates a fact-based defense inappropriate for adjudication at the motion to dismiss stage.  *See, e.g.*, *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) ("the Court's disposition of the claims in

*McDonald* rested on failure of proof"); *Hill v. Stone*, 421 U.S. 289, 300 n.9 (1974) (the *McDonald* court "expressly noted that there was nothing in the record to indicate that the challenged Illinois statute had any impact on the appellants' exercise of their right to vote"); *Goosby v. Osser*, 409 U.S. 512, 521-22 (1973) (holding *McDonald* does not foreclose challenges to a statute governing absentee ballots, which are entitled to a hearing on the merits).

Indeed, both *O'Brien* and *Goosby* rejected Secretary Lee's argument that, as a matter of law, restrictions on absentee ballots cannot implicate the right to vote. *Compare* ECF 122-1 at 8 with *O'Brien*, 414 U.S. at 530 (finding that the challenged restrictions on absentee voting "operate as a restriction which is so severe as itself to constitute an unconstitutionally onerous burden on the … exercise of the franchise" (internal quotation marks omitted)) *and Goosby*, 409 U.S. at 521-22 (requiring a hearing on petitioners' claim that restrictions implicate the right to vote).

Courts of appeal, including the Eleventh Circuit, routinely apply the *Anderson-Burdick* framework to review laws governing absentee ballots. *See, e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020); *Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012). The Court should here as well.

The balancing required under *Anderson-Burdick* does not lend itself to summary disposition, certainly not on a Rule 12 motion. "[T]he *Anderson* test emphasizes the relevance of context and specific circumstances to each challenge to

ballot-access requirements" and is best "address[ed] with testimony and other direct evidence." *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020). In *Duke v. Cleland*, the Eleventh Circuit explained why the *Anderson-Burdick* balancing test should not be conducted at the pleading stage:

> The posture of this case makes it impossible for us to undertake the proper review required by the Supreme Court. While [plaintiffs] have made clear their asserted rights under the First and Fourteenth Amendments, the record before us is devoid of evidence as to the state's interests in promulgating section 21-2-193. This case is before us on appeal from a dismissal of the plaintiffs' amended complaint under Rule 12(b)(6). Discovery has not commenced. The state, therefore, has not as yet asserted its precise interests justifying the burden imposed by its election law.

5 F.3d 1399, 1405 (11th Cir. 1993). That reasoning applies equally here, where discovery is underway and where the Complaint identifies the significant burdens imposed by each of the challenged provisions and demonstrates why the proffered justifications do not outweigh those burdens. *See* ECF 59 ¶ 16 (describing how the Secure Drop Box Restriction, Voter Registration Delivery Restriction, Vote-By-Mail Application Restriction, and Line Warming Restriction "make voting more burdensome"); *id.* ¶ 17 (explaining how "[e]ach of these changes individually imposes an unjustified burden on voting" and "[c]umulatively, they impose a significant burden, in some cases leading to the wholesale disenfranchisement of voters."); *see also, e.g.*, *id.* ¶¶ 6, 7, 13, 18, 116, 121, 189, 190.

6

Although Secretary Lee appears to recognize that the *Anderson-Burdick* framework does not support dismissal of Plaintiffs' undue burden claims, ECF 122-1 at 6, 8, she invokes Justice Scalia's non-precedential concurrence in *Crawford* to argue that dismissal is nonetheless proper because the Complaint does not allege a burden on voters "generally," as opposed to a "subset of the electorate." ECF 122-1 at 6, 10-12. This argument is wrong on the facts. Plaintiffs specifically allege that "SB 90 imposes unjustified burdens on *all* voters," and that it "places disproportionate burdens" on large groups of voters, including "Black voters, Latino voters, disabled voters, and voters who face greater challenges in exercising the right to vote, even in the best of circumstances." ECF 59 ¶ 6 (emphasis added). These groups are not "narrow band[s]" of voters, as the Secretary puzzlingly charges. ECF 122-1 at 10. As this Court has recognized: "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla.*, 314 F. Supp. 3d at 1216.

Defendants are also wrong as a matter of law. Justice Scalia's position —that courts should evaluate the burdens of a voting restriction on voters generally rather than on a subset of voters with particular circumstances—came in a concurrence joined by only two other Justices; it is not the law. Even if it was, *Crawford* was decided following completion of discovery (not on a Rule 12 motion) and did not involve allegations of race discrimination. Numerous appellate courts have recognized that *Crawford*'s burden analysis does not apply where racial distinctions

are involved.  *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016); *Veasey v. Abbott*, 830 F.3d 216, 248-49 (5th Cir. 2016) (en banc); *Frank v. Walker*, 819 F.3d 384, 386-88 (7th Cir. 2016); *cf. Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 997 F.3d 1363, 1368 (11th Cir. 2021) (Martin, J., dissenting from denial of rehearing en banc) ("*Crawford* never addresses <u>race</u> discrimination, so it cannot properly govern the resolution of the race discrimination claims made here.").

Similarly, Secretary Lee's contention that particular "subsets" of voters could "presumably" vote by other means, ECF 122-1 at 11-12, ignores the critical question under *Anderson-Burdick* of whether the challenged rules unduly *burden* those voters' rights.  *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318-19; *League of Women Voters of Fla., Inc.*, 314 F. Supp. 3d at 1215-16.  While the Secretary suggests that she intends to dispute the significance of the burdens Plaintiffs identify, that is a contested factual issue which cannot be resolved by a Rule 12 motion.

Accordingly, Plaintiffs have stated a claim for relief under *Anderson-Burdick*, and Secretary Lee's motion as to the undue burden claim should be denied.

## II.    PLAINTIFFS HAVE STATED A CLAIM UNDER THE EQUAL PROTECTION CLAUSE AND UNDER THE FIFTEENTH AMENDMENT

Plaintiffs have sufficiently alleged facts that, if proven, will establish violations of the Fourteenth and Fifteenth Amendments (Counts II and III).  A law

is unconstitutional so long as race is a "motivating" factor in its enactment—that purpose need not be the "dominant" or "primary" reason for the legislation's passage. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The Supreme Court has emphasized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct *evidence* of intent as may be available," and has identified certain "*evidentiary* source[s]" that should be considered in the "*evidentiary* inquiry." *Id*. at 266-67 (emphases added). Consistent with the Supreme Court's emphasis on analysis of facts and evidence before deciding intentional discrimination claims, such cases are rarely decided pre-trial. *See Hunt v. Cromartie*, 526 U.S. 541, 552-54 (1999); *see generally Washington v. Davis*, 426 U.S. 229, 242 (1976) ("invidious discriminatory purpose may often be inferred from the totality of the relevant facts").

The Complaint includes ample factual allegations to support Plaintiffs' claims that SB 90 intentionally discriminates against Black and Latino voters. Secretary Lee's motion ignores key allegations, and mischaracterizes others. Tracking the *Arlington Heights* factors, Plaintiffs allege:

**Impact of SB 90**: Plaintiffs have alleged specific facts demonstrating that each challenged provision disproportionately harms Black and Latino voters in a clear pattern: the four challenged provisions all "target[ed] precisely those strategies

and mechanisms successfully employed by Plaintiffs and other similar organizations in the 2020 election to mobilize Black and Latino voters" by placing "disproportionate burdens on Black [and Latino] voters."  ECF 59 ¶ 6, 14.

Secretary Lee's incorrect assertion that the Complaint failed to adequately allege impact sufficient to "establish a pattern, unexplainable on grounds other than race," ECF 122-1 at 14-15 (internal quotation marks omitted), neglects to address the actual allegations.  ECF 59 ¶¶ 4, 6-10, 14, 17, 110, 116, 121, 125, 129, 137, 145, 153.  The thematic glue binding the diverse provisions of SB 90 together is Plaintiffs' and similar organizations' unprecedented success in mobilizing Black and Latino voters in the 2020 election.  ECF 59 ¶¶ 4-5, 17.  Specifically, Plaintiffs allege:

- *Vote-By-Mail*: Prior to the 2020 election, white voters were more likely than Black or Latino voters to vote by mail.  In the 2020 election, Black and Latino voters nearly doubled their vote-by-mail rate compared to the 2016 election (Blacks from 20 to 40 percent, Latinos from 26.7 to 42.1 percent).  ECF 59 ¶¶ 7, 110, 145.  SB 90, for the first time, requires persons requesting an absentee ballot to provide a driver's license, Florida identification, or Social Security number matching information in the county's voter registration records; these are all forms of identification that white voters are significantly more likely to possess than Black or Latino voters.  ECF 59 ¶¶ 7, 16, 146-49, 151-52.

- *Third Party Registration*: Historically and during the 2020 election, Plaintiffs and similar organizations have registered significant numbers of voters, especially new Black and Latino voters, culminating in record turnout for these communities in the 2020 election. ECF 59 ¶¶ 9, 17, 125-26. SB 90 requires voter registration organizations, for the first time, to affirmatively tell voters that their registrations may not arrive in time to be valid, and to deliver registration forms to the office of the Supervisor where the voter resides, and subjects them to fines for noncompliance. Both restrictions are intended to and will chill registration efforts, reducing the availability of a registration mechanism that is disproportionately used by Black and Latino voters. ECF 59 ¶¶ 9, 16, 127-37, 140-43.

- *Line Warming Restriction*: Historically and during the 2020 election, lines to vote in person have been much longer in predominantly Black and Latino communities than in white communities. ECF 59 ¶¶ 8, 10, 153. To address this, Plaintiffs and other similar organizations have provided assistance to voters (including water, food, chairs, and umbrellas) waiting in line to enable them to wait for long periods of time; such efforts are vital to ensuring that voters are able to remain in line to vote. ECF 59 ¶¶ 10, 153-55, 158-59, 161. SB 90 criminalizes

such activity by subjecting anyone who provides assistance to voters waiting in line with prosecution punishable by a fine of up to $1,000 and a year in prison; these prohibitions will directly curtail the work of several Plaintiffs to encourage voting in Black and Latino communities, which will result in fewer Black and Latino voters casting their ballots. ECF 59 ¶¶ 10, 16, 153-57, 161.

- *Secure Drop Box Restriction*: During the 2020 election, as a means of addressing long voting lines in Black and Latino communities and concerns about poor mail service, Plaintiffs and other similar organizations encouraged Black and Latino voters to return their ballots to secure drop boxes, and the use of drop boxes was critical in reducing the lines and wait times for in-person voting. ECF 59 ¶¶ 8, 110-11. Secretary Lee herself acknowledged the importance of drop boxes in allowing voters concerned about long lines to cast their ballots. *Id.* ¶ 107. SB 90 imposes new restrictions reducing the availability of drop boxes. ECF 59 ¶¶ 8, 16, 115-19. These restrictions drastically reduce the accessibility of a critical voting method, which will have a disproportionate impact on Black and Latino voters. ECF 59 ¶¶ 8, 111, 116-17, 121. In tandem with the vote-by-mail restrictions, these provisions will force more voters to the polls on election day, making

lines in Black and Latino communities even longer. *Id.* ¶¶ 17, 118, 120-21.

The Complaint alleges that the cumulative effect of these changes—from undermining voter registration efforts to criminalizing support provided to voters in long lines—all disproportionately burden and will reduce participation of Black and Latino voters. *Id.* ¶ 17.

*Historical Background of SB 90*: The Complaint alleges that the historical background of SB 90 supports a finding of intentional discrimination. Specifically, the Complaint recounts a long history of efforts by the Florida legislature to discriminate against Black and Latino voters, particularly in backlash to successful mobilization efforts of Black and Latino voters. ECF 59 ¶¶ 3, 65-80. The Complaint specifically details efforts in the last decade including HB 1355 (2011 law targeting early voting and third-party registration), a proposed voter purge in 2012, signature match requirements and restrictions on early voting imposed in 2018, and SB 7066 (the 2019 law that blunted the effect of the Amendment 4 re-enfranchisement of returning citizens), and explains how each of these measures was taken in response to increased Black and Latino voter participation. ECF 59 ¶¶ 68-80. The Florida legislature's actions in passing SB 90 fall well within this pattern of backlash. ECF 59 ¶¶ 3, 80.

Secretary Lee bizarrely asserts that the Complaint's discussion of "historical background" focuses on "the distant past" and suggests it is limited to "obviously discriminatory laws from the 1880's and 1890s." ECF 122-1 at 15-16. This is patently incorrect: The Complaint specifically addresses more recent discriminatory efforts by the Florida Legislature, including efforts from 2020, 2019, 2018, 2017, 2012, and 2011. ECF 59 ¶¶ 3, 68, 74-78.

***Sequence of Events Leading to the Passage of SB 90***: The Complaint lays out why the legislative process to enact SB 90 supports a finding of intentional discrimination. ECF 59 ¶¶ 91, 99-104. The Complaint identifies significant procedural and substantive departures from normal legislative process, including severe limiting of public testimony and comment, refusing to accommodate members of the public who wished to testify remotely due to the pandemic, limiting public testimony to 1 minute per speaker, a rushed approval process that prevented review of the bill, limiting Committee debate to 30 seconds per member, restrictions limiting debate to no more than 5 minutes per proposed amendment, and radical curtailment of time to consider the bill and floor debate. ECF 59 ¶¶ 91, 99-104.

Secretary Lee argues that the Legislature's procedures were all directly attributable to "changes made during a once-in-a-lifetime pandemic." ECF 122-1 at 16. But she does not link any specific procedural irregularity to the pandemic, and her assertion is contrary to the Complaint, which specifically notes that members of

14

the public were required to travel to the Leon County Civic Center to testify in a crowded room, rather than permitted to testify remotely. ECF 59 ¶ 100. In any event, this is a contested factual issue which cannot be resolved on a motion to dismiss. Similarly, Secretary Lee asks that the Court rule that the Legislature's repeated use of "strike all" amendments cannot, as a matter of law, constitute procedural departures. ECF 122-1 at 16-17. That too is a contested factual issue that cannot be resolved on a Rule 12 motion.

*Contemporaneous Statements and Actions of Key Legislators*: The Complaint identifies numerous contemporaneous statements and actions of key legislators that support a finding of intentional discrimination. ECF 59 ¶¶ 11-13, 81, 85, 86, 92, 93, 94, 95, 122, 138, 150. These include statements from legislators concerning the discriminatory impact of SB 90 on Black and Latino voters (ECF 59 ¶¶ 85-86, 111, 116, 142, 143, 158, 159), procedural irregularities that allowed the sponsors to strong-arm SB 90 through passage with minimal debate (ECF 59 ¶¶ 89, 99-104), and concessions from the sponsors that the 2020 election ran smoothly in tandem with the failure to provide any cogent justification for the legislation (ECF 59 ¶¶ 11-13, 81, 91-95, 122, 150), all of which support an inference that the articulated rationales were pretext to conceal discriminatory motives.

Secretary Lee argues that the Complaint's discussion of statements of key legislators was insufficient. ECF 122-1 at 17-18. But she discusses only two of the

thirty statements cited in the Complaint—both from the lead sponsor, *see* ECF 122-1 at 17-18 (citing ECF 59 ¶ 91), and both self-serving statements that pretextually conceal discriminatory intent. Secretary Lee apparently contends that these two statements can demonstrate, as a matter of law, that the Legislature was taking a "proactive" approach and was committed to "integrity." Obviously not. That is a contested factual issue which cannot be resolved on a Rule 12 motion. The Complaint identifies numerous other statements and actions of key legislators making clear that the impact and intent of the law was to target Black and Latino voters, and that the explanations of the legislative sponsors were pretext for discriminatory motives. ECF 59 ¶¶ 11-13, 81, 85-86, 89, 91-95, 99-104, 111, 116, 122, 138, 142-143, 150, 158-159.

*Foreseeability and Knowledge of the Discriminatory Impact of SB 90*: The Complaint alleges facts that Florida legislators were on notice that SB 90 would have a discriminatory impact, which supports a finding of intentional discrimination. ECF 59 ¶¶ 7-10, 85, 86, 87, 88, 110, 116, 121, 143, 150, 152, 158, 159, 161. These allegations include statements from state legislators concerning SB 90's discriminatory impact on Black and Latino voters (ECF 59 ¶¶ 85-86, 111, 116, 142, 143, 158, 159), as well the knowledge and affirmative efforts of bill supporters to gather voter data to assess the impact of specific provisions of the law (ECF 59 ¶¶ 7-10, 88, 98, 107-109, 125, 148, 152).

Secretary Lee argues that the Complaint's discussion of the "[f]oreseeability and [k]nowledge of [d]isparate [i]mpact" of SB 90 is insufficient. ECF 122-1 at 18-19. She asserts, without citing any authority, that statements from the bill's opponents should be disregarded as a matter of law. That is not the law. *See Veasey*, 830 F.3d at 236-37 (noting statements of "likely discriminatory impact . . . by many legislators"). She also asserts that there are no allegations that specific legislators "anticipated" a discriminatory impact, ECF 122-1 at 18-19, ignoring contrary allegations, ECF 59 ¶¶ 3-6, 14-15, 178, 182.

***Availability of Less Discriminatory Alternatives***: The Complaint identifies numerous amendments that were offered and summarily rejected during floor debate (ECF 59 ¶ 89, 143, 160) that would have reduced the discriminatory impact of SB 90 (including removing the Line Warming Ban, allowing volunteers with nonprofit organizations to engage in line warming, specifically permitting providing water or food to people waiting on line, allowing voters to request mail ballots using their name, address, and date of birth, removing the restrictions on secure drop boxes, etc.), all of which support a finding of intentional discrimination. *Cf. Veasey*, 830 F.3d at 237 (noting summary rejection of "ameliorative" amendments supports an inference of discriminatory intent). And in addition to these, the Legislature had another alternative—not passing SB 90 at all. Maintaining the status quo is certainly an effective alternative, given that there was a consensus that Florida's 2020 election

17

was the "smoothest, most successful election of any state in the country."  ECF 59 ¶¶ 11-13, 81, 92.

Cumulatively—considering the allegations of impact, legislative history and process, and the actions and statements of legislators—the facts pleaded are more than sufficient to claim intentional discrimination.  The Secretary's motion should be denied.

## III.   PLAINTIFFS HAVE STATED A CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT

In *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), the Supreme Court confirmed that evaluating a Section 2 claim "requires consideration of 'the totality of the circumstances' in each case.'"  *Id.* at 2332.  The Secretary tries (again) to short-circuit this Court's review by mischaracterizing the allegations in the Complaint and the reasoning of *Brnovich*, which was decided on the record of a ten-day bench trial.  Plaintiffs have pleaded more than sufficient facts to allow this case to proceed to trial.

### A.   *Brnovich* Does Not Require Plaintiffs to Prove Their Case at the Pleading Stage

As the Supreme Court recognized in *Brnovich*, "Section 2 of the Voting Rights Act provides vital protection against discriminatory voting rules."  *Id.* at 2343.  The statute prohibits any rule that "results in denial or abridgement of the right of any citizen of the United States to vote … on account of race."  52 U.S.C.

§ 10301(a).   A rule violates that prohibition when, "based on the totality of circumstances, it is shown that political processes … are not equally open to participation" by members of a protected group "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Id.* § 10301(b).

While *Brnovich* upheld a district court ruling that the Arizona law at issue did not violate Section 2, the Supreme Court reaffirmed key principles that "nobody disputes: that § 2 applies to a broad range of voting rules, practices, and procedures; that an 'abridgement' of the right to vote under § 2 does not require outright denial of the right; that § 2 does not demand proof of discriminatory purpose; and that a 'facially neutral' law or practice may violate that provision."   141 S. Ct. at 2341. Further, the Court confirmed that evaluating a Section 2 claim at trial "requires consideration of 'the totality of circumstances'" that inform whether a rule illegally denies or abridges voting rights.  *Id.* at 2338.  "[A]ny circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered."  *Id.*  To assist courts with that inquiry, *Brnovich* identified a handful of key considerations as "guideposts" that may be relevant, but took care to note that its list is "not … exhaustive" and should be considered alongside relevant factors set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), including past discrimination and its persistent effects.  *Id.* at 2336, 2338, 2340.

19

Nothing in *Brnovich* suggests that the "totality of the circumstances" analysis it directed is appropriately deployed to weigh the sufficiency of a pleading, as opposed to a developed record. Notwithstanding that, and without actually quoting any language from *Brnovich*, the Secretary wrongly asserts that *Brnovich* establishes, at the pleading stage, a "burden" test that requires a Plaintiff to plead whether a voting rule concerns "usual" or "unusual burdens of voting," and how those burdens weigh against the state's interest in imposing the rule. ECF 122-1 at 20-22. This distortion of *Brnovich* completely misses the mark: *Brnovich* emphasizes the importance of the "totality of the circumstances," of which the "burdens of voting" and "state interests" are among many considerations, *see Brnovich*, 141 S. Ct. at 2338-39, not new factors that a court must weigh before a case may proceed beyond the pleading stage.

The question at this stage is simply whether Plaintiffs have set forth plausible allegations—which must be taken as true—that the challenged provisions of SB 90 "result[] in denial or abridgement of the right of any citizen of the United States to vote … on account of race." 52 U.S.C. § 10301(a). The Court's inquiry in making that determination is limited to the "four corners of the complaint." *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006). That the Secretary's motion at times references facts not in the pleadings (and which are disputed) to rebut Plaintiffs' allegations, *see, e.g.*, ECF 122-1 at 23-25, 27-28, is a clear

illustration that the viability of Plaintiffs' claim cannot be evaluated without a record. The Secretary's motion should be denied as to the Section 2 results claim for that reason alone.

### B. Plaintiffs Have Alleged Facts Plausibly Asserting a Section 2 Results Claim

To meet the pleading burden, Plaintiffs must merely set forth plausible allegations that the challenged provisions of SB 90 result in denial or abridgment of the right to vote on account of race by making the political process not equally open to participation by voters of color. 52 U.S.C. § 10301(a)-(b). Plaintiffs have plausibly alleged the disproportionate burden placed on Black and Latino voters by the challenged provisions, which "target[] precisely those strategies and mechanisms successfully employed by Plaintiffs and other similar organizations in the 2020 election to mobilize Black and Latino voters." ECF 59 ¶¶ 4, 6-10, 14, 17, 110, 116, 121, 125, 129, 134-135, 145, 153. As discussed above in conjunction with the Equal Protection and Fifteenth Amendment claims, the Complaint alleges in elaborate detail precisely how each of the challenged provisions create conditions in which Black and Latino voters—members of historically disenfranchised communities— "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

The Secretary ignores these detailed allegations. Instead, trying to graft another requirement into *Brnovich*, the Secretary asserts that at the pleading stage,

Plaintiffs must make both "qualitative" and "quantitative" allegations to establish the size of the burden imposed by the challenged provisions. ECF 122-1 at 22-24. *Brnovich* imposes no such requirement. But even if it did, Plaintiffs have satisfied it by offering detailed allegations about the growth in use by Black and Latino voters of voting methods that the challenged provisions restrict, and the harms those restrictions will inflict on those communities' access to electoral processes, as just described. *See, e.g.*, ECF 59 ¶¶ 7-10, 17, 110-11, 125-126, 145, 153. The Secretary's selective and distorted readings of scattered passages from the Complaint do nothing to undermine the sufficiency of Plaintiffs' extensive allegations.

Further, to the extent the Complaint does not address each of the considerations on *Brnovich*'s non-exhaustive list to the same degree, Plaintiffs need not prove—and certainly need not allege at the pleading stage—that every totality of circumstances factor supports their case. As the Supreme Court explained in *Gingles*, Congress did not intend that "any particular number of factors be proved, or that a majority of them point one way or the other." 478 U.S. at 45. Nonetheless, as described above, Plaintiffs have alleged detailed facts relevant to the factors *Brnovich* noted, including the size of the burden imposed by the challenged provisions, the disparate impact of the provisions on voters of color due to their disproportionate usage of the voting methods now restricted, and the lack of

evidence proffered in the legislative process for any legitimate state interest.  ECF 59 ¶¶ 12, 17, 122, 138, 150.  Plaintiffs accordingly have met their pleading burden, and the Court should deny the Secretary's motion to dismiss the results prong of Plaintiffs' Section 2 claim.

### C.    Plaintiffs Have Sufficiently Alleged Intentional Discrimination in Violation of Section 2

For the same reasons that Plaintiffs have sufficiently alleged intentional discrimination under the 14th and 15th Amendments, Plaintiffs have set forth a plausible claim of intentional discrimination in violation of Section 2.  As *Brnovich* confirmed, the Section 2 discriminatory purpose inquiry follows "the familiar approach outlined in *Arlington Heights*."  141 S. Ct. at 2349.  As outlined above, the Complaint includes extensive allegations demonstrating that the *Arlington Heights* factors point strongly to the presence of discriminatory intent in the enactment of SB 90.  Accordingly, the Court should deny the Secretary's motion to dismiss Plaintiffs' Section 2 intentional racial discrimination claim.

## IV.    THE LINE WARMING RESTRICTION VIOLATES THE FIRST AMENDMENT AND FOURTEENTH AMENDMENT AND IS PREEMPTED UNDER VOTING RIGHTS ACT SECTION 208

As alleged in the Complaint, the Line Warming Restriction (SB 90 Section 29) suffers from numerous legal infirmities.  Section 29 changed prior law to expand the definition of "solicitation" to include "engaging in any activity with the intent to influence or effect of influencing a voter."  Fla. Stat. § 102.031(4)(b); *see* ECF 59

¶¶ 153-161.    It violates the First and Fourteenth Amendments because it is unconstitutionally vague; it further violates the First Amendment as applied to plaintiffs by chilling protected speech; and in any event, it is facially invalid because it is unconstitutionally overbroad.    Separate and apart from this, Section 29 is preempted by the Voting Rights Act.

### A.    Plaintiffs Have Adequately Pleaded that the Line Warming Restriction is Unconstitutionally Vague

Section 29 is unconstitutionally vague both because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," and because it "is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Before SB 90 added the Line Warming Restriction, Florida law barred a narrowly defined set of "solicitation" activities within the vicinity of a polling place. These specifically enumerated prohibitions included "seeking … any vote" for a particular candidate, "distributing … any political or campaign material," or "selling or attempting to sell any item."  Fla. Stat. § 102.031(4)(b) (2020).  But under SB 90, plaintiffs are prohibited from "engaging in *any activity* with the intent to influence or effect of influencing a voter."  Fla. Stat. § 102.031(4)(b) (emphasis added).  Not with the intent or effect of influencing a voter to vote in a particular way, but with the intent or effect of influencing a voter in *any* way.  The new law fails to provide a definition or any limitation on what constitutes an "activity" or "influence," and

the possibilities are endless. Simply encouraging a voter to stay in line might be said to influence a voter. Providing food or water or a chair to an elderly voter standing in lines for hours might be said to influence a voter. Merely speaking about the importance of voting might be said to influence a voter.

This is textbook vagueness. It would be impermissible in any context, but it is indisputably so in the context of the Line Warming Restriction, which regulates speech. As the Supreme Court has noted repeatedly, "[t]he vagueness of [a content-based regulation of speech] raises special First Amendment concerns because of its obvious chilling effect." *Fox*, 567 U.S. at 254-55 (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870-71 (1997)). Thus, while it is always the case that "regulated parties should know what is required of them so they may act accordingly," and that "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way," *id.* at 253, "[w]hen speech is involved, rigorous adherence to those requirements is necessary," *id.* at 253-54.

The Secretary's motion confirms that the Line Warming Restriction is unconstitutionally vague. Her primary argument is that the text of the statute "cannot reasonably be interpreted to criminalize 'any activity' within the no-solicitation zone." ECF 122-1 at 30. Given that the statutory text literally states that it covers "any activity," the Secretary's argument that "any activity" doesn't actually mean "any activity" only renders the meaning of the statute *more* vague. The Secretary

similarly argues that the "surrounding text and the provision as a whole" make clear that the statute only prohibits "partisan efforts," ECF 122-1 at 31, but she does not cite any language from the statute or anything else that explains what she is referring to. Nor would the Secretary's made-up phrase "partisan efforts" render the statute any clearer. That phrase cannot just mean soliciting a vote for a particular candidate or distributing political material, because the unamended statute already prohibited those activities. So what does it mean? The Secretary does not say, and the only examples of prohibited activities she offers concern activities that were already prohibited by the unamended statute. ECF 122-1 at 32.

The Secretary also argues that the statute does not prohibit "innocent, nonpartisan assistance such as the provision of food or water," ECF 122-1 at 31, but she fails to explain how that interpretation is clear from the text, which on its face extends to *any* "influence," not just influencing "a voter's decision on *how* to vote," ECF 122-1 at 32 (emphasis added). In any event, such a limiting construction would not save the statute from vagueness. What about speech urging a voter to remain in line? The Secretary does not say whether that is prohibited.

The Secretary repeatedly argues that the phrase "any activity" should be interpreted "in light of" the series of specifically itemized prohibited activities, like distributing campaign material or supporting a particular candidate, that the statute contained before it was amended. ECF 122-1 at 33-34. But that argument fails

under *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), which held that a prohibition on "[i]ssue oriented material designed to influence or impact voting" was impermissibly vague notwithstanding that it followed three "clear" examples. *Id.* at 1884, 1889. And the "any activity" language is far broader and vaguer than the law at issue in *Mansky*.

If Secretary Lee is willing to stipulate, in her capacity as the Chief Elections Officer of the State, that § 102.031(4)(b) prohibits *only* those specifically enumerated activities—i.e., to stipulate that the "any activity" amendment is nugatory and to accept a partial judgment declaring as much—the *Florida Rising* plaintiffs would accept such a judgment as a resolution of Count V. But in the interim, the Secretary's motion must be denied.

### B. Plaintiffs Have Adequately Pleaded that the Line Warming Restriction Violates the First Amendment As Applied To Their Conduct

Plaintiffs Hispanic Federation, Faith in Florida, Equal Ground, Poder Latinx, Sant La, and Mi Familia Vota all allege that Section 29 violates the First Amendment as applied to conduct that they engaged in in the past and intend to continue to engage in. ECF 59 ¶¶ 193-96. In particular, plaintiffs "regularly engage, and intend to continue engaging, in protected speech by communicating with voters waiting in long polling place lines to convey a message about the importance of staying in line, the value of each individual's vote, and each individual's inherent value as a person

27

and a participant in our democracy." *Id.* ¶ 194.  They also "provide food, water, seating, and other support to voters waiting in long lines at polling places as an expressive manifestation of Plaintiffs' central message concerning the importance of voting." *Id.* ¶ 195.  And Plaintiffs allege that these activities are core, expressive speech protected by the First Amendment and that the Line Warming Restriction unconstitutionally prohibits them.  *Id.* ¶ 196-97; *see Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243 (11th Cir. 2018) (provision of food in a public forum is expressive conduct protected under First Amendment).

Secretary Lee's motion completely ignores this aspect of Count V, which is separate from the facial overbreadth challenge and is independently sufficient to state a First Amendment claim.  *Compare* ECF 59 ¶ 197 *with* ¶ 198.  Plaintiffs who allege that a statute unconstitutionally prohibits their own protected speech are entitled to an injunction against application of the statute regardless of whether they can sustain an overbreadth challenge.  Accordingly, the Secretary's motion to dismiss Count V must be denied.

### C.    Plaintiffs Have Adequately Pleaded that the Line Warming Restriction is Unconstitutionally Overbroad

"In the First Amendment context," a law must be struck down on its face as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).  Section 29 is impermissibly overbroad: it restricts substantial

28

expressive activity, including exhortations to voters to remain in line to vote and the provision of food, water, and other assistance to voters that might influence them to remain in line to vote. Indeed, the whole point of the Line Warming Restriction is to restrict expression by preventing anyone from attempting to "influence a voter."

And the law has no legitimate sweep at all. The only "legitimate sweep" that the Secretary claims in her motion is a prohibition on "political advocacy," such as soliciting votes for or against a candidate or distributing campaign materials. ECF 122-1 at 37-39 (citing discussion of electioneering restrictions the Supreme Court upheld in *Burson v. Freeman*, 504 U.S. 191 (1992)). But electioneering activities were already expressly prohibited by the prior statute. The only possible function of the "any activity" clause is to expand the law to restrict expression that is *not* political advocacy for a particular candidate or campaign.

The Secretary also notes that overbreadth doctrine is to be invoked only as a "last resort" if no "limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973); *see* ECF 122-1 at 37. But, again, the only "limiting construction" the Secretary has offered is to read the "any activity" provision to restrain nothing more than what was already prohibited by other aspects of § 102.031(4)(b). As noted above, Plaintiffs would be amenable if the Secretary wishes to stipulate to judgment based on her limiting

construction of "any activity."  In the interim, the motion to dismiss Count V should be denied.

### D.    The Line Warming Restriction is Preempted Under Section 208

The Secretary offers three reasons for dismissing Count VI, which alleges that the Line Warming Restriction is preempted by federal law.  Each is wrong as a matter of law.

First, Plaintiffs have standing, and the Secretary is a proper defendant for claims that the Line Warming Restriction violates Section 208, which entitles voters who "require[] assistance to vote by reason of blindness, disability, or inability to read or write" to such assistance.  52 U.S.C. § 10508.  As just discussed, contrary to the Secretary's assertions, nothing in the Line Warming Restriction's expansion of the definition of "solicitation" to include "any activity" contains a limitation to partisan activity.  Thus, the Line Warming Restriction directly impacts the activities of Plaintiffs Hispanic Federation and Sant La, who offer language assistance to voters with the intent and the effect of encouraging voters to remain in voting lines to cast a ballot, ECF 59 ¶ 216, as well as the multiple Plaintiffs who offer food, water and other assistance intended to enable disabled voters to stay in line, ECF 59 ¶¶ 10, 215.

While the Secretary asserts that SB 90's violation of Section 208 is not "fairly traceable" to her, this is incorrect.  ECF 122-1 at 40.  The Secretary of State is the

"chief election officer" of the State of Florida, is responsible for "obtain[ing] and maintain[ing] uniformity in the interpretation and implementation of the election laws," and "may … adopt by rule uniform standards for the proper and equitable interpretation and implementation" of the election laws.  ECF 59 ¶¶ 58, 218 (citing Fla. Stat. § 97.012(1)).  She is sued in that capacity with regard to the Line Warming Restriction.  *Id.*  Indeed, elsewhere in her brief, the Secretary interprets the Line Warming Restriction.  *See* ECF 122-1 at 29-35 (contending the ban applies only to partisan activity and will not affect the activities of Plaintiffs).  The Secretary's effort to define the scope of activities barred by the Section 29 affirms her central role in this litigation: the Secretary is sued precisely because she is responsible for interpreting and issuing guidance to the SOEs regarding the Line Warming Restriction, as well as investigating and enforcing the Line Warming Restriction. *See* Fla. Stat. § 97.012(15).  Complete relief cannot be afforded to the Plaintiffs without enjoining the Secretary: while individual SOEs could offer numerous different interpretations of the scope of the Line Warming Restriction, only the Secretary can provide a definitive resolution of what activities it does and does not bar.  An injunction issued solely to the SOEs would not bar the Secretary from concluding that one or more Plaintiffs had violated the Line Warming Restriction and referring them for prosecution.

Second, the Secretary asserts there is no private right of action under Section 208. ECF 122-1 at 41-43. This argument ignores that Plaintiffs have brought this claim under both Section 1983 and the Voting Rights Act. ECF 59 ¶¶ 212, 213. Secretary Lee cites no reason why Plaintiffs cannot bring this claim under Section 1983 asserting a violation of the Voting Rights Act, a federal statute, and for that reason alone, her argument fails. Moreover, even if Plaintiffs brought this claim exclusively under the VRA, based on both the plain language of the VRA and a decision of the U.S. Supreme Court, the VRA confers a private right of action. *See* 52 U.S.C. § 10302(b) (authorizing "proceeding instituted by . . . an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment"); *Morse v. Republican Party of Va.*, 517 U.S. 186, 233-34 (1996) (discussing the breadth of private rights of actions under the Voting Rights Act); *see also Ark. United v. Thurston,* No. 5:20-CV-5193, 2021 WL 411141 at *7, *11 (W.D. Ark. Feb. 5, 2021) (reviewing 52 U.S.C. § 10302 and concluding that "this language explicitly creates a private right of action to enforce the VRA" that extends to Section 208 and that questions of conflict preemption are not suitable to be resolved on a Rule 12 motion). Numerous courts have allowed private challenges under Section 208. *See, e.g., OCA-Greater Houston v. Texas,* 867 F.3d 604, 614 (5th Cir. 2017); *Democracy N.C. v. N.C. State Bd. of Elections,* 476 F. Supp. 3d 158, 188 (M.D.N.C. 2020): *Priorities USA v. Nessel,* 462 F. Supp. 3d 792, 816 (E.D. Mich.

2020); *Nick v. Bethel,* No. 3:07-cv-98, 2008 WL 11456134, at *5 (D. Alaska July 30, 2008). Significantly, the Secretary's motion to dismiss does not identify a single case holding that Section 208 does *not* confer a private right of action.

Third, the Line Warming Restriction is clearly preempted by Section 208. Conflict preemption exists where a party's "compliance with both federal and state regulations is a physical impossibility" or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012). As noted, Section 208 states that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." 52 U.S.C. § 10508. By its terms, the Line Warming Restriction bars (i) the provision of language assistance to voters waiting in line to vote, since the provision of language assistance is intended to and would in fact influence the voter to remain in line and cast a ballot, and (ii) a voter from seeking assistance from a person of the voter's choice under Section 208. This renders the Line Warming Restriction in direct conflict with Section 208. *See Priorities USA*, 462 F. Supp. 3d at 816 (finding that a Michigan law limiting assistance in returning absentee ballots conflicted with Section 208's guarantee that "a voter may be given assistance by anyone of that voter's choice.").

33

The Complaint specifically alleges how this new restriction conflicts with Section 208 and limits Plaintiffs' activities.  ECF 59 ¶¶ 215-17.  At the pleading stage, this is sufficient to make out a claim of conflict preemption under Section 208.

## CONCLUSION

The Court should deny Secretary Lee's motion to dismiss.

Dated:  August 13, 2021

Respectfully submitted,

s/    *Kira Romero-Craft*

JOHN A. FREEDMAN*
JEREMY C. KARPATKIN
ELISABETH S. THEODORE*
SAM I. FERENC*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001-3743
202-942-5000
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Elisabeth.Theodore@arnoldporter.com
Sam.Ferenc@arnoldporter.com

KIRA ROMERO-CRAFT
Florida Bar No. 49927
MIRANDA GALINDO**
LatinoJustice, PRLDEF
523 W Colonial Dr.
Orlando, FL 32804
(321) 418-6354
Kromero@latinojustice.org
Mgalindo@latinojustice.org

JEFFREY A. MILLER*
Arnold & Porter Kaye Scholer LLP
3000 El Camino Road
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
(650) 319-4500
Jeffrey.Miller@arnoldporter.com

BRENDA WRIGHT*
DEMOS
80 Broad St, 4th Flr
New York, NY 10004
(212) 633-1405
bwright@demos.org

AARON STIEFEL*
DANIEL R. BERNSTEIN*
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-8000
Aaron.Stiefel@arnoldporter.com
Daniel.Bernstein@arnoldporter.com

JUDITH BROWNE DIANIS**
GILDA R. DANIELS
JORGE VASQUEZ**
SABRINA KHAN**
ESPERANZA SEGARRA
Florida Bar No. 527211
SHARION SCOTT**
ADVANCEMENT PROJECT
1220 L Street, N.W., Suite 850
Washington, DC 20005
(202) 728-9557
Jbrowne@advancementproject.org
Gdaniels@advancementproject.org
Jvasquez@advancementproject.org
Skhan@advancementproject.org
Esegarra@advancementproject.org
Sscott@advancementproject.org

*Attorneys for Plaintiffs*
*\*Admitted pro hac vice*

*\*\*Application for admission pro hac vice forthcoming*

## **LOCAL RULE 7.1(F) CERTIFICATION**

Pursuant to Local Rule 7.1(F), this memorandum contains 7936 words, excluding the case style, table of authorities, table of contents, signature blocks, and certificate of service.

s/    *Kira Romero-Craft*
Attorney for Plaintiffs


## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document was served on all counsel of record through the Court's CM/ECF system on the 13th of August, 2021.

s/    *Kira Romero-Craft*
Attorney for Plaintiffs