## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**FLORIDA RISING TOGETHER,**
**et al.,**

      *Plaintiffs*,

**v.**                              **Case No.: 4:21cv201-MW/MJF**

**LAUREL M. LEE,**
**in her official capacity as the**
**Secretary of State of Florida,**
**et al.,**

      *Defendants*,

**and**

**NATIONAL REPUBLICAN**
**SENATORIAL COMMITTEE and**
**REPUBLICAN NATIONAL**
**COMMITTEE,**

      *Intervenor-Defendants.*

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

This is a voting rights case. Plaintiffs are nonprofit groups who allege several Florida laws amended by Senate Bill 90 ("SB 90") "violate[] the U.S. Constitution and federal law and endanger[] the right to vote of all Floridians, and in particular voters of color." ECF No. 59 ¶ 19. Plaintiffs have sued Florida's Secretary of State, Laurel Lee, and Florida's 67 Supervisors of Elections. Defendant Lee has moved to

dismiss Plaintiffs' amended complaint. ECF No. 122. This Court has considered, without hearing, Defendant Lee's motion to dismiss, *id*., her memorandum in support, ECF No. 122-1, all other attachments, and the Plaintiffs' response in opposition to the motion, ECF No. 130.[1]

For the reasons set out below, Defendant Lee's motion is **GRANTED in part** and **DENIED in part**.

I

Plaintiffs Florida Rising Together ("Florida Rising"), Faith in Florida, UnidosUS, Equal Ground Education Fund ("Equal Ground"), Hispanic Federation, Poder Latinx, Haitian Neighborhood Center Sant La ("Sant La"), and Mi Familia Vota Education Fund ("Mi Familia") filed their amended complaint on July 9, 2021, alleging eight counts against Defendant Lee (Counts I–VIII) and six counts against Defendant Supervisors (Counts I–VI). ECF No. 59. Before discussing Plaintiffs'

---

[1] On June 16, 2021, Defendant Lee moved to consolidate this case with other election cases before this Court. ECF No. 39. This Court granted the motion in part and consolidated this case with others for *discovery purposes only*. ECF No. 53. This Court specifically noted that "[a]ny motions to dismiss, for summary judgment, or other motions not related to discovery must be filed in its corresponding case, *not* in the parent case." *Id*. at 1-2 (emphasis in original). However, Defendant Lee ignored this Court's order and filed an "omnibus" memorandum with each motion to dismiss in each of the consolidated election cases before this Court. Accordingly, this Court will clarify its prior directive. Even if you file a separate motion for each case, you must also file a separate memorandum addressing *only* that case. Otherwise, going forward, this Court will deny without prejudice any substantive motions raising "omnibus" arguments in the same manner as Defendant Lee's "omnibus" memorandum in support of her motions to dismiss.

claims in more detail, some background information regarding Plaintiffs is necessary.

A

Plaintiffs' amended complaint alleges that Florida Rising is a nonprofit organization "with a mission to increase the voting and political power of marginalized and excluded constituencies." ECF No. 59 ¶ 20. Its "principal office is in Miami, and the organization engages with voters throughout the state," but "most extensively in Orange, Hillsborough, Osceola, Pinellas, Miami-Dade, Broward, Palm Beach, Duval, Leon, Gadsden, and Seminole Counties." *Id*. To achieve the organization's goal of "expand[ing] democracy by ensuring that every eligible voter in the state, regardless of party affiliation, is able to exercise his or her fundamental and constitutionally protected right to vote," Florida Rising "conducts massive registration, voter education, voter engagement, and election protection programs." *Id*.

Faith in Florida is likewise a nonprofit organization "with a mission to build a powerful, multicultural, nonpartisan network of over 800 congregation community organizations in Florida[.]" *Id*. ¶ 23. The goal of this network is to "address systemic racial and economic issues, including voter education, voter registration, and voter engagement throughout the State of Florida." *Id*.

3

"Faith in Florida has staff organizers and regularly conducts voting-related activities in 30 counties throughout the state, including Miami-Dade, Broward, Palm Beach, Leon, and Hillsborough Counties, and maintains satellite offices in Miami and Miami Gardens." *Id*. ¶ 24. In past elections, Faith in Florida coordinated with Florida Supervisors of Elections "to make sure that drop boxes were placed in practical and accessible locations for community members." *Id*. ¶ 25. It has also "widely distributed information on delivering ballots and where drop boxes were located," in addition to providing "ponchos and umbrellas . . . [and] food and drinks to voters who waited in particularly long lines to make their experiences more comfortable." *Id*. Plaintiffs allege that "[t]hese activities are intended to encourage voters to remain in line and cast their ballots, but Faith in Florida does not seek to influence how voters vote." *Id*.

Plaintiff UnidosUS "is a nonprofit organization and the nation's largest Latino civil rights and advocacy organization." *Id.* ¶ 27. It has offices in Florida and 17 affiliates based or working in Broward, Collier, DeSoto, Flagler, Glades, Hardee, Hendry, Highlands, Hillsborough, Indian River, Lake, Lee, Manatee, Marion, Miami-Dade, Monroe, Palm Beach, Pasco, Polk, Putnam, Orange, Osceola, Sarasota, Seminole, and Volusia Counties. *Id*. UnidosUS's mission is "to build a stronger America . . . [and] to simultaneously challenge the social, economic, and political barriers that affect Latinos in the United States." *Id*. "As part of its work,

4

UnidosUS also conducts voter registration by community canvassing in high-traffic commercial areas or events, placement of digital ads, mailers and contacting voters directly." *Id*. "In addition, UnidosUS provides support and technical assistance to Affiliates to conduct voter registration with their existing members." *Id*.

Plaintiffs allege that during the 2020 elections, "UnidosUS helped 71,160 eligible citizens in Florida register to vote and 25,459 voters register to vote-by-mail." *Id.* ¶ 28. "UnidosUS's voter education program included providing ballot box location information to voters needing to return vote-by-mail ballots as well as direct mailing over 10,000 vote-by-mail request forms directly to eligible voters who could not navigate their respective county websites to request a vote-by-mail ballot online." *Id*.

Plaintiff Equal Ground also conducted "extensive voter registration and voter engagement efforts" in Florida during the 2020 primary and general elections. *Id*. ¶ 31. Equal Ground is a nonprofit organization "with a mission to register, educate, and increase engagement among Black voters in Florida' I-4 corridor." *Id*. ¶ 30. The organization "worked with partners to host a robust Souls to the Polls program in 21 Florida counties[,]" and "coordinated drop box locations and availability for people with limited access to drop box options." *Id*. ¶ 31. Equal Ground "also transported voters to polling precincts and provided food, music, and live entertainment near polling locations to assist voters waiting in long lines." *Id*.

5

Similarly, Plaintiff Hispanic Federation, a "nonprofit, nonpartisan, community organizing, and advocacy organization," has an office in Central Florida, and participates in voter engagement activities in Florida. *Id.* ¶¶ 33–34. Hispanic Federation's "mission is to empower and advance the Hispanic community, support Hispanic families, and strengthen Latino institutions through work in the areas of education, health, immigration, civic engagement, economic empowerment, and the environment, including by promoting voter engagement." *Id.* ¶ 33. Hispanic Federation's "work assists the Hispanic electorate to register to vote, apply for vote-by-mail ballots, and vote during election day and early voting." *Id.* ¶ 34.

Plaintiffs further allege that Hispanic Federation aids voters waiting in long lines by providing "entertainment for families with children, snacks, soft drinks, water, and phone charge stations." *Id.* This group conducts its Florida voter engagement work in Duval, Alachua, Seminole, Volusia, Lake, Orange, Osceola, Polk, Hillsborough, Pinellas, Manatee, Sarasota, Broward, and Miami-Dade Counties. *Id.* In addition, Hispanic Federation collects "voter registration forms at college campuses, Hispanic-owned local businesses, partner agency sites, seasonal festivals, food bank pantries, churches, and events sponsored by [Hispanic Federation]." *Id.* ¶ 35. According to Plaintiffs, many of these voter-registration events "attract voters from numerous different counties" in Florida who choose to register through Hispanic Federation. *Id.*

Next, Plaintiffs allege that Poder Latinx is a "social justice, organizing, and civic engagement organization whose mission is to build a political wave where Latinx communities, inclusive of immigrants and people of color, are decision-makers in our democracy and play a vital role in the transformation of our country." *Id.* ¶ 41. "Poder Latinx works locally and statewide in Florida . . . to expand the electorate by encouraging people to register to vote through in-person activities, via digital campaigns, and telephone banking." *Id.*; *see also id.* ¶ 42. "Poder Latinx's voter registration, voter education and civic engagement work is carried out throughout the state of Florida with a specific focus on Orange, Osceola, Polk, Lake, Volusia, Seminole, Lee, and Palm Beach Counties." *Id.* Poder Latinx also aids voters waiting in lines at the polls by handing out food and drinks and helping voters "with a special focus on assisting Spanish-language dominant voters." *Id.* ¶ 43.

Plaintiff Sant La is also a nonprofit organization "headquartered in North Miami, Florida," whose mission "is to empower, strengthen, and uplift South Florida's Haitian Community by providing free access to information and existing services to ensure its successful integration." *Id.* ¶ 46. "Sant La conducts voter education and outreach as part of its civic engagement work[,]" with a focus "on language access for Haitian Creole-speaking voters in Miami-Dade County." *Id.* ¶ 48. "Sant La staff members regularly walk voters to the polling location closest to the organization's office and furnish any assistance the voters request, including

providing Haitian language assistance to voters while inside the polling location." *Id*. The organization also helps voters in "delivering completed ballots to drop boxes and Supervisor of Elections offices . . . ." *Id*. ¶ 49.

Finally, Plaintiff Mi Familia is a "nonpartisan, nonprofit civic engagement organization, with offices in Florida, dedicated to empowering and engaging the Latino community in the democratic process." *Id*. ¶ 53. Its mission is "to facilitate civic engagement by the Latino community[,]" and it "is one of the leading Latino outreach voter registration groups in Florida." *Id*. Mi Familia "conducts voter registration efforts, education, and citizen workshops throughout Florida, with a special focus in Hillsborough, Osceola, and Orange Counties." *Id*.

In 2018, Mi Familia was responsible for registering 29,585 voters, and in 2020, Mi Familia registered an additional 4,186 voters in Florida. *Id*. ¶ 54. The organization also mailed over 1,000 vote-by-mail applications to eligible voters in 2020, and had members present at 21 different polling locations across Osceola, Orange, and Hillsborough Counties to offer assistance to voters "by encouraging people to remain in line to exercise their right to vote," and partnering with local restaurants to provide food and drink to individuals facing particularly long wait times. *Id*.

8

B

Plaintiffs' amended complaint includes a detailed description of Florida's history of racially discriminatory voting practices. *Id.* ¶¶ 65–80. Juxtaposed with this history are allegations of the logistical success of the 2020 general election in Florida, which Plaintiffs allege "was heralded for being one of the smoothest elections in Florida's history by state officials." *Id.* ¶ 81. Plaintiffs note that "[a]mong other successes of the 2020 election in Florida, Black and Latino voters achieved record turnout due to the massive investment of time and resources by organizations such as Plaintiffs." *Id.* ¶ 82. But Plaintiffs allege that "[i]n response to this unprecedented Black and Latino turnout, and in spite of the fact that Florida's election was well-administered, safe and secure, the Florida legislature, with the support of Florida's governor, began work to change Florida's election procedures to make it harder for Black and Latino persons to vote." *Id.* ¶ 83. Plaintiffs detail the legislative process resulting in the laws that they now challenge, which were amended following the 2021 legislative session. *Id.* ¶¶ 84–98. They allege the final bill that was passed was the "result of a rushed process that afforded little opportunity for public participation." *Id.* ¶ 99; *see also id.* ¶¶ 100–04.

C

Plaintiffs claim that the challenged provisions "impact or burden the right to vote, and particularly the right to vote of historically disenfranchised voters and

disabled voters." *Id.* ¶ 105. Specifically, Plaintiffs focus on the following new provisions of Florida law as amended by SB 90:

(1) Section 97.0575, Florida Statutes (2021), which requires third-party voter registration organizations to

    a.  deliver voter registration applications to the Division of Elections or the Supervisor of Elections in the county in which the applicant resides within 14 days after the applicant completes the application, but not after registration closes for the next election;

    b.  notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election;

    c.  to advise the applicant that he or she may deliver the application in person or by mail; and

    d.  to inform the applicant how to register online with the division and how to determine whether the application has been delivered;

(2) Section 101.69, Florida Statutes (2021), pertaining to the return of vote-by-mail ballots to drop boxes and requiring an employee of the Supervisor of Elections' office to continuously monitor any secure drop box at an office of

the Supervisor when the drop box is accessible for deposit of ballots, among

other changes, and imposing a $25,000 civil penalty if any drop box is left

accessible for ballot receipt other than as authorized;

(3) Section 101.62(1)(b), Florida Statutes (2021), which requires any voter

seeking to vote by mail to provide their Florida driver's license number,

Florida identification card number, or the last four digits of the voter's social

security numbers and for the Supervisors of Elections to verify that

information matches what is in the county's voter registration records; and

(4) Section 102.031(4)(a)–(b), Florida Statutes (2021), which prohibits anyone

from "engaging in any activity with the intent to influence or effect of

influencing a voter" inside a polling place or within 150 feet of a drop box or

the entrance to any polling place.

## II

Defendant Lee moves to dismiss Counts I through VI of Plaintiffs' amended

complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). As it

must, this Court first addresses threshold jurisdictional issues. A Rule 12(b)(1)

motion to dismiss for lack of subject matter jurisdiction "can be asserted on either

facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572

F.3d 1271, 1279 (11th Cir. 2009) (citation omitted). A facial challenge occurs when,

as here, defendants base their challenge to subject matter jurisdiction solely on the

11

allegations in the amended complaint. *Id.* In considering Defendant Lee's facial challenge, this Court must take Plaintiffs' allegations as true. *Id.*

A

Defendant Lee only moves to dismiss Count VI—challenging the line warming ban under section 208 of the Voting Rights Act—for lack of standing. ECF No. 122-1 at 39. But, unsatisfied with the parties' treatment of the issues surrounding standing in other cases, this Court ordered the parties to brief standing as to each of Plaintiffs' claims. Defendant Lee filed an "omnibus" response that argued that Plaintiffs also lack standing to challenge the line warming ban. *See* ECF No. 115 at 2. Regardless, whether the parties raise the issue or not, this Court has an independent responsibility to ensure Plaintiffs have standing to bring *all* of their claims. *E.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Accordingly, this Court examines whether Plaintiffs have standing to bring each count in their amended complaint.

To establish standing, Plaintiffs must show (1) that they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And they must do so for each statutory provision they challenge. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists

as to each challenged provision even in a case where the plaintiffs established harm under one provision of the statute"). Plaintiffs proceed under two theories of standing, organizational standing and associational standing. This Court discusses each in turn, starting with organizational standing.

An organization may have standing to assert claims based on injuries to itself if that organization is affected in a tangible way. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004) ("An organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))). Here, Plaintiffs proceed under a diversion-of-resources theory. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

In addition to organizational standing, an organization may have associational standing to sue "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th

Cir. 2021) ("*GBM*"). As discussed below, Plaintiffs' members have standing as to the challenged provisions of SB 90. Additionally, this lawsuit is germane to Plaintiffs, whose core purposes involve registering voters, voter education, encouraging electoral participation, and advocating for accessibility for Florida voters. Finally, neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003); *GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

In addressing both forms of standing, this Court starts with the injury requirement as to each of the challenged provisions.

## 1. *Injury*

### i. Section 97.0575, Florida Statutes (2021)

Plaintiffs allege that they "frequently conduct voter registration drives that reach voters from many counties in a single event." ECF No. 59 ¶ 131. "These organizations collect and submit thousands, sometimes tens of thousands, of registration applications each year." *Id*. ¶ 132. Therefore, "[i]t is extremely difficult, if not impossible, to ensure that no applications are inadvertently sent to the wrong county when processing a high volume of applications within the short timeframes needed to ensure voters are timely registered." *Id*. But this provision's new

requirement "to sort registration forms and mail them to many different counties will impose additional burdens and costs on voter registration organizations, impairing their ability to register voters." *Id*. ¶ 133.

For example, Plaintiff UnidosUS "will have to divert resources from other projects to hire additional staff to handle the sorting, packaging and delivering of voter registration forms to the correct county," and "add additional staff to triple check the county of all registrants." *Id.* ¶ 28. In addition, Plaintiff Hispanic Federation "will have to divert resources to return voter registration forms to their offices for sorting instead of delivering them directly to the Supervisor's office closest to the voter registration event," and "provide additional postage for mailing the registration forms to many different counties," or "devote staff time to driving significant distances to hand deliver voter registration forms to" distant counties. *Id*. ¶ 39. Plaintiff Poder Latinx also will have to divert its limited resources "to delivering registration forms to distant counties, either in person, entailing far greater expense, or by mail, which risks losing oversight and control of the registration form, and may require express delivery, tracking, signatory confirmation, and other costly postal services to ensure forms are delivered reliably." *Id*. ¶ 45. Plaintiff Mi Familia faces a similar diversion-of-resources injury, especially considering that it "frequently conducts voter registration activities at events and in locales which border two or three counties or include participants from across the state." *Id*. ¶ 57.

Mi Familia alleges that "[p]roperly identifying and sorting new voter registrations as well as delivering them in-person or mailing them will require staff to be re-trained and to expend additional resources to ensure that fines are not incurred." *Id*.

Indeed, Plaintiffs allege that they "risk . . . a substantial fine if an organization misdelivers even a single application," and that this deters smaller organizations from engaging in voter registration work. *Id*. For example, the amended complaint alleges that Plaintiff Equal Ground has been forced to suspend its voter registration operations because the risk of liability that this new provision creates and the costs of complying with the law to avoid those risks are too great. *Id*. ¶¶ 134–35.

In addition to allegedly "reduc[ing] the availability of a voter registration option that is disproportionately used by Floridians of color to register to vote," *id*. ¶ 137, the voter registration disclaimer requirement under the same statute will force Plaintiffs "to suggest [they] may not return the registrations on time," and "directly discourage the activity of such organizations." *Id*. ¶ 141. Plaintiffs allege that the disclaimer requirement infringes on the organizations' First Amendment rights and unconstitutionally compels them "to undermine their own credibility by forcing Plaintiffs to tell potential voters that, in effect, Plaintiffs cannot be trusted with their registration forms." *Id*. ¶ 251.

Both the Plaintiffs' diversion of resources and First Amendment injuries are cognizable injuries-in-fact that satisfy the first prong of this Court's standing

analysis.[2] *See, e.g.*, *Arcia*, 772 F.3d at 1341; *Janus v. Am. Fed. of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) ("Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines [the] ends [that free speech serves]."). Indeed, no Defendant has argued that Plaintiffs have not properly alleged an injury-in-fact with respect to this statute. *See, e.g.*, ECF No. 115 at 10 (supplemental brief concluding that Plaintiffs have standing to proceed against Defendant Lee with respect to this statute). Accordingly, I conclude that Plaintiffs have alleged injuries-in-fact with respect to section 97.0575, as amended by SB 90.

---

[2] "The party invoking federal jurisdiction bears the burden of proving standing." *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Critically, "each element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.' " *Id.* (quoting *Lujan*, 504 U.S. at 561). "Therefore, when standing becomes an issue on a motion to dismiss, general factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing." *Id.* "However, when standing is raised at the summary judgment stage, the plaintiff must 'set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken as true.' " *Id.* (quoting *Lujan*, 504 U.S. 561). This Court reiterates this well-worn standard to make plain that Plaintiffs must present evidence moving forward. Moreover, Plaintiffs must be mindful that generalized testimony about a diversion of resources may not be enough at the summary judgment stage or later to prove that the organizational plaintiffs have been injured under a diversion-of-resources theory. *See, e.g.*, *Jacobson*, 974 F.3d 1236, 1250 (11th Cir. 2020) ("Although resource diversion is a concrete injury, neither Kazin nor Cecil explained what activities the Committee or Priorities USA would divert resources away from in order to spend additional resources on combatting the primacy effect, as precedent requires." (emphasis in original)). Here, although Plaintiffs' detailed factual allegations may survive a motion to dismiss, Plaintiffs must substitute their allegations with sufficient, detailed, and relevant evidence at summary judgment and later.

ii.     Section 101.69, Florida Statutes (2021)

This section now requires in-person monitoring of drop boxes by an employee of the Supervisor of Elections, and it imposes a $25,000 civil penalty against any Supervisor who does not comply with the monitoring requirements. §§ 101.69(2)(a), (3), Fla. Stat. (2021). In addition, drop boxes that are not located at the Supervisor of Elections main office or branch office are only available during early voting hours. §§ 101.69(2)(a), (2)(c)1., Fla. Stat. (2021). The Division of Elections, within Defendant Lee's Department of State, is responsible for enforcing the $25,000 penalty provision. § 101.69(3), Fla. Stat. (2021).

As a result of these new requirements, Plaintiffs allege that they will have to divert resources to respond to the new restrictions on drop boxes. For example, Plaintiffs allege that "Faith in Florida will have to start its voting work earlier, more than double its voter education and voter engagement efforts, and update all of its voter education materials." ECF No. 59 ¶ 26. Plaintiff Equal Ground is also planning to create "new voter education guides, staff trainings, and community events to update voters on the changes wrought by SB 90." *Id*. ¶ 32. Plaintiff Hispanic Federation will likewise "divert funds and staff time from its other election activities toward educational activities such as sending additional rounds of text messages and revising educational materials about . . . [the] new limitations on the availability of drop boxes[.]" *Id*. ¶ 39. And Plaintiffs Poder Latinx and Mi Familia also allege that

18

the new law requires them to "divert limited resources" and "to invest in new campaigns, more staff, and more resources[,]" to respond to this change. *Id*. ¶¶ 45, 57. Accordingly, I conclude that Plaintiffs have alleged an injury based on this diversion of resources.[3]

### iii.   Section 101.62, Florida Statutes (2021)

Plaintiffs allege that sections 101.62(1)(b) and 101.62(3) burden voters and "will lead to the arbitrary rejection of mail ballot requests." ECF No. 59 ¶ 150. This statute requires voters who request to vote by mail to provide their Florida driver's license number, Florida identification card number, or the last four digits of their social security number before their requests are verified and approved. According to Plaintiffs, this new requirement "will prevent many voters in Florida from obtaining a vote-by-mail ballot, because many voters in Florida registered to vote without providing either a driver's license or ID card number or a social security number, and lack those documents." *Id*. ¶ 151. Moreover, Plaintiffs allege that the new identification requirements "pose a particular burden on voters who lack these forms of ID, including Black and Latino voters." *Id*. ¶ 152.

---

[3] This Court reiterates what it said earlier about presenting evidence at successive stages in this litigation. *See* FN 2. Plaintiffs' detailed factual allegations regarding the diversion of resources to educate voters on the new requirements of the law are not enough once this case reaches the summary judgment stage. Instead, they must supplement the record with evidence.

To respond to this new law, Plaintiffs are required to divert resources to educate voters about the change when applying to vote by mail. For example, Plaintiff UnidosUS "will have to divert its limited resources from other projects to translate instructions to voters regarding the changes made by the passage of SB 90 and provide Spanish-language assistance to Spanish-dominant Florida eligible voters." *Id.* ¶ 29. Plaintiff Hispanic Federation must also "divert funds and staff time from its other election activities toward educational activities such as sending additional rounds of text messages and revising educational materials about the vote-by-mail process to include the new restrictions on applying for vote-by-mail ballots[,]" among other changes. *Id.* ¶ 39. Plaintiffs further allege that "Hispanic seniors and Puerto Rican voters in Florida are less likely to possess a Florida driver's license or state ID card, or to possess or know their social security number," which will require more of Hispanic Federation's "voter education and outreach resources to overcome the new restrictions on requesting vote-by-mail ballots." *Id*. Plaintiff Poder Latinx will also have to "divert limited resources and staff to update their staff training materials as well as update materials to educate voters about the changes made to the law that will . . . require the use of Florida identification numbers or social security numbers to request a vote-by-mail ballot." *Id*. ¶ 45. Likewise, Plaintiffs Sant La and Mi Familia allege that they must now spend "limited resources on training staff on changes made to voting laws by SB 90, creating printed materials

regarding the impact of SB 90 on vote-by-mail requests [,]" and "re-education of voters who previously exercised the vote by mail option, increasing and expanding educational campaigns, . . . and assisting individuals to request vote by mail ballots[.]" *Id.* ¶¶ 52, 57. As this Court discussed above, this diversion of resources is enough to satisfy the injury requirement for Article III standing.

In addition, Plaintiffs claim the new identification requirement imposes an undue burden on Florida voters, including Plaintiffs' members. *Id.* ¶ 189. Here, the Eleventh Circuit has previously held that "[t]he slightness of [the voters'] burden . . . is not dispositive." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009). Instead, "a small injury, 'an identifiable trifle,' is sufficient to confer standing." *Id.* (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)). In this case, Plaintiffs allege that the new vote-by-mail identification requirement is more than a mere "trifle," especially for voters of color who are less likely to have the required identification information. *See Billups*, 554 F.3d at 1351–52 (holding that even when a voter possesses an acceptable identification, they may still challenge a voter ID law because they are required to produce that photo identification to vote in person). Accordingly, I conclude that Plaintiffs have alleged an injury with respect to this statute.

iv.   Section 102.031(4)(a)-(b), Florida Statutes (2021)

Finally, with respect to section 102.031(4)(a)-(b), as amended by SB 90, Plaintiffs allege this provision has the effect of "criminaliz[ing] the practice of providing food, water, language assistance, and other assistance to voters waiting in line to vote[,]" and "will result in fewer Black and Latino voters casting their ballots." ECF No. 59 ¶ 153. Plaintiffs further allege that Hispanic Federation, Faith in Florida, Sant La, Equal Ground, Poder Latinx, and Mi Familia all engage in some form of "line warming" to assist voters waiting in long lines and encourage them to remain in line and cast their ballots. *Id.* ¶ 154. Plaintiffs assert the challenged statute now bans their activities, which they allege not only imposes an undue burden on their members' voting rights, but also violates Plaintiffs' First Amendment rights "by limiting protected election-related expressive activities." *Id.* ¶¶ 18, 189.

In addition, Plaintiff Hispanic Federation alleges this restriction requires it to divert resources and training time to educate canvassers "in the new rules and restrictions on voter assistance." *Id.* ¶ 40. Similarly, the alleged ban on Plaintiff Sant La's voting assistance requires it to divert resources toward other means of "supporting voting rights and ballot access for the Haitian community," including "educating voters about restrictions on requesting assistance from volunteers positioned outside of the no-solicitation line[.]" *Id.* ¶ 52.

22

Accordingly, for the same reasons discussed above, I conclude that Plaintiffs have alleged an injury with respect to section 102.031.

## 2. *Causation*

This Court is satisfied that Plaintiffs have suffered an injury-in-fact as to each of the challenged provisions. But an injury-in-fact is not enough, Plaintiffs must also show causation and redressability. *Lujan*, 504 U.S. at 560.

First, causation. Plaintiffs must establish causation by showing that "their injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). In other words, Plaintiffs must show that their injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

To do so, Plaintiffs need only show "that there is a substantial likelihood of causation." *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978). This is not an exacting standard; "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). And thus "[a] plaintiff . . . need not show (or, as here, allege) that 'the defendant's actions are the very last step in the chain of causation.' " *Wilding*, 941 F.3d at 1126 (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly

traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

In this case, Plaintiffs' claims against Defendant Lee are limited to challenging the new drop box restrictions and civil penalty provisions under section 101.69, Florida Statutes (2021), the "line warming" ban under section 102.031, Florida Statutes (2021), and the voter registration disclaimer and delivery requirements under section 97.0575, Florida Statutes (2021).

Starting with the new drop box restrictions, Plaintiffs' asserted injuries, including the diversion of resources to respond to the new restrictions on drop boxes and the burdens such restrictions will place on voters who will have fewer drop box options, are traceable to Defendant Lee's enforcement authority created by this new law. Specifically, Defendant Lee's Division of Elections is granted specific authority to impose a $25,000 civil penalty against any Supervisor of Elections who leaves a drop box "accessible for ballot receipt other than as authorized by this section." § 101.69(3), Fla. Stat. (2021). In turn, this serves as a specific deterrent to Supervisors of Elections who would otherwise offer more drop box options beyond the statutorily required drop boxes at the Supervisors' main office, permanent branch office, and early voting sites. *See* § 101.69(2)(a), Fla. Stat. (2021) ("Secure drop boxes *shall* be placed at the main office of the supervisor, at each permanent branch office of the supervisor, and at each early voting site. Secure drop boxes *may* also

be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1)." (emphasis added)).

Similarly, Defendant Lee has authority to refer suspected violations of the voter registration disclaimer and delivery requirements to the Attorney General pursuant to section 97.0575(4), Florida Statutes. *See* § 97.0575(4), Fla. Stat. ("If the Secretary of State reasonably believes that a person has committed a violation of this section, the secretary may refer the matter to the Attorney General for enforcement."). Thus, Plaintiffs' injuries under the disclaimer and delivery requirements are traceable to Defendant Lee's statutory authority to refer violations to the Attorney General for investigation and subsequent enforcement proceedings.

Although Plaintiffs' injuries are traceable to Defendant Lee's enforcement authority under sections 97.0575 and 101.69, Plaintiffs' injuries under the "line warming ban" in section 102.031 are not. Instead, Defendant Supervisors are responsible for designating "no-solicitation zones" at voting locations and marking their boundaries. § 102.031(4)(a), Fla. Stat. (2021). Defendant Supervisors are also statutorily authorized to "take any reasonable action necessary to ensure order at the polling places, including, but not limited to, having disruptive and unruly persons removed by law enforcement officers from the polling room or place or from the 150-foot zone surrounding the polling place." § 102.031(4)(c), Fla. Stat. (2021).

Plaintiffs' assertion that their injuries are traceable to Defendant Lee because she is Florida's "chief election officer" and can adopt uniform standards to interpret and implement Florida's election laws does not change the outcome and runs contrary to binding Eleventh Circuit authority. *Compare* ECF No. 130 at 36–37 *with Jacobson*, 974 F.3d at 1253. And though the Eleventh Circuit did not hold in *Jacobson* that injuries flowing from Florida's election laws are *never* traceable to the Secretary of State, it did require that Plaintiffs show some "control" over the challenged provision beyond the Secretary's general election authority to establish traceability. Here, like in *Jacobson*, "Florida law expressly gives a different, independent official control over" the way in which the "line warming ban" is enforced—namely, the Defendant Supervisors of Elections. Accordingly, Plaintiffs' claims against Defendant Lee, challenging section 102.031, are **DISMISSED for lack of standing**.

As to the Defendant Supervisors, for the same reasons just discussed, Plaintiffs' injuries flowing from the "line warming ban" are traceable to them.[4] Plaintiffs also sue Defendant Supervisors to challenge the drop box restrictions and vote-by-mail application requirements. With respect to the drop box restrictions, the

---

[4] The Supervisors of Elections have not moved to dismiss, nor have they adopted any of Defendant Lee's arguments. However, this Court has an independent responsibility to determine whether it has jurisdiction to hear Plaintiffs' claims, which includes whether Plaintiffs have standing to challenge each of the provisions at issue in this case against each of the Defendants in this case.

Defendant Supervisors are directly responsible for offering drop boxes and complying with the statute limiting the locations, operating hours, and monitoring of such drop boxes. § 101.69, Fla. Stat. Similarly, though no one has argued otherwise, Defendant Supervisors are responsible for implementing statutes governing vote-by-mail ballot requests and directly enforce the challenged provision requiring the submission of identification when requesting a vote-by-mail ballot. *See* § 101.62, Fla. Stat. Defendant Supervisors are likewise responsible for designating the "no-solicitation zone" and marking its boundaries. § 102.031(4)(a), Fla. Stat. (2021). And Defendant Supervisors are statutorily authorized to "take any reasonable action necessary to ensure order at the polling places, including, but not limited to, having disruptive and unruly persons removed by law enforcement officers from the polling room or place or from the 150-foot zone surrounding the polling place." § 102.031(4)(c), Fla. Stat. (2021). I therefor conclude that Plaintiffs' alleged injuries are traceable to the Defendant Supervisors with respect to sections 101.69, 101.62(1)(a), and 102.031(4)(a)-(b).

Having concluded that Plaintiffs' injuries as to the drop box restrictions are traceable to both the Defendant Supervisors and Defendant Lee, their injuries as to the vote-by-mail application requirements and "line warming ban" are traceable to the Defendant Supervisors only, and their injuries with respect to the registration

disclaimer and delivery requirements are traceable to Defendant Lee, this Court turns to the third element of standing, redressability.[5]

### 3. *Redressability*

The redressability prong "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). A "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79.

Starting with the drop box restrictions, enjoining Defendant Lee from using her powers to impose a $25,000 civil penalty on any Supervisor who offers drop boxes in violation of section 101.69 will go a long way towards redressing Plaintiffs' and their members' injuries. To understand why, one need only ask what practical effect such an order would have. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (finding redressability where a favorable ruling's "practical consequence" was to

---

[5] This Court recognizes that not all Plaintiffs are operating in every county, and thus, their alleged injuries are not all traceable to each of the 67 Supervisors of Elections. However, at this stage, this Court need only consider whether a single Plaintiff has standing to bring its claims against Defendants without getting into the weeds as to whether each of the other Plaintiffs is similarly situated. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) ("[I]f 'we have at least one individual plaintiff who has demonstrated standing,' we do not need to 'consider whether the other plaintiffs have standing to maintain the suit.' "). Here, both Florida Rising and Poder Latinx allege that they conduct their activities throughout the state of Florida, *see* ECF No. 59 ¶¶ 20-22, 41–42, and are thus subject to the Supervisors' enforcement of the drop box restrictions, the "line warming" ban, and the vote-by-mail application requirements throughout the state. But going forward, this Court *will* get into the weeds, so the Plaintiffs must be prepared to explain exactly which Defendants they can seek redress against based on where they operate in the state.

make it more likely "that the plaintiff would obtain relief that directly redresses the injury suffered"). Enjoining Defendant Lee would remove the threat of punishment for Supervisors who offer drop boxes in violation of Florida law, even if such Supervisors are acting in compliance with a court order. Indeed, if this Court were to order the Supervisors not to comply with the challenged drop box restrictions, they would have to choose between complying with this Court's order and facing a $25,000 penalty from the Division of Elections. Moreover, enjoining Defendant Lee and her agents or employees from enforcing the civil penalty provision also removes a major deterrent for Supervisors who would otherwise offer drop boxes but do not want to run the risk of violating the strict terms of the statute's monitoring requirements. And it makes no difference that, were Defendant Lee enjoined, some Defendant Supervisors might still comply with the drop box restrictions absent an order from this or any other court. "Article III . . . does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *see also I. L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014).

As for the Defendant Supervisors, the practical effect of enjoining them from complying with the challenged drop box restrictions is that Defendant Supervisors will no longer be limited to providing voters with drop boxes that must be always monitored in person and open only during early voting hours.

Similarly, enjoining Defendant Supervisors from enforcing the identification requirement for voters requesting vote-by-mail ballots and from prohibiting "any activity with the intent to influence or effect of influencing a voter" within the non-solicitation zone at polling places, will have a similar practical effect with respect to Plaintiffs' alleged injuries. An injunction against enforcing the identification requirement would redress Plaintiffs' injuries of having to divert resources to educate voters about this new requirement and alleviate the alleged burden the identification requirement has on voters who seek to request a vote-by-mail ballot. In addition, a court order prohibiting enforcement of the new solicitation restriction would prohibit the Defendant Supervisors from preventing Plaintiffs' members and volunteers from engaging with voters at drop boxes and polling places as they have done in the past without fear of running afoul of the law.

Finally, enjoining Defendant Lee from referring suspected violations of the voter registration disclaimer and delivery requirements under section 97.0575 similarly removes a threat of enforcement against Plaintiffs and provides partial redress for their injuries flowing from this statute. Although the Attorney General is ultimately authorized to prosecute violations of this section through civil enforcement proceedings, and Plaintiffs have not sued the Attorney General in this action, Plaintiffs are not required to seek complete relief. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("True, a single dollar often cannot provide

full redress, but the ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)); *Church of Scientology*, 506 U.S. at 13 ("Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred when the IRS obtained the information on the tapes, a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession.").

Accordingly, for these reasons, I conclude that enjoining Defendant Lee and Defendant Supervisors from enforcing the drop box restrictions, enjoining Defendant Supervisors from enforcing the vote-by-mail identification requirements and the "line warming ban," and enjoining Defendant Lee from enforcing the voter registration disclaimer and delivery requirements all have the practical effect of redressing Plaintiffs' alleged injuries. Accordingly, Plaintiffs have standing to pursue their claims challenging section 101.69, as amended by SB 90, against Defendant Lee and Defendant Supervisors, section 97.0575, as amended by SB 90, against Defendant Lee, and sections 101.62 and 102.031, as amended by SB 90, against Defendant Supervisors.

Having so concluded, this Court addresses the balance of Defendant Lee's arguments for dismissal below. [6]

### III

### A

In her "omnibus" memorandum, the Defendant Lee first seeks to dismiss all claims alleging that SB 90 places an undue burden on the right to vote. ECF No. 122-1 at 5–12. Here, Count IV of Plaintiffs' First Amended Complaint alleges that the drop box, voter registration return, vote by mail repeat request, and voting line relief restrictions place an undue burden on the right to vote in violation of the First and Fourteenth Amendments. ECF No. 59 ¶¶ 183–90. Because, as discussed above, this Court dismissed Plaintiffs' claims against Defendant Lee as to the latter two restrictions, Defendant Lee only has standing to defend the former two restrictions. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1265 (11th Cir. 2015) (explaining that "the requirement that a party establish its standing to litigate applies not only to plaintiffs but also defendants"); *Fleetwood Servs., LLC*

---

[6] As the parties well know, in evaluating Defendant Lee's motion, this Court accepts the allegations in the amended complaint as true and construes them in the light most favorable to Plaintiffs. *See Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plaintiff's allegations must amount to 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

*v. Ram Cap. Funding LLC*, No. 20-cv-5120 (LJL), 2021 WL 1987320, at *2 (S.D.N.Y. May 18, 2021) ("[I]t is axiomatic that for a defendant to move to dismiss a cause of action for failure to state a claim for relief, the complaint must actually assert that cause of action against the defendant."). And because no other parties who would have standing to defend the remaining provisions join in the arguments Defendant Lee has raised in her "omnibus" memorandum, this Court focuses solely on the drop box and registration return restrictions.

Challenges to election laws are evaluated using the sliding scale standard set out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* test is designed to balance the fundamental right to vote against the reality that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The test requires this Court to "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule" while "taking into consideration the extent to which those justifications require the burden to plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). The greater burden the law imposes on the right to vote, the greater the scrutiny this Court must apply.

Laws that impose " 'severe' restrictions . . . must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Laws that impose "reasonable, nondiscriminatory restrictions," on the other hand, are subject to a more-forgiving review, under which the "state's important regulatory interests" will generally justify the restrictions. *Anderson*, 460 U.S. at 788. But no matter how slight the burden, "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.' " *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).

Because the *Anderson-Burdick* test "emphasizes the relevance of context and specific circumstances," it is particularly difficult to apply at the motion to dismiss stage. *Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020); *see also Duke v. Cleland*, 5 F.3d 1399, 1405 (11th Cir. 1993); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985). And any court foolhardy enough to attempt such a stunt is liable to find itself "in the position of Lady Justice: blindfolded and stuck holding empty scales." *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 736 (9th Cir. 2015) (McKeown, J., concurring).

Against this backdrop, Defendant Lee nonetheless urges this Court to dismiss Plaintiffs' undue burden claims. This case is different, she argues, for two reasons. *First*, she argues that regulations on vote-by-mail ballots do not implicate the right

to vote at all. ECF No. 122-1 at 7. *Second*, she argues that Plaintiffs' claims fail because they focus on the burdens placed on "vulnerable" voters instead of the electorate as a whole. *Id.* at 6, 10-12. She is wrong on both points.

This Court begins with Defendant Lee's first argument. Relying entirely on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), Defendant Lee argues that "unless a restriction on vote-by-mail 'absolutely prohibit[s]' someone from voting, the right to vote is not at stake." ECF No. 122-1 at 7 (quoting *McDonald*, 394 U.S. at 809). Though Defendant Lee argues at length that the Supreme Court has not abrogated *McDonald*, *see id.* at 8–10, her argument has a more fundamental problem; namely, that she grossly overreads *McDonald*.

In *McDonald*, pretrial detainees in the Cook County jail sued Chicago's election board, arguing—in part—that an Illinois law that allowed inmates from outside Cook County to receive absentee ballots while denying them to those from Cook County violated the Equal Protection Clause. *McDonald*, 394 U.S. at 806. A three-judge district court panel granted the board's motion for summary judgment, and the plaintiffs appealed directly to the Supreme Court. *Id.*

Writing for the unanimous Court, Chief Justice Warren explained that the first step was to "determine . . . how stringent a standard to use" in evaluating the challenged law. *Id.* Rational basis review applied, the *McDonald* Court determined, because the challenged classification was not based on wealth or race and because

35

there was "nothing in the record to indicate that the Illinois statutory scheme has an impact on [the plaintiffs'] ability to exercise the fundamental right to vote." *Id.* at 807. In a footnote, the Court emphasized that, because the plaintiffs had offered no evidence, for all the Court knew, Illinois might "furnish the jails with special polling booths or facilities on election day, or provide guarded transportation to the polls themselves for certain inmates, or entertain motions for temporary reductions in bail to allow some inmates to get to the polls on their own." *Id.* at 809 n.6. Because the state might offer pretrial detainees an equally convenient method of voting, the only thing before the Court was "a claimed right to receive absentee ballots." *Id.*   The Court explained that it would not assume that the state in fact denied the plaintiffs the right to vote "with nothing in the record to support such an assumption." *Id.* at 808. And so, the Court concluded that the challenged statute did not implicate the right to vote. *Id.*

Four years later, in *Goosby v. Osser*, the Court addressed a nearly identical claim. 409 U.S. 512, 514 (1973). This time around, pretrial detainees in the Philadelphia County jail brought suit against Pennsylvania's Attorney General and Secretary of State. The plaintiffs argued that Pennsylvania's election laws denied them the right to vote because Pennsylvania "neither permit[ed] [plaintiffs] to leave prison to register and vote, nor provide[d] facilities for the purpose at the prisons," and Pennsylvania law "expressly prohibit[ed] persons 'confined in penal

institutions' from voting by absentee ballot." *Id.* at 514. *Goosby* rejected the argument that *McDonald* foreclosed the plaintiffs' claims. In so doing, *Goosby* emphasized that *McDonald* turned on the lack of record evidence that Illinois refused to "make the franchise available by other means." *Id.* at 520. By contrast, in *Goosby*, the record was clear that the state provided no alternatives. *Id.* at 522. Satisfied that *McDonald* did not control, the *Goosby* Court remanded the plaintiffs' claims to a three-judge district court panel for consideration. *Id.*

The very next year, the Court addressed the issue yet again. This time, the plaintiffs were pretrial detainees in Monroe County, New York. *O'Brien v. Skinner*, 414 U.S. 524, 525 (1974). The facts in *Skinner* were nearly identical to *McDonald*. *See id.* at 525–27. Distinguishing *McDonald*, the *Skinner* Court explained that its decision in *McDonald* "rested on failure of proof." *Id.* at 529. But, presented with evidence that New York did not allow the plaintiffs "to use the absentee ballot," and that it denied them "any alternative means of casting their vote," the Court held the statute unconstitutional. *Id.* at 530.

As other circuits have explained, this line of cases does not "require proof that there was no possibility that the plaintiffs would find a way to adjust and vote through the remaining options." *Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 541 (6th Cir. 2014). Instead, it stands for the unremarkable proposition that, when plaintiffs proffer no evidence that the challenged law burdens their right to

vote, rational basis review applies. *See Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012).

Although *McDonald* came long before *Anderson-Burdick*, when put in context, it fits neatly within that test. Under *Anderson-Burdick*, when plaintiffs fail to show that the law creates more than a de minimis burden, rational basis review applies. And if a plaintiff offers no evidence that the challenged law burdens the right to vote, the court cannot assume that such a burden exists. *See Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1145 (N.D. Fla. 2020) (noting that, in applying *Anderson-Burdick*, "this Court . . . is limited to the evidence before it"). It is for that proposition that *McDonald* stands and nothing more.

Given that *McDonald* did not—in one sentence—create a sweeping vote-by-mail exception to the Constitution, it should come as no surprise that the Eleventh Circuit has repeatedly applied *Anderson-Burdick* to restrictions on mail-in voting. *See, e.g., Lee*, 915 F.3d at 1318 (using *Anderson-Burdick* to evaluate "the constitutionality of the signature-match scheme as it relates to vote-by-mail and provisional voters"). Just last year, when addressing the constitutionality of Georgia's absentee ballot deadline, the Eleventh Circuit remarked, "[t]he standard is clear: '[W]e must evaluate laws that burden voting rights using the approach of

*Anderson* and *Burdick*.' " *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (quoting *Jacobson*, 974 F.3d at 1261).[7]

In sum, Defendant Lee's argument that restrictions on mail-in ballots do not implicate the right to vote is unsound. Having so concluded, this Court turns to her second argument; namely, that Plaintiffs' claims fail because they focus on the burdens placed on "vulnerable" voters instead of the electorate as a whole.

If Defendant Lee's second argument looks familiar, it is because this Court has already rejected it. *See League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick*."). Still, this Court will briefly address it here.

Defendant Lee's argument relies entirely on Justice Scalia's concurrence in *Crawford*. Joined by Justices Thomas and Alito, Justice Scalia concurred in the judgment, but took issue with Justice Steven's opinion because it "assume[d] [the] premise that the voter-identification law 'may have imposed a special burden on' some voters, . . . but [held] that [the] petitioners ha[d] not assembled evidence to show that the special burden is severe enough to warrant strict scrutiny" instead of

---

[7] In support of her position, Defendant Lee cites Judge Lagoa's concurrence from *New Georgia Project*. In so doing, Defendant Lee puts words in Judge Lagoa's mouth. In her concurrence, Judge Lagoa *agreed* that *Anderson-Burdick* applied to the challenge before the court. *New Ga. Project*, 976 F.3d at 1288 (Lagoa, J., concurring). She took a different tack and cited *McDonald* to argue that there is no liberty interest in voting absentee, and thus, in her view, the district court had erred in applying the factors set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Id.* at 1289.

considering the law's "reasonably foreseeable effect on *voters generally*." *Crawford*, 553 U.S. at 204, 208 (Scalia, J., concurring) (emphasis in original). But Justice Scalia's concurrence is not the law. Instead, "Justice Stevens's plurality opinion controls . . . because it is the narrowest majority position."[8] *ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1321 (10th Cir. 2008); *see also GBM*, 992 F.3d at 1320 (applying Justice Stevens's opinion).

If anything, *Crawford* supports, not forecloses, the conclusion that disparate impact matters. "[A] majority of the justices in *Crawford* either did not expressly reject or in fact endorsed the idea that a burden on only a subgroup of voters could trigger balancing review under *Anderson-Burdick*." *Ohio State Conf. of NAACP*, 768 F.3d at 544. The Eleventh Circuit has applied *Anderson-Burdick* this way as well. *See Lee*, 915 F.3d at 1319 (evaluating the "burden . . . on vote-by-mail and provisional voters' fundamental right to vote"). And if there was any lingering doubt, *Anderson* itself "assessed the burden imposed by the challenged law by looking to its impact on a subgroup of voters." *Ohio State Conf. of NAACP*, 768 F.3d at 544 (citing *Anderson*, 460 U.S. at 792).

---

[8] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks omitted).

Beyond citing Justice Scalia's concurrence as if it were law, Defendant Lee offers zero authority supporting her position. Thus, given the above and in the absence of any authority to the contrary, this Court reiterates what it said before, "[d]isparate impact matters under *Anderson-Burdick*." *League of Women Voters*, 314 F. Supp. 3d at 1216.

Defendant Lee often finds herself on the receiving end of lawsuits challenging Florida's election laws. So this Court can hardly blame her for finding the "New" *Anderson-Burdick* test she has concocted more refreshing. But, unless and until the Supreme Court changes the formula, this Court will vend exclusively *Anderson-Burdick* "Classic." Secretary Lee's motion to dismiss is **DENIED** as to Count IV of Plaintiffs' First Amended Complaint.

B

Defendant Lee also targets Plaintiffs' discriminatory results claim under section 2 of the Voting Rights Act. Passed nearly 95 years after the Fifteenth Amendment first promised the right to vote regardless of race, "[t]he Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 308–09 (1966). Such discrimination was, and remains, "an insidious and pervasive evil[,] . . . perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *Id.* at 309. Plaintiffs allege that SB 90 is yet another link in that long,

41

shameful chain of insidious and ingenious attempts to defy the promise of equal voting rights for all.

Specifically, Count I of Plaintiffs' First Amended Complaint alleges that the drop box, vote-by-mail application, voter registration delivery, and voting line relief restrictions violate section 2 because, "by their discriminatory impact, they will 'result in a denial or abridgement' of the right of voters of color to vote and to participate equally in the democratic process." ECF No. 59 ¶ 169.

In moving to dismiss these claims, Defendant Lee argues that "Plaintiffs Complaint[] fail[s] to include enough non-speculative, non-conclusory allegations of discriminatory effect to survive *Twombly*, *Iqbal*, and the U.S. Supreme Court's test in [*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)]." ECF No. 122-1 at 22. As explained above, Defendant Lee only has standing to defend the drop box and voter registration delivery restrictions, and no other parties adopt the arguments she raised in her "omnibus" memorandum, thus this Court's analysis is likewise limited.

In evaluating Plaintiffs' claims, this Court starts with section 2's text. *See Brnovich*, 141 S. Ct. at 2336; *GBM*, 992 F.3d at 1328. It provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. . . .

52 U.S.C. § 10301(a)–(b).

So "in looking into the totality of the circumstances, if 'members of a protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,' a violation is shown." *GBM*, 992 F.3d at 1329 (quoting *Chisom v. Roemer*, 501 U.S. 380, 388 (1991)). Put another way, section 2 is violated when minority voters are denied "meaningful access to the political process[.]" *Osburn v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994)). But how exactly are courts to determine when that occurs?

In *Brnovich*, the Supreme Court "for the first time appl[ied] § 2 of the Voting Rights Act . . . to regulations that govern how ballots are collected and counted." 141 S. Ct. at 2330. At the outset, the Court "decline[d] . . . to announce a test to govern all [Voting Rights Act] claims involving rules . . . that specify the time, place, or manner for casting ballots." *Id.* at 2336. Having so qualified its ruling, the Court went on to "identify certain guideposts" that can help courts decide section 2 cases. *Id.* These "guideposts" are (1) "the size of the burden imposed by a challenged voting

rule," (2) "the degree to which a voting rule departs" from standard practice in 1982, (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interest served by the challenged rule." *Id.* at 2338–40.

The Court made clear that this list was non-exhaustive. *Id.* at 2338. And, given that section 2 requires courts to consider "the totality of circumstances," it is axiomatic that no one factor controls. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (explaining that, when considering vote dilution claims under section 2, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other" (quoting S.Rep., at 29, U.S. Code Cong. & Admin. News 1982, p. 207)).[9] Plus, the Court explained that, while they are "less helpful," the factors set out in *Gingles* remain relevant—especially "that minority group members suffered discrimination in the past . . . and that effects of that discrimination persist." *Id.* at 2340 ("We do not suggest that these factors should be

---

[9] *See also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, -- F.4th --, No. 19-13604, 2021 WL 3870708, at *11 (11th Cir. 2021) (explaining that, when considering whether voluntary cessation moots a case, no factor is dispositive because "the question is whether the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation." (cleaned up)); *DeJesus v. Lewis*, -- F.4th --, No. 18-11649, 2021 WL 4269920, at *14 (11th Cir. 2021) (explaining that, when considering motions to appoint counsel in a civil case, "[n]o single factor is dispositive, but the totality of the circumstances may tip the balance in favor of appointing counsel").

disregarded"); *contra GBM*, 992 F.3d at 1331 ("As a threshold matter, we question the applicability of *Gingles* to this case.").

Finally, the Court paused to recognize that section 2 "applies to a broad range of voting rules, practices and procedures; that an 'abridgment' of the right to vote under § 2 does not require outright denial of the right; that § 2 does not demand proof of discriminatory purpose; and that a 'facially neutral' law or practice may violate [section 2]." *Id.* at 2341.

Working through each *Brnovich* factor, Defendant Lee argues that Plaintiffs' "qualitative" and "quantitative" allegations are insufficient—when considering the opportunities provided by Florida's entire voting system—to show that SB 90 disproportionally impacts Black and Latino voters, that Florida's election code makes it substantially easier to vote now than it did in 1982, that Plaintiffs do not sufficiently plead the size of the burden SB 90 places on minority voters, and that Florida has a "*per se*" interest in preventing voter fraud. ECF No. 122-1 at 14–28.

But just as she does in the undue burden context, Defendant Lee puts the cart before the horse; these are summary judgment arguments, at best. *Cf. Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) (stating that "[s]ummary judgment in [section 2] cases presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and our precedent"). As Plaintiffs point out, the district court decided *Brnovich* after "a

ten-day bench trial" that involved at least 7 expert witnesses, 33 lay witnesses, and 11 witnesses who testified by deposition. *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 832, 833–38 (D. Ariz. 2018).

Even if it were appropriate to address Plaintiffs' claims on the merits now, Defendant Lee's arguments fail because they are built on a faulty foundation. That is, Defendant Lee assumes that Plaintiffs must allege facts satisfying each *Brnovich* factor. But the *Brnovich* factors are merely "guideposts." *Brnovich*, 141 S. Ct. at 2336. Even at trial, failure on some factors is not dispositive. *Gingles*, 478 U.S. at 45. It should thus go without saying that *Brnovich* did not set out a rigid pleading standard that section 2 plaintiffs must meet.

With that in mind, Plaintiffs' First Amended Complaint includes more than enough factual allegations to support a claim under section 2. For example, Plaintiffs direct extensive allegations towards the first and third *Brnovich* factors. *See, e.g.*, ECF No. 59 ¶¶ 6 ("SB90 . . . places disproportionate burdens on Black voters [and] Latino voters . . . ."), 7 (alleging that "SB90 makes voting by mail more burdensome" and alleging that "approximately 40 percent of all votes cast by Black voters were cast by mail" and "approximately 41% of all votes cast by Latino voters were cast by mail"), 110 ("Approximately 550,000 Black voters and 740,000 Latino voters voted by mail in the 2020 election, and a large percentage of these ballots were returned to drop boxes."), 121 ("The Secure Drop Box Restriction imposes a

particular burden on voters of color an others who disproportionately rely on secure drop boxes to vote after work . . . .").

Plaintiffs also include allegations addressing the most relevant *Gingles* factors. *See, e.g.*, *id.* ¶¶ 2 ("Florida has a long history of imposing racially discriminatory voting requirements."); 65–80 (discussing the Florida Legislature's "long and sordid history of passing legislation that is intended to disenfranchise or severely burden Black and Latino voters"). And while the Eleventh Circuit has cautioned against "allowing the old, outdated intentions of previous generations to taint [the state's] ability to enact voting legislation," *GBM*, 992 F.3d at 1332, here Plaintiffs have at least plausibly alleged that the old, outdated intentions of the current generation are tainting Florida's election code, *see, e.g.*, ECF No. 59 ¶ 3 (giving examples of how Florida "has engaged in repeated efforts over the last decade to discourage or prevent Black and Latino residents from voting."); *cf. City of S. Miami v. DeSantis*, -- F. Supp. 3d -- , No. 19-cv-22927, 2021 WL 4272017, at *49 (S.D. Fla. Sept. 21, 2021) (finding "that the Legislature enacted [anti-sanctuary city legislation] to promote and ratify . . . racist views").

To be sure, other factors cut against Plaintiffs. For example, it appears that Florida makes it easier to vote now than it did in 1982. Plus, the Supreme Court has held that preventing voter fraud is "a valid and important state interest." *Brnovich*, 141 S. Ct. at 2340. Of course, Plaintiffs contend that SB 90 does not serve *any*

legitimate state interest. *See, e.g.*, ECF No. 59 ¶ 11–15, 122, 171 (alleging that the stated interests supporting SB 90 are pretextual). And nothing in *Brnovich* suggests that the words "voter fraud" are a mysterious and powerful incantation that instantly incinerates even the most fearsome section 2 claims. Instead, as in any other case, Plaintiffs must be given the opportunity to *prove* what they allege—that SB 90 does not prevent voter fraud, prophylactically or otherwise. *See Duke*, 5 F.3d at 1405 n.6 (declining to weigh Georgia's asserted interests at the motion to dismiss stage because "[t]he existence of a state interest . . . is a matter of proof.").

In short, Defendant Lee argues that Plaintiffs must prove their case at the pleading stage. That is not so. *See* Fed. R. Civ. P. 8(a)(1) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Defendant Lee's arguments may yet win the day; at this stage, however, they are premature. Because Plaintiffs have plausibly pleaded that, considering the totality of the circumstances, the drop box and registration return restrictions deny Black and Latino voters meaningful access to the political process, the motion to dismiss Count I is **DENIED**.

## C

Next, this Court turns to Defendant Lee's attack on Plaintiffs' intentional discrimination claims. In Counts I through III of their First Amended Complaint, Plaintiffs allege that the drop box, vote-by-mail application, voter registration

delivery, and voting line relief restrictions violate section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment because the Legislature passed them with discriminatory intent. ECF No. 59 ¶¶ 165–82.

As explained above, section 2 guarantees voters "meaningful access to the political process" regardless of race. *Osburn*, 369 F.3d at 1289. The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. And the Fifteenth Amendment guarantees that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. Amend. XV, § 1.

Though facially neutral, SB 90 may nonetheless violate the Constitution—and section 2—if the Legislature passed it with the intent to discriminate. Indeed, ostensibly neutral laws motivated by racial prejudice "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

To determine whether a facially neutral law violates the Fourteenth or Fifteenth Amendments, this Court must apply a two-prong analysis. *GBM*, 992 F.3d at 1321. Plaintiffs must first show that the law has both "a discriminatory purpose and effect." *Id.* (quoting *Burton v. City of Belle Glade*, 187 F.3d 1175, 1188–89 (11th Cir. 1999)). Once Plaintiffs satisfy the first prong, "the second prong provides that

'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.' " *Id.* (citations omitted).

To address the first prong, this Court must apply the multi-factor approach set out in *Arlington Heights*. 429 U.S. at 252. *See GBM*, 992 F.3d at 1321 ("The *Arlington Heights* analysis . . . applies to both Fourteenth Amendment and Fifteenth Amendment claims); *Brnovich*, 141 S. Ct. at 2349 (applying *Arlington Heights* to section 2 intent claim).

The *Arlington Heights* factors are (1) the challenged law's impact (2) the law's historical background; (3) "the specific sequence of events leading up" to the law's passage, which includes "(4) procedural and substantive departure; and (5) the contemporary statements and actions of key legislators." *GBM*, 992 F.3d at 1322. This "list has been supplemented" with an additional three factors: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.*[10] These factors are nonexhaustive, *id.*, and no one factor is controlling, *see Perkins v. West Helena*, 675

_____

[10] In passing, Defendant Lee suggests that Florida "is not required to show that 'a less restrictive means would not adequately serve the State's objectives.' " ECF No. 122-1 at 19 (quoting *Brnovich*, 141 S. Ct. at 2346). The *Cf.* in Defendant Lee's citation is working overtime here. *See* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. B1.2, at 4 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020) (explaining that *Cf.* signals that "[t]he authority is different from the main proposition but sufficiently analogous to lend support"). The Court made the statement Defendant Lee quotes in addressing the standard governing section 2 *results* claims. In addressing *Arlington Heights*, the Court explained that the Ninth Circuit erred by re-weighing facts on appeal. Nothing in *Brnovich*'s abbreviated discussion of section 2 intent claims suggests that the Supreme Court sought to edit a factor out of the *Arlington Heights* standard.

F.2d 201, 209 (8th Cir. 1982) ("In determining whether a discriminatory purpose existed, no set of factors, including those suggested in . . . *Arlington Heights*, is dispositive of the question of intent.").

Further, in applying the *Arlington Heights* factors, this Court is mindful that the discriminatory purpose need not be the " 'dominant' or 'primary' one;" rather, it need only be a motivating factor because "[r]arely can it be said that a legislature or an administrative body operating under a broad mandate made a decision motivated by a single concern." *Arlington Heights*, 429 U.S. at 265–66. Plus, as with discriminatory results under *Brnovich*, discriminatory purpose under *Arlington Heights* is determined "from the totality of relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Here, as with her other arguments, Defendant Lee overextends by asking this Court to resolve, on a motion to dismiss, claims that require this Court to undertake a complex, fact intensive inquiry. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("The task of assessing a jurisdiction's motivation, however, is not a simple matter; on the contrary, it is an inherently complex endeavor."); *Arlington Heights*, 429 U.S. at 226 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); *GBM*, 992 F.3d at 1322 n.33 ("The *Arlington Heights* factors require a fact intensive examination of the record.").

Nonetheless, this Court will address Defendant Lee's arguments as to each *Arlington Heights* factor.

1. *Discriminatory impact*. Challenging Plaintiffs' allegations on the first factor, Defendant Lee argues that Plaintiffs' First Amended Complaint "largely provides bare legal conclusions regarding the 'Impact of SB 90.'" ECF No. 122-1 at 14. But as this Court explained while discussing Plaintiffs' discriminatory results claim, Plaintiffs have sufficiently alleged that the drop box and voter registration delivery restrictions have a discriminatory impact. Perhaps anticipating that conclusion, Defendant Lee also argues that, even if Plaintiffs do allege some evidence of discriminatory impact, Plaintiffs' allegations are insufficient to create the "'rare' case where discriminatory impact alone could be determinative." *Id.* (quoting *GBM*, 992 F.3d at 1322). But, as explained below, here discriminatory impact does not stand alone.

2. *Historical background*. In challenging Plaintiffs' allegations on this factor, Defendant Lee complains that Plaintiffs "choose to dwell on the distant past." ECF No. 122-1 at 15. If only that were so; neither history nor discriminatory voting restrictions ended in 1965. *But see Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 532 (2013). As examples, Plaintiffs provide voting restrictions of a more recent vintage. Specifically, Plaintiffs point to, among others, a 2011 law that targeted early voting and third-party registration, a proposed voter purge in 2012, and signature match and

early voting restrictions in 2018.[11] *See* ECF No. 59 ¶¶ 68 ("[I]n 2012, the United States sued the state to stop a voter purge that this Court found likely discriminated against naturalized citizens."); 69 (alleging that "[s]ince 1983, . . . . "[a]t least 57 [lawsuits against Florida] have resulted in findings of discrimination, including 37 under Section 2 of the Voting Rights Act and six under Section 5"); 70 (alleging that, "in 2000 the state improperly removed at least 1,100 eligible voters from the voting rolls after identifying them as convicted felons," that "of the voters dropped from the rolls in this voter purge, 41% were Black," and that, "[i]n Miami-Dade County, more than 65 percent of the names on the purge list were Blacks, who represented only 20.4 percent of the population" (quotations omitted)); 71 (alleging that, "[i]n 2006 and 2007, Florida's [registration matching requirements] disenfranchised tens of thousands of otherwise eligible voters, disproportionately voters of color" and that, "[e]ven though Latino communities comprised only 15 percent of the applicant pool and Blacks only 13 percent, 65 percent of the rejected applicants were Latino (39 percent) or Black (26 percent)"); 74 (alleging that, in 2011, "the United States Department of Justice successfully moved to block [early voting restrictions] from taking effect in Collier, Hendry, Hardee, Hillsborough, and

---

[11] Plaintiffs also point to SB7066, which they describe as blunting "the effect of Amendment 4 re-enfranchisement of returning citizens." ECF No. 130 at 19; ECF No. 59 ¶¶ 77–78. But although the challenge to SB7066 presented troubling questions, even Judge Hinkle found that, while "the issue [was] close and could reasonably be decided either way[,] . . . . [o]n balance, . . . SB7066 was not motivated by race." *Jones v. DeSantis*, 462 F. Supp. 3d 1196, 1235, 1238 (N.D. Fla. 2020). Accordingly, citations to SB7066 do not support Plaintiffs' case.

Monroe Counties"); 75 ("Social scientists concluded that HB1355 resulted in a precipitous drop in voter registrations leading into the 2012 elections, particularly among Black voters." Citing Michael C. Herron and Daniel A. Smith, *The Effects of House Bill 1355 on Voter Registration in Florida*, 13 St. Pol. & Pol'y Q. 279, 297 (2013)); and 76 (claiming "Florida's voting laws continue to show a particularized pattern of disenfranchisement of voters.").

Far from "at best" pointing "to no intentional discrimination," Plaintiffs' allegations draw a straight, shameful line from the discriminatory laws of the 1880s to today. Whether Plaintiffs can prove such a link is another matter. At this stage, however, these allegations will do.

3. *The sequence of events*. Defendant Lee argues that "[t]he sequence of events and departure from standard procedure inquiry, as plead, is insufficient." ECF No. 122-1 at 16. Her argument is twofold. First, she argues that "the Plaintiffs attribute most of the sequence of events and departure to changes made during a once-in-a-lifetime pandemic." *Id.* Second, she argues that Plaintiffs' "claim that" using "the 'strike all' amendment was unusual or 'flawed.' . . . is not true." *Id.* at 17. Maybe recognizing the flaws in her argument, Defendant Lee also argues that "even if this Court found significant evidence of unexplainable procedural deviations, this factor alone cannot support a finding of intent." *Id.* at 16.

Defendant Lee's argument is flawed; Plaintiffs allege enough facts to survive the motion to dismiss stage. For example, Plaintiffs allege that, during debate in the Legislature, SB 90's sponsors could not articulate why the bill was necessary, ECF No. 59 ¶ 92, that the time for public comment was limited to one minute, and that members of the public were forced to testify remotely from FSU's Civic Center, *id.* ¶ 100. At other hearings, no public testimony was permitted at all. *Id.* And while the use of a strike all amendment may not be unusual, Plaintiffs allege that here the Legislature used it in a way that "was so rushed that legislators were afforded only a few minutes to introduce, explain, debate and vote on each proposed amendment." *Id.* ¶ 101. In short, Plaintiffs allege that the Legislature passed SB 90 in a short flurry of activity that allowed for essentially no public input, and barely any legislative input. *Id.* ¶¶ 101–04.

It may well be that—as Defendant Lee claims—COVID-19 made these changes necessary. At the motion to dismiss stage, however, this Court takes Plaintiffs' allegations as true and draws reasonable inferences therefrom. Applying that standard, Plaintiffs have satisfied this prong.

4. *Contemporaneous statements*. Defendant Lee next argues that "Plaintiffs cannot show discriminatory intent through statements of 'key legislators' supportive of the 2021 Law 'made contemporaneously' with its passage." ECF No. 122-1 at 17 (quoting *GBM*, 992 F.3d at 1322). Plaintiffs respond by directing this Court to

portions of their First Amended Complaint, in which they allege that many legislators and advocates told the Legislature that "the bills were targeting voting practices increasingly relied upon by Black and Latino voters." ECF No. 59 ¶¶ 86–87. Plaintiffs also highlight that, in response, SB 90's sponsors struggled to articulate why the bill was necessary. *See, e.g.*, *id.* ¶¶ 91–98.

As far as contemporaneous statements go, it is not clear this is the strongest evidence—after all, a bill's opponents could always create a record in this way. *See Veasey v. Abbott*, 830 F.3d 216, 233 (5th Cir. 2016) ("[T]he district court mistakenly relied in part on speculation by the bill's opponents about proponents' motives (rather than evidence of their statements and actions)").

But that is not to say that it is totally irrelevant that, allegedly, a majority of the Florida Legislature was repeatedly warned that SB 90 would have a discriminatory effect, struggled to identify why the Act was necessary, and eventually said, more or less, "eh, why not?" *See id.* at 239 (finding relevant evidence that, "[a]gainst a backdrop of warnings that [Texas's voter ID law] would have a disparate impact on minorities and would likely fail the (then extant) preclearance requirement, amendment after amendment was rejected."). Plaintiffs have therefore pleaded sufficient facts under this factor.

5. *Foreseeability and knowledge of disparate impact.* Defendant Lee argues that Plaintiffs' allegations under this factor are insufficient because Plaintiffs

"simply claim[] that there exists a discriminatory impact (without attempting to explain the nature of that impact)" and because Plaintiffs "rely on statements from those opposing the 2021 Law's passage." ECF No. 122-1 at 18–19.

As this Court explained, Plaintiffs *have* alleged discriminatory impact. Moreover, while this Court acknowledges the issues attendant with relying on opposing legislators' statements, Plaintiffs also allege that "the House Public Integrity and Elections Committee surveyed all 67 County Supervisors of Elections on key details concerning the 2020 General Election with particular focus on practices that were subsequently targeted in SB 90" and that, using that study, the Legislature "could readily predict that SB 90 would have a discriminatory impact." ECF No. 59 ¶ 88. That may not be true in the end, but at this stage it is enough.

6. *Less discriminatory alternatives*. Setting aside Defendant Lee's argument that the Supreme Court eliminated this factor *sub silentio*—which this Court rejected in footnote six, *supra*—Defendant Lee's first argument regarding less discriminatory alternatives is that Plaintiffs "attempt to allege the existence of less discriminatory alternatives . . . without first properly pleading that the 2021 Law is discriminatory in the first instance." ECF No. 122-1 at 19. Ignoring the somewhat circular nature of Defendant Lee's argument, Plaintiffs have clearly alleged that SB 90 is discriminatory. Thus, this argument has no merit.

Second, Defendant Lee asserts that "the Florida legislature provided multiple ways for a voter to provide sufficient identification to receive a vote-by-mail ballot." *Id.* at 20. While that could factor into the final calculus, this argument only addresses *one* of SB 90's many provisions. And at any rate, Plaintiffs have alleged that many less discriminatory alternatives were suggested—and rejected—during debate in the Florida Legislature. *See* ECF No. 59 ¶ 89; *see also Veasy*, F.3d at 237 (explaining that legislature's rejection of "ameliorative measures" is relevant under *Arlington Heights*). Accordingly, Defendant Lee's argument provides no basis to dismiss Plaintiffs' claims at this stage.

In sum, Plaintiffs have pleaded facts addressing every *Arlington Heights* factor. Given that the question is whether this Court can infer a discriminatory purpose given the totality of the circumstances, and that no one factor is dispositive, Plaintiffs have gone above and beyond what is necessary at the pleading stage. That said, as this Court has paused to say over and over again, that does *not* mean Plaintiffs can prove what they allege. Rather, this Court means just what it says; at the pleading stage, Plaintiffs have done enough.

## D

The balance of Defendant Lee's arguments may be addressed in short order. To start, Defendant Lee argues that Count V is due to be dismissed because Plaintiffs fail to state a claim that the "line warming ban" is unconstitutionally overbroad or

vague under the First and Fourteenth Amendments. ECF No. 122-1 at 29 n.19. But as this Court has already determined Plaintiffs lack standing to proceed against Defendant Lee with respect to section 102.031, and because no other parties in this case have adopted the arguments that Defendant Lee raises in her motion to dismiss, this Court need not address the balance of her arguments on this point.

Similarly, Defendant Lee argues that Count VI is due to be dismissed for lack of standing because Plaintiffs' alleged injuries flowing from the "line warming ban" are not traceable to Defendant Lee. ECF No. 122-1 at 40. As discussed at length above, this Court agrees. And again, as to Defendant Lee's remaining points concerning the merits of Count VI, no other parties in this case have adopted her arguments and this Court therefore need not address them here.

Finally, Defendant Lee has not moved to dismiss Counts VII or VIII; accordingly, given that Plaintiffs have standing to proceed with these claims, they may go forward.

For the foregoing reasons,

**IT IS ORDERED**:

1.  Defendant Lee's motion to dismiss, ECF No. 122, is **GRANTED in part** and **DENIED in part**.

2.  Plaintiffs' claims against Defendant Lee challenging the "line warming ban," under section 102.031, Florida Statutes, are **DISMISSED for lack**

**of standing**; namely, Counts V and VI are **DISMISSED** as to Defendant Lee.

3. Counts I-III against Defendant Lee are limited to challenging sections 101.69 and 97.057, as amended by SB 90.

4. Defendant Lee's motion to dismiss Counts I-IV is otherwise **DENIED**.

5. If any party files a substantive "omnibus" memorandum or "omnibus" order again, that party's motion will be denied without prejudice for failure to follow this Court's orders.

**SO ORDERED on October 8, 2021.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**

60