IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS
OF FLORIDA, INC., et al.,

        *Plaintiffs*,

v.

LAUREL M. LEE, in her official
capacity as Florida Secretary of
State, et al.,

        *Defendants*,

and

NATIONAL REPUBLICAN
SENATORIAL COMMITTEE and
REPUBLICAN NATIONAL
COMMITTEE,

        *Intervenor-Defendants.*

_____/

Case No.:  **4:21cv186-MW/MAF**
**4:21cv187-MW/MAF**
**4:21cv201-MW/MJF**
**4:21cv242-MW/MAF**

## OMNIBUS ORDER ON MOTIONS TO QUASH

There are two motions to quash pending in this partially consolidated voting-rights case. Both raise important questions about the scope and strength of various state governmental privileges. *First*, seeking documents and deposition testimony, Plaintiffs in Case Nos. 4:21cv187 and 4:21cv201 have served subpoenas on seven members of the Florida Legislature. Although the Legislators "have largely agreed" to produce the documents Plaintiffs seek, they move to quash the deposition

subpoenas on legislative privilege grounds. *Second*, raising similar arguments, the Executive Office of the Governor moves to quash a subpoena Plaintiffs in Case No. 4:21cv201 have served on it. Specifically, the Governor's office claims that legislative and executive privileges bar its subpoena, and that the limited time Plaintiffs gave the Governor's office to prepare imposes an undue burden. This Court ordered Plaintiffs to file expedited responses to both motions. Now, having considered those responses, the motions to quash, the Legislators' reply in support thereof, and all attachments, both motions to quash are **GRANTED**.[1]

I

To put the motions to quash in context, this Court provides some brief background. Plaintiffs filed these partially consolidated cases between May and June 2021, alleging that several Florida elections laws, as amended by Senate Bill 90 ("SB 90"), violate the Constitution and federal law. Relevant here, Plaintiffs in Case Nos. 4:21cv187 and 4:21cv201 claim that SB 90 violates section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment because the Legislature passed it with the intent to discriminate based on race. Because the cases raise similar issues, this Court consolidated them for discovery purposes only.

---

[1] Recently, much of this Court's attention has been consumed by an ongoing bellwether trial in a multidistrict litigation case. Still, this Court recognizes the urgency of this matter, and is therefore issuing this truncated order on an expedited basis.

Pursuing evidence of discriminatory intent, Plaintiffs in Case No. 4:21cv187 subpoenaed Senators Baxely and Boyd in late September, demanding that they sit for depositions and produce certain categories of documents related to the Legislature's drafting and passage of SB 90. At the same time, Plaintiffs in Case No. 4:21cv201 served similar subpoenas on Senators Brandes, Gruters, and Passidomo, as well as Representatives Ingoglia and Grall. Then, in early October, Plaintiffs in Case No. 4:21cv201 subpoenaed the Governor's office, demanding that it produce a Rule 30(b)(6) witness for deposition on several topics related to the Governor's involvement in SB 90's drafting and passage. A few days later, Plaintiffs served the Governor's office with an amended subpoena.

Although not perfectly clear from the record, Plaintiffs appear to seek to depose the Legislators about (1) the information available to the Legislators about the potential impact of SB 90, (2) the legislative process generally, (3) the Legislators' decision-making process, (4) the Legislators' interactions with third-party groups like Heritage Action and the James Madison Institute, and (5) the Legislator's service on the Republican National Committee or Republican State Leadership Committee Election Integrity Commissions.

On the other hand, Plaintiffs seek to question the Governor's office about (1) the state interest that the Governor's office contends each of SB 90's challenged provisions advances, (2) the Governor's office's statements and opinions concerning

3

the conduct of the 2020 general election in Florida, (3) the success or failure of the 2020 general election in Florida, and the Governor's office's understanding of what contributed to that success or failure, (4) the Governor's office's statements and opinions concerning SB 90, (5) the Governor's office's role in drafting, discussing, negotiating, and enacting SB 90, (6) the Governor's office's communications regarding SB 90 with various enumerated entities, (7) any analysis that the Governor's office has conducted relating to the anticipated or actual effects of any of SB 90's challenged provisions on voting in Florida and any communications involving the Governor's office regarding the anticipated or actual effects of any of those provisions on voting in Florida, (8) any analysis that the Governor's office has conducted concerning the anticipated or actual costs of implementing any of SB 90's challenged provisions, (9) any analysis that the Governor's office has conducted concerning the need for or purpose of any of SB 90's challenged provisions, (10) the Governor's office's collection and production of documents in response to a subpoena in Case No. 4:21cv186, and (11) the Governor's office's communications with various entities making up Florida's university system concerning SB 90, litigation involving SB 90, or expert witnesses involved in litigation about SB 90.

After issuing the subpoenas, Plaintiffs conferred with counsel for the Legislators and the Governor's office. The Legislators agreed to produce the documents Plaintiffs sought but refused to sit for depositions. The Governor's office

indicated that it would move to quash its subpoena in its entirety. Having reached an impasse, both the Legislators and the Governor's office moved to quash their respective subpoenas.

## II

Federal Rule of Civil Procedure 45 directs this Court to quash a subpoena if the subpoena "requires [the] disclosure of privileged or other protected matter, if no exception or waiver applies," or if it "fails to allow a reasonable time to comply." Fed. R. Civ. P. 45(d)(3)(A)(i), (iii). The Legislators raise a claim of privilege, and the Governor's office argues both privilege and that it is unduly burdened. This Court starts with the privilege arguments.

## A

"The federal courts have the authority and duty to recognize claims of privilege that are valid under federal common law." *In re Hubbard*, 803 F.3d 1298, 1307 (11th Cir. 2015) (citing Fed. R. Evid. 501). To claim privilege in response to a subpoena, a person must "expressly make the claim" and "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(i)–(ii). The party asserting a privilege bears the burden to show that the privilege applies. *In re Grand Jury Investigation*, 842 F.2d 1223, 1225 (11th Cir. 1987). Both the Legislators and the Governor's office

assert legislative privilege. The Governor's office also raises executive privilege; namely, the deliberative process privilege. This Court begins its analysis with legislative privilege.

1

Legislative privilege is an "important" privilege that "has deep roots in federal common law." *Hubbard*, 803 F.3d at 1307. The privilege is best understood in conjunction with "the parallel concept of legislative immunity." *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 180 (4th Cir. 2011). Legislative immunity provides broad immunity to legislators "from arrest or civil process for what they do or say in legislative proceedings." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). And legislative privilege furthers the policy goals behind legislative immunity by preventing parties from using third-party discovery as an end-run around legislative immunity—harassing legislators through burdensome discovery requests. *See Wash. Suburban*, 631 F.3d at 181. Put another way, legislative immunity shields legislators from direct liability for actions taken during legislative proceedings; legislative privilege shields legislators from indirect liability through the costs of litigation. *See id.* (explaining that legislative privilege recognizes that "litigation's costs do not fall on named parties alone.").

The motions to quash raise three unresolved issues relating to legislative privilege. These issues are (1) the legislative privilege's scope, (2) whether the

privilege is absolute in civil cases, and (3), if the privilege is not absolute, when can a party overcome it (and whether Plaintiffs have done so here).

a

The first question is whether the testimony Plaintiffs seek implicates legislative privilege at all—*i.e.*, what is the scope of the privilege? The Eleventh Circuit has defined the privilege as covering "both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308.

Starting with the Legislators, Plaintiffs argue that legislative privilege extends only to communications between legislative staff and other legislators. Thus, Plaintiffs say, the privilege does not protect the Legislators' communications with third parties. The Legislators, by contrast, argue that discussions with outside groups fall within the privilege so long as they concern the proposal, formulation, and passage of legislation.

To support their argument, Plaintiffs point to district courts outside this circuit. For example, *Baldus v. Brennan* held that the Wisconsin "Legislature . . . waived its legislative privilege to the extent that it relied on . . . outside experts for consulting services." No. 11-CV-1011 JPS-DPW, 2011 WL 6122542, at *2 (E.D. Wis. Dec. 8, 2011). *See also Favors v. Cuomo*, 285 F.R.D. 187, 212 (E.D.N.Y. 2012) (explaining that "communications with 'knowledgeable outsiders'—e.g.,

7

lobbyists—fall outside the privilege"); *League of Women Voters of Mich. v. Johnson*, No. 17-14148, 2018 WL 2335805, at *6 (E.D. Mich. May 23, 2018) ("Communications between legislators or staff members and third parties consulted during the redistricting process are not protected by the legislative privilege.").

Alternatively, as the Legislators point out, "district courts within this circuit have concluded that the legislative privilege is not waived simply because a legislator has communicated with third parties, if the communication was part of the formulation of legislation." *Thompson v. Merrill*, No. 2:16-cv-783-ECM, 2020 WL 2545317, at *3 (M.D. Ala. May 19, 2020). This is the better position.

To start, this Court agrees with the Legislators and the Governor's office that "the maintenance of confidentiality is not the fundamental concern of the legislative privilege." *Pulte Home Corp. v. Montgomery Cnty., Md.*, No. GJH-14-3955, 2017 WL 2361167, at *8 (D. Md. May 31, 2017). Instead, the privilege serves to prevent parties from harassing legislators—or the Governor—for actions those legislators take in their legislative capacity. And "[m]eeting with persons outside the legislature" is "a routine and legitimate part of the modern-day legislative process." *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007). *See also Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) (observing that "[m]eeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures"). Accordingly, this Court finds that

communications with third parties are subject to legislative privilege so long as those communications were part of the formulation of legislation.[2]

As to the Governor's office, Plaintiffs argue and the Governor's office concedes that topics 2 and 3,[3] on their face, do not implicate legislative privilege. The Governor's office, however, contends that "the only conceivable relevance of" these topics is tied to the reasons the Governor decided to support SB 90. Thus, it says, legislative privilege applies to these topics as well. Beyond topics 2 and 3, Plaintiffs and the Governor's office disagree as to whether topics 1, 7, 8, 10, or 11 implicate the legislative privilege.[4]  Plaintiffs argue that topics 1, 7, and 8, are not subject to the privilege because the Governor oversees the enforcement of SB 90,

---

[2] That said, because confidentiality is not the legislative privilege's animating concern, the privilege would not prevent Plaintiffs from asking the third parties with which the Legislators communicated about those communications. *See* ECF No. 287 (arguing Plaintiffs can get the same information from sources other than the Governor's office).

[3] Topic 2 concerns the Governor's office's statements and opinions concerning the conduct of the 2020 general election in Florida and topic 3 concerns the success or failure of the 2020 general election in Florida, and the Governor's office's understanding of what contributed to that success or failure.

[4] Topic 1 concerns the state interest that the Governor's office contends each of SB 90's challenged provisions advances, topic 7 concerns any analysis that the Governor's office has conducted relating to anticipated or actual effects of any of SB 90's challenged provisions on voting in Florida and any communications involving the Governor's office regarding the anticipated or actual effects of any of those provisions on voting in Florida, and topic 8 concerns any analysis that the Governor's office has conducted concerning the anticipated or actual costs of implementing any of SB 90's challenged provisions. Topic 10, on the other hand, concerns the Governor's office's collection and production of documents in response to a subpoena in Case No. 4:21cv186, and topic 11 concerns the Governor's office's communications with the Florida university system concerning SB 90, litigation involving SB 90, or expert witnesses involved in litigation over SB 90.

and thus the Governor's office's communications, beliefs, and analysis of SB 90 are relevant outside of the Governor's legislative role. For topic 10, Plaintiffs argue that the Governor's office's document production in this case has nothing to do with the Governor's legislative role. Finally, Plaintiffs say topic 11 targets attempts by the Governor's office to interfere with this litigation, and clearly does not implicate the legislative process.

By implication then, Plaintiffs acknowledge that the legislative privilege covers topics 4, 5, 6, and 9. And this Court concludes that legislative privilege covers many of the other topics discussed above. For instance, topics 2 and 3 clearly target the Governor's motivation in supporting SB 90 and thus implicate legislative privilege. Likewise, topics 1, 7, and 8 are subject to the legislative privilege. Though Plaintiffs argue that these topics are relevant because the Governor's office enforces SB 90, Plaintiffs have not alleged in their Amended Complaint that the Governor's office enforces any of the challenged provisions, nor have they named the Governor's office as a defendant in this case. To be sure, this is not a one-size-fits-all analysis. In a different posture, these topics might not implicate the legislative privilege. But here, Plaintiffs plainly seek to depose the Governor's office regarding the Governor's role in drafting and passing SB 90. Accordingly, this Court concludes that the legislative privilege covers topics 1, 7, and 8. Finally, the Governor's office provides no explanation as to how topics 10 and 11—which concern events

occurring *after* SB 90 became law—implicate legislative privilege, and this Court has identified none. Thus, this Court concludes that topics 10 and 11 do not implicate legislative privilege.

In short, as the Eleventh Circuit has explained, "inquiry into the motivation" behind a state legislative enactment "strikes at the heart of the legislative privilege." *Hubbard*, 803 F.3d at 1310. Similarly, the Supreme Court has observed that, in cases such as this, where legislators "might be called to the stand at trial to testify concerning the purpose of the official action, . . . such testimony frequently will be barred by privilege." *Arlington Heights Metro. Housing Dev. Corp.*, 429 U.S. 252, 268 (1977); *accord Florida v. United States*, 886 F. Supp. 2d 1301, 1303 (N.D. Fla. 2012). Following that logic, this Court concludes that most of the testimony Plaintiffs seek from the Governor's office and the Legislators is subject to the legislative privilege.

b

But the inquiry does not end here. In opposing the motions to quash, Plaintiffs argue that legislative privilege is qualified and must yield in important cases such as this one. In response, the Governor's office and the Legislators argue that, in civil cases, their privilege is absolute.

To be clear, neither the Governor's office nor the Legislators contend their privilege is without limit. Nor could they. Both the Eleventh Circuit and the Supreme

11

Court have explained that "a state lawmaker's privilege" may give way to "important federal interests such as 'the enforcement of federal criminal statutes.' " *Hubbard*, 803 F.3d at 1311 (quoting *United States v. Gillock*, 445 U.S. 360, 373 (1980)). The question, then, is whether the exception to legislative privilege extends beyond the circumstances identified in *Gillock* and *Hubbard*.

This is a thorny issue. "[T]he Supreme Court has not set forth the circumstances under which the privilege must yield to the need for a decision maker's testimony." *Lee v. City of Los Angeles*, 908 F.3d 1175, 1187 (9th Cir. 2018). And, as the Governor's office and the Legislators concede, the Eleventh Circuit has left this question open. *See Hubbard*, 803 F.3d at 1312; *see also Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 88 (1st Cir. 2021) ("We need not reject altogether the possibility that there might be a private civil case in which state legislative immunity must be set to one side because the case turns so heavily on subjective motive or purpose."); *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 335 (E.D. Va. 2015) (describing the issue of "whether the state legislative privilege is either 'absolute' or 'qualified' " as "bedeviling the federal courts").

To support their argument that legislative privilege must yield in voting-rights cases, Plaintiffs point to district court cases—typically redistricting cases—finding that the privilege gives way in private civil cases concerning important, federally guaranteed public rights. *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 337.

Arguing otherwise, the Governor's office and the Legislators point to this Court's decision in *Florida v. United States*. *Florida* concerned litigation in the United States District Court for the District of Columbia over the preclearance of legislation regulating elections under section 5 of the Voting Rights Act. *Florida*, 886 F. Supp. 2d at 1302. Ancillary to that litigation, certain parties moved in this Court to compel Florida state legislators to sit for depositions. *Id.* In response, the legislators raised legislative privilege. *Id.* Rejecting the argument that legislative privilege must give way in Voting Rights Act cases, this Court observed that "Voting Rights Act cases are important, but so are equal-protection challenges to many other state laws, and there is nothing unique about the issues of legislative purpose and privilege in Voting Rights Act cases." *Id.* at 1304.

In response to this point, Plaintiffs assert that *Florida* only "stand[s] for the proposition that allegations of racially discriminatory intent do not, standing alone, overcome the legislative privilege." ECF No. 228 at 13. This Court agrees that merely asserting a constitutional claim is not enough to overcome the privilege. *See Alviti*, 14 F.4th at 88 (explaining that "[w]ere . . . the mere assertion of a federal claim sufficient, even one that addresses a central concern of the Framers, the privilege would be pretty much unavailable largely whenever it is needed"). That said, this Court also finds that some civil cases implicate federal interests that are at least as important—if not more important—than the enforcement of federal criminal

statutes, where the privilege undoubtedly gives way.[5] So the privilege can be overcome in an extraordinary civil case, but how should this Court decide if this case is one of those extraordinary cases?

c

This Court finds that it must apply a five-factor balancing test to determine whether the legislative privilege must give way to Plaintiffs' need for the evidence they seek. *See Bethune-Hill*, 114 F. Supp. 3d at 337. The relevant factors are (1) whether the evidence Plaintiffs seek is relevant, (2) whether other evidence is available, (3) whether the litigation is sufficiently "serious," (4) whether the government is involved in the litigation,[6] and (5) whether upholding the subpoena defeats the legislative privilege's purpose. *Id.* at 338. With these factors in mind, this Court turns back to the motions before it.

**1**. The first factor is relevance. The Legislators argue that the testimony Plaintiffs seek has little relevance because individual legislators' motivations are not particularly relevant to the overall legislative motive. There is some truth to this argument. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992

---

[5] While the Legislators correctly quote *Gillock* as stating that the Supreme Court's decision in *Tenney* drew "the line at civil actions," 445 U.S. at 373, *Gillock* also emphasized that *Tenney* was a "civil action brought by a private plaintiff to vindicate private rights," *id.* at 372. To hold either of these statements definitive would be overreading *Gillock*. Instead, *Gillock* stands for nothing more than what it says, state legislative privilege gives way in federal criminal prosecutions.

[6] Though, as this Court explains below, this factor is not particularly useful.

F.3d 1299, 1324 (11th Cir. 2021) (explaining that the intent of one legislator, even if they sponsored a bill, is of limited relevance). And as other courts have noted, "[t]o demonstrate intentional discrimination, . . . plaintiffs need not offer direct evidence of discriminatory intent." *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *3 (N.D. Ill. Oct. 12, 2011). But just because other evidence is more relevant does not make this evidence irrelevant. Rather, the subjective motivations of SB 90's leading sponsors are highly relevant to many of the issues before this Court. Thus, as to the Legislators, this factor weighs, slightly, in favor of disclosure.

As for the Governor's office, this Court finds that the purpose the Governor's office thinks SB 90 serves, the Governor's statements regarding the 2020 election, and the Governor's office's thoughts on the success or failure of the 2020 election (topics 1, 2, and 3) are not particularly relevant to whether the legislature passed SB 90 with discriminatory intent. Conversely, the Governor's office's statements and opinions concerning SB 90, its role in drafting, discussing, negotiating, and enacting SB 90, and its communications regarding SB 90 (topics 4, 5, and 6) are relevant to determining the Governor's subjective motivations in supporting SB 90, and are thus somewhat, but not especially, relevant to Plaintiffs' claims. Finally, analyses regarding SB 90's anticipated costs, purpose, and effects (topics 7, 8, and 9) are highly relevant to Plaintiffs' claims. Accordingly, as far as the Governor's office is

concerned, this factor weighs in favor of disclosure as to topics 7, 8, and 9, is a wash on topics 4, 5, and 6, and weighs against disclosure for topics 1, 2, and 3.

**2**. The Second factor is the availability of other evidence. On this factor, the Legislators argue that "there is other, more relevant evidence available to Plaintiffs." ECF No. 257 at 17; *see also* ECF No. 287 (making a similar argument on behalf of the Governor's office). For example, the Legislators have agreed to produce the documents Plaintiffs requested. The Legislators also argue that Plaintiffs can get much of the information they seek from other parties, such as the Heritage Foundation. The Governor's office similarly argues that Plaintiffs can obtain much of the evidence they seek from other parties in this action, as well as public records requests.

But this Court is not convinced. The Heritage Foundation has been nothing if not recalcitrant in the face of Plaintiffs' efforts to obtain information. And the Governor's office alone will possess much of the evidence Plaintiffs seek from it. On balance, given that the Legislators have agreed to produce documents, this factor weighs slightly in favor of quashing the subpoenas as to them. For the Governor, on the other hand, it weighs slightly in favor of denying the motion to quash.

**3**. The third issue is the litigation's seriousness. All litigation is serious. But, as the Legislators acknowledge, voting-rights litigation is especially serious. Nonetheless, the Legislators contend that this case still falls short of the seriousness

of, say, the federal criminal prosecution addressed in *Gillock*. Citing *Florida*, the Governor makes a similar argument. While a close call, this Court finds that, as other courts have ably stated, "[v]oting rights cases, although brought by private parties, seek to vindicate public rights. In this respect, they are akin to criminal prosecutions. Thus, much as in *Gillock*, 'recognition of an evidentiary privilege for state legislators for their legislative acts would impair the legitimate interest of the Federal government.' " *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *6 (quoting *Gillock*, 445 U .S. at 373). Thus, this factor weighs in favor of disclosure.

**4**. The fourth factor is the government's involvement in the litigation. As the Legislators point out, this factor—drawn, as all these factors are, from deliberative process privilege case law—is inapt in the legislative privilege context. Of course the state is involved, there would be no point in deposing the Governor's office or the Legislators if it were not. Accordingly, this factor is a wash.

**5**. The final factor is the legislative privilege's purpose. The Legislators argue that "the privilege is necessary because it 'shields [legislators] from political wars of attrition in which their opponents try to defeat them through litigation rather than at the ballot box.' " ECF No. 257 at 19–20 (quoting *Wash. Suburban*, 631 F.3d at 181). This Court agrees. And in addition, "the need to encourage frank and honest discussion among lawmakers favors nondisclosure." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8. To allow Plaintiffs to pry into the most sensitive

aspects of the legislative process would "chill legislative debate" and "discourage earnest discussion within governmental walls." *Id.* at \*9.

For example, many cases have compared asking legislators about their motivations in supporting legislation to questioning judges about judicial decisions. *See In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987) ("[T]he legislator's need for confidentiality is similar to the need for confidentiality in communications between judges . . . ."); *Florida*, 886 F. Supp. 2d at 1303 ("Legislators ought not call unwilling judges to testify at legislative hearings about the reasons for specific judicial decisions, and courts ought not compel unwilling legislators to testify about the reasons for specific legislative votes."). Thus, this factor weighs heavily in favor of non-disclosure, as to both the Legislators and the Governor's office.

So the factors are largely mixed; but this Court must strike some balance. One way to do so is "[b]y limiting privileged documents [or testimony] to those that contain opinions, recommendations or advice" and allowing the production of "documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings." *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at \*9 (cleaned up). This balance gives Plaintiffs some of the most relevant evidence under *Arlington Heights* while at the same time limiting the most egregious intrusions into the legislative process. In other words, this Court finds that Plaintiffs are entitled to

18

"the materials and information available [to the Legislature] at the time a decision was made" and nothing more. *ACORN v. Cnty. of Nassau*, No. CV05-2301(JFB)(WDW), 2007 WL 2815810, at *3 (E.D.N.Y. Sept. 25, 2007). Because the Legislators are already providing that information in the form of document production, their motion to quash is **GRANTED**.

For the Governor's office, however, the inquiry is more complicated. Topics 1, 2, and 3, as explained above, are not particularly relevant, and on balance do not justify piercing the legislative privilege. Topics 4, 5, and 6, on the other hand, strike directly at the heart of the privilege, and likewise tip towards non-disclosure. Next, to the extent topics 7, 8, and 9 concern what the Governor's office considered when SB 90 was before the Legislature, this Court is hard pressed to see why they are so relevant as to justify breaching the legislative privilege, given that the Governor's intent is not dispositive. Accordingly, the Governor's office's motion to quash is **GRANTED in part** as to topics 1 through 9.

### B

Alas, the inquiry does not end here. This Court must still address topics 10 and 11 in Plaintiffs' subpoena to the Governor's office. To recap, topic 10 addresses the Governor's response to a subpoena in Case No. 4:21cv186 and topic 11 addresses communications between the Governor's office and the Florida university system regarding experts in this case. Plaintiffs assert, and nobody denies, that the

University of Florida has blocked potential experts from agreeing to testify for Plaintiffs. Plaintiffs would like to explore the Governor's office's involvement in that decision.

As explained above, these topics do not implicate legislative privilege. The Governor's office also argues that these topics implicate the deliberative process privilege. They do not. That privilege covers documents "prepared in order to assist an agency decision maker in arriving at his [or her] decision." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1263 (11th Cir. 2008). Clearly, that does not cover discovery in this case or communications with Florida's universities regarding expert witnesses.

That leaves the Governor's office's undue burden arguments. This Court agrees that Plaintiffs' subpoena imposes an undue burden, but not for the reason the Governor's office argues. Rule 45 protects "subpoena recipient[s] by requiring the issuer to 'take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.' " *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1329 (11th Cir. 2020) (quoting Fed. R. Civ. P. 45(d)(1)). Further, "it is generally accepted that the scope of discovery allowed under Rule 45 is limited by the relevancy requirement of the federal discovery rules." *Id.* "Thus, a subpoena issued under Rule 45 should be quashed to the extent it seeks irrelevant information." *Id.*

In turn, the Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). And the Federal Rules of Evidence provide that relevant information must have a "tendency to make a [consequential] fact more or less probable." Fed. R. Evid. 401. The question here is whether the manner in which the Governor's office has conducted discovery or whether the Governor's office has communicated with the Florida university system regarding experts in this case tends to make any fact supporting a claim or defense more likely. The answer is no.

Whether the Governor's office played a role in the University of Florida's decision to prohibit professors from serving as witnesses in this case—or whether the University's denial was simply *vorauseilender Gehorsam*—does not tend to make any fact supporting the parties' claims or defenses more likely. Although this case is about the alleged degradation of our core democratic values, Plaintiffs seek to explore allegations of the degradation of different, though no less important, democratic values that are not at issue before this Court.[7] The Governor's office's motion to quash is **GRANTED**.

---

[7] To be clear, this Court is *not* saying there is no issue here, only that any potential issue raised by the University's actions are not before this Court at this time. For example, this Court might get involved if Plaintiffs' allegations lead to the initiation of other civil claims or cases, or if a witness is prevented from appearing pursuant to a valid subpoena. *See* 42 U.S.C. § 1985(a)(2) (creating civil liability for conspiring to "deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter

Accordingly,

**IT IS SO ORDERED**:

1. The Legislators' mirroring motions to quash, ECF No. 257 in Case No. 4:21cv187 and ECF No. 217 in Case No. 4:21cv201, are **GRANTED**.

2. The Governor's office's mirroring motions to quash, ECF No. 287 in Case No. 4:21cv186 and ECF No. 220 in Case No. 4:21cv201, are **GRANTED**.

3. Given this Court's order quashing the subpoenas at issue, Plaintiffs' mirroring motions for leave to depose non-parties after the close of discovery, ECF No. 265 in Case No. 4:21cv187 and ECF No. 224 in Case No. 4:21cv201, are **DENIED as moot**. By separate order, this Court extended discovery in Case No. 4:21cv187 *only* for the purpose of conducting a Rule 30(b)(6) deposition of non-party Heritage Action. ECF No. 273.

**SO ORDERED on November 4, 2021.**

> **s/Mark E. Walker**
> **Chief United States District Judge**

---

pending therein, freely, fully, and truthfully"). This issue could also come before this Court if the United States Attorney's Office decides to pursue its own investigation and initiate criminal proceedings. *See* 18 U.S.C. § 1512 (making it a felony to "knowingly use[] intimidation, threaten[], or [to] corruptly persuade[] another person" to refrain from testifying in an official proceeding). However, because such allegations are not at issue before me now, this Court declines to allow Plaintiffs to turn over these particular rocks.