IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**LEAGUE OF WOMEN VOTERS
OF FLORIDA, INC., et al.,**

    *Plaintiffs,*

v.

**FLORIDA SECRETARY OF
STATE, et al.,**

    *Defendants,*

and

**NATIONAL REPUBLICAN
SENATORIAL COMMITTEE and
REPUBLICAN NATIONAL
COMMITTEE,**

    *Intervenor-Defendants.*

_____/

Case No.: 4:21cv186-MW/MAF
Case No.: 4:21cv187-MW/MAF
Case No.: 4:21cv201-MW/MAF[1]

## FINAL ORDER ON REMAND

Plaintiffs filed these consolidated cases in 2021 to challenge several amendments to Florida's Election Code under legislation known as S.B. 90. This Court heard Plaintiffs' consolidated claims during a two-week bench trial in February 2022 and issued its Order on the Merits on March 31, 2022. Defendants

---

[1] These cases were consolidated with a fourth, Case No.: 4:21cv242. However, 4:21cv242 did not include an *Anderson-Burdick* claim, and judgment has already been entered in that case on remand.

appealed this Court's final order to the Eleventh Circuit Court of Appeals. The Eleventh Circuit reversed this Court in part, affirmed in part, and remanded these consolidated cases to address the narrow claims of whether the drop-box restrictions[2] and registration-delivery requirements[3] at issue in these cases unduly burden the right to vote under the First and Fourteenth Amendments. In making that determination, both sides agree this Court must apply the *Anderson-Burdick* test. The question before this Court is how the test applies to the record before this Court, taking into consideration certain legal conclusions and "factual findings" that the Eleventh Circuit made while these cases were on appeal.

Ordinarily, factual findings following a bench trial are reviewed for clear error. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). If determined to be clearly erroneous, the appellate court states which

---

[2] Namely, section 101.69, Florida Statutes (2021), requires that (1) drop boxes be continuously monitored in person by an employee of the Supervisor of Elections's office, (2) drop boxes be available only during early voting hours (except for drop boxes located at an office of the Supervisor), and (3) Supervisors are subject to a $25,000 civil penalty if they fail to continuously monitor their drop boxes or otherwise leave drop boxes accessible in violation of section 101.69. *See* §§ 101.69(2)(a), (3), Fla. Stat. (2021).

[3] Namely, section 97.0575, Florida Statutes (2021), requires third party voter registration organizations (3PVROs) to deliver completed voter registration applications to either the Supervisor's office in the county in which each applicant resides or to the Division of Elections within fourteen days after the application is completed, but not after registration closes for the next ensuing election. § 97.0575(3)(a), Fla. Stat. (2021).

findings are clearly erroneous, why, and remands for further fact finding if necessary. *See, e.g.*, *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350–55 (11th Cir. 2005) (applying clear-error review to findings of fact following bench trial and remanding for further fact finding on specific issue concerning application of correct legal standard). In this case, the Eleventh Circuit was not so precise. Moreover, the court engaged in its own fact finding rather than remand with directions for further fact finding at the trial level.

On remand, this Court has now been put in an odd predicament. Normally, once the appellate court rules on certain legal issues and remands a case for further proceedings consistent with its ruling, this Court is bound by those legal conclusions as the law of the case. *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1290 (11th Cir. 2005) (" 'Under the law-of-the-case doctrine, the resolution of an issue decided at one stage of a case is binding at later stages of the same case.' The doctrine operates to preclude courts from revisiting issues that were decided explicitly or by necessary implication in a prior appeal." (citations omitted)). But here, this Court is faced with a blend of legal conclusions and new "factual findings," and it is unclear how this blended appellate ruling binds this Court going forward. This is particularly true when the new "factual findings" at issue implicate the State's justifications for passing the challenged provisions and this Court must now apply a different legal

3

standard than what the Eleventh Circuit reviewed on appeal.[4]

On remand, these cases come cloaked with a pall of new facts, and it is unclear to this Court what weight to assign these new "factual findings" when the appellate court apparently did not need to make them to reach the same conclusion on appeal. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) (holding that "[e]ven if there were no evidence of voter fraud in Florida, our precedents would not require it before a bill like S.B. 90 could be adopted").[5] Regardless, though, the Eleventh Circuit found that the record in this

---

[4] The predicament in which this Court now finds itself only exemplifies the mischief associated with appellate courts reweighing the facts on appeal instead of applying the correct standard of review. Indeed, this practice has gained a growing chorus of critics in this Circuit. *See, e.g.*, *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1280 (11th Cir. 2020) (Wilson, J., dissenting) ("We must review those findings with great deference, disregarding them only if clearly erroneous. But the majority does not apply ordinary clear-error review, as we might in a sentencing case or an employment dispute. Instead, the majority steps into the district court's shoes to reweigh the facts, reassess credibility determinations, and rearrange the record to reach a different result. That is not our role . . . . We cannot simply supplant the district court's findings with our own. And yet that is what the majority does here."); *Keohane v. Fla. Dep't of Corrs. Sec'y*, 981 F.3d 994, 1008–09 (11th Cir. 2020) (Rosenbaum, J., dissenting from denial of rehearing en banc) ("The *Keohane* majority opinion was not free to stray from the clear-error standard of review that *Thomas* held governs the components of the subjective inquiry. Yet that is what it did."); *see also Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 829 (11th Cir. 2022) (Jordan, J., dissenting) ("Although the district court explained that 'this case is not about eliminating separate sex bathrooms,' the majority insists on discussing bathrooms at wholesale, while addressing issues not presented by the case. So much for judicial restraint, whose 'fundamental principle' is that 'if it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more.' " (citations omitted)).

[5] Although this Court would only note that "[t]he Supreme Court's guidance on this topic, permissive towards the state as it may be, does not require us to naively accept every invocation of voter fraud that is proffered regardless of its factual support." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 81 F.4th 1328, 1339 (11th Cir. 2023) (Wilson, J., dissenting from denial of rehearing en banc).

case was rife with evidence of voter fraud, thus supporting, in part, the State's asserted motivations for passing S.B. 90. Guided by these new factual findings, this Court must apply the *Anderson-Burdick* test to determine whether the State's interests outweigh the asserted burdens on the right to vote in this case.

I

To start, the right to vote encompasses more than simply the right to cast one's ballot. Instead, the right to vote encompasses the right of eligible citizens to lawfully register to vote, the right of lawfully registered voters to cast their ballots, and the right of eligible voters to have their lawful votes counted. Here, the challenged provisions implicate both the right to lawfully register to vote and the right of lawfully registered voters to cast their ballots.

With respect to both the drop-box provisions and the registration-delivery requirements, this Court " 'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). In so stating, this Court recognizes that the analytical framework for Plaintiffs' claims on remand functions as a balancing test on a sliding scale. That is,

5

when rights are subjected to " 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id*. (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). However, some cases involve only a *de minimis* burden on the right to vote. And when such *de minimis* or incidental burdens are the result of "reasonable, nondiscriminatory restrictions," then "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788. Nonetheless, "[h]owever slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).

Both this Court's own experience and case law teach that application of the *Anderson-Burdick* test is highly fact-dependent and turns upon weighing the burden on whatever iteration of the right to vote is at issue against the State's asserted interest for imposing that burden. As noted above, some cases are easy—the challenged provision may not impact the right to vote or may only impose a *de minimis* burden on the right to vote that is easily justified by the State's interest in regulating its elections. *See, e.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) (concluding that Georgia's absentee ballot deadline did not disenfranchise anyone and posed a less-than-severe burden that was easily justified

6

by Georgia's regulatory interests in "conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud").

On the other hand, some laws work severe deprivations on the right to vote. For example, this Court determined that a law that permitted standardless signature-match determinations made by laypeople and which operated to disenfranchise thousands of legitimate voters with only an illusory opportunity to cure the mismatch amounted to a "substantial burden" on the right to vote. *See Dem. Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018) (Walker, C.J.). In the signature-match case, the scheme at issue led to vote-by-mail voters whose ballots were not counted based on a mismatched-signature determination that occurred *after* the State's deadline to cure had already expired. In other words, the State's scheme worked an absolute deprivation of the right to vote inasmuch as lawfully-cast ballots were not counted, often through no fault of the voter. Due to this substantial burden on the right to vote, the State faced a much higher burden to demonstrate that it was necessary to advance a compelling state interest.

Other cases have presented high burdens, but sufficiently weighty state interests to justify the high burden on the right to vote. Such was the case in *Namphy v. DeSantis*, 493 F. Supp. 3d 1130 (N.D. Fla. 2020) (Walker, C.J.). In that case, the State's online voter registration system crashed on the last day of the registration period ahead of the 2020 General Election, which led to thousands of would-be

7

voters missing the deadline to register to vote in that election. However, with little notice to the public, the State extended the book closing deadline to the following day to mitigate the harm caused by the crash of Florida's online registration system. This Court determined that without further extending the registration deadline, the burden on voters who missed the registration deadline through no fault of their own was high, given that potentially thousands of Floridians might not have been able to register to vote even by the already-extended deadline. *Id*. at 1144. But this Court also found the State's justifications for not further extending the registration deadline based on the need for conducting an efficient and orderly election were entitled to great weight, particularly given the context of the 2020 General Election—that is, given "uncertainty [concerning the election] compounded by an unprecedented pandemic." *Id*. at 1145. This was only underscored by the evidence before this Court, including two Supervisor of Elections' affidavits setting out the consequences of further extending the registration deadline—namely, forcing Supervisors to divert resources to answering calls, processing new registration applications, and taking time away from processing vote-by-mail requests and ballots and administering early voting. *Id*.[6]

---

[6] Juxtapose *Namphy* with another voter-registration-deadline case that involved the deprivation of the right to vote by foreclosing voter registration after a hurricane that devastated parts of Florida, *Florida Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D. Fla. 2016) (Walker, J.). In *Scott*, this Court was faced with a challenge to Florida's decision not to extend the voter registration deadline after Hurricane Matthew hit the state in the final days of the registration period, forcing Floridians to evacuate or shelter in place and foreclosing the only methods of

In short, *Anderson-Burdick* does not provide a one-size-fits-all approach to reviewing voting restrictions. Cases reviewing these laws exist along two spectrums—one with respect to the burdens imposed on voters and another with respect to the weightiness of the State's justification for the burden. Here, this Court must determine where Plaintiffs' claims fall along these spectrums, starting with determining the character and magnitude of the burden the challenged provisions place on voters. This Court reviews each provision in turn, beginning with the drop-box restrictions.

A

As noted above, the drop-box restrictions require in-person monitoring by an employee of the Supervisor of Elections's office and limit the times and locations where drop-boxes may be offered. Plaintiffs argue that these provisions, individually and in conjunction with each other, work to severely limit access to drop boxes for thousands of Floridians who rely on this modality of voting. But the State argues that while these restrictions may reduce the availability of drop boxes, this does not

---

registering to vote. This Court determined that "Florida's statutory framework completely disenfranchises thousands of voters, and amounts to a severe burden on the right to vote," given that Florida law did not include a provision that extended the voter registration deadline in the event of an emergency. Unlike in *Namphy*—where elections officials extended the registration period to mitigate the damage done when the online registration system crashed—elections officials did not direct Supervisors of Elections to accept voter registration applications after the formal book closing deadline in the wake of Hurricane Matthew. Finding that the burden on the State in extending the registration deadline was merely *de minimis*, this Court granted preliminary injunctive relief and the State did not appeal.

constitute a deprivation of the right to vote. In so stating, the State is correct in saying that a restriction on a certain modality of voting is not a deprivation of the right to vote itself—but the State overstates the argument. Simply asserting that another modality of voting is still available—i.e., voting in-person on election day—does not mean that one could never bring an *Anderson-Burdick* challenge to a restriction on an alternative modality of voting. Boiled down, the State's theory is that so long as you can crawl over glass within the designated hour for voting on election day and make it to the polls in time, Plaintiffs would have no avenue to challenge a restriction on an alternative modality of voting under *Anderson-Burdick*. This Court categorically rejects this argument.

Both the State and the Plaintiffs overstate the rule when it comes to categorizing the injury in this case. The State would require Plaintiffs to prove the drop-box restrictions severely burden voters at large to obtain relief under *Anderson-Burdick*, while Plaintiffs argue for something akin to a "class of one" approach to framing the injury in this case.

Plaintiffs are correct in restating the general proposition that disparate impact matters for this Court's analysis. *See League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla 2018). But this does not mean that this Court looks exclusively to the special circumstances of individual voters to determine the magnitude of the asserted injury. This Court cannot accept Plaintiffs' argument that

10

it should focus only on the severity of the burden imposed upon the specific voters who face the highest burden based on their own unique set of circumstances. If that were the law, then individual voters would be able to invalidate reasonable voting laws based solely on their unique circumstances.

Instead, this Court's focus rests on how the drop-box restrictions burden the larger subgroup of voters who are actually affected by the challenged provisions—namely, those vote-by-mail voters who use drop boxes after normal business hours and at locations that are no longer available. For reference, this Court will call these voters "after-hours drop-box voters." This approach considers the disparate impact the challenged provision may have on those voters who would utilize drop boxes to return their absentee ballots, but also avoids reducing this Court's lens to an artificially granular level of review that would be inconsistent with precedent.

Here, the evidence at trial demonstrated that the challenged provisions cause Supervisors of Elections to offer fewer drop boxes to deposit vote-by-mail ballots during fewer hours of the day and for a shorter period of time than previously permitted. These provisions burden after-hours drop-box voters who have become accustomed to the convenience of dropping off their ballots outside of normal business hours and at locations that may no longer be available. But this convenience of accessing 24/7 drop boxes is no trifling matter, particularly for voters with disabilities or those who work long hours or have several other responsibilities that

make it difficult for them to drop their ballots off during normal business hours. Indeed, several witnesses at trial testified that the availability of 24/7 drop boxes were essentially game changers with respect to making it possible for them to participate in the democratic process.[7] But this Court's focus is on how the drop-box restrictions at issue burden *all* after-hours drop-box users, not just those voters whose unique circumstances transform these restrictions into an insurmountable burden resulting in disenfranchisement for the individual after-hours drop-box voter.

Having properly characterized the injury, this Court finds that although the drop-box restrictions make it harder for after-hours drop-box voters to deliver their vote-by-mail ballots, the restrictions at issue do not keep people from voting. This is not a case involving an absolute deprivation like the mismatched-signature case. Instead, the burden here is relatively modest—something more than an incidental burden for those who depend upon more flexible hours to submit their ballots, without constituting a substantial burden on the right to vote.

Next this Court must consider the State's asserted justifications for imposing this burden upon drop-box voters. To start, this Court categorically rejects the notion that the State may rely on the incantation of "fraud" to justify the drop-box

---

[7] A troubling theme throughout these cases was the suggestion that voters who complain about the hurdles they face to make it to the polls are simply "lazy." At best, this suggestion amounts to an elitist take from those who choose not to respect the effort thousands of Floridians make to support themselves and their families by working multiple jobs or inflexible minimum-wage hours. At worst, insofar as it arose during discussions regarding Black voters, the suggestion that such voters are "lazy" is nothing but a rank dog whistle.

12

restrictions or any other voting restriction. In so stating, this Court is not discounting the fact that in some cases, there may in fact be evidence of fraud or legitimate concerns about fraud connected with a given modality of voting.

But here, notwithstanding this Court's own fact finding after a two-week bench trial, the Eleventh Circuit found that voter fraud, including vote-by-mail fraud, "has plagued Florida elections in the past," such that preventing this "plague" constituted a legitimate motivation giving rise to the passage of SB 90. *League of Women Voters of Fla. Inc.*, 66 F.4th at 925. On remand, this Court is left to piece together how the record—construed anew by the Eleventh Circuit—fits within the applicable test. Although it is unclear whether this Court is bound to apply *Anderson-Burdick* to the reweighed facts on remand, this Court cannot overlook the guidance that the Eleventh Circuit set out for it in determining that vote-by-mail fraud "has plagued Florida elections in the past." *Id*. So where does that leave Plaintiffs' *Anderson-Burdick* challenge to the drop-box restrictions? The appellate court's factual finding that the State articulated legitimate and weighty concerns for the passage of the drop-box restrictions, coupled with the relatively modest burden the drop-box restrictions impose upon after-hours drop-box voters means Plaintiffs have failed to prove that the drop-box restrictions unduly burden their First and Fourteenth Amendment rights. And even if this Court ignores the Eleventh Circuit's reweighing

13

of the facts, there is still some evidence of fraud—as remote[8] as it may be—and other facts that support the State's asserted interests in uniformity to justify the modest burden after-hours drop-box voters now face. Accordingly, Plaintiffs have not met their burden to establish that the drop-box restrictions unduly burden their First and Fourteenth Amendment rights.

B

The same is true with respect Plaintiffs' challenge to the registration-delivery requirements. Plaintiffs argue that the evidence at trial demonstrated that the registration-delivery requirements substantially burden 3PVROs and severely burden voters who rely on 3PVROs for voter registration. Of course, this Court considers the disparate impact these provisions have on Black voters—even the Eleventh Circuit affirmed this Court's finding that these voters face a disparate impact under the challenged provisions. *League of Women Voters of Fla., Inc.*, 66 F.4th at 942. But based on the Eleventh Circuit's reweighing of the facts, this Court cannot find that the registration-delivery requirements are intentionally racially

---

[8] In support of its conclusion that Florida is "plagued" by fraud, the Eleventh Circuit relied upon an expert report to which this Court assigned little weight. Shockingly, that report largely detailed examples of fraud in local elections in Miami and Hialeah that occurred almost thirty years ago. To reiterate, the Eleventh Circuit pointed to these examples to support its "conclusion" that Florida is "plagued" with voter fraud. In other words, the Eleventh Circuit relied upon anecdotal evidence of isolated incidents of fraud, some nearly three-decades old, to draw the conclusion that Florida was "plagued" with fraud while also discounting this Court's conclusion that there was a dearth of evidence of fraud and these isolated, anecdotal examples did nothing to diminish this Court's finding.

discriminatory, and thus, necessarily pose a severe burden on Black voters.[9] Instead, this Court must consider the disparate impact these provisions have on voters who rely on 3PVROs to register—particularly Black voters—and the magnitude of this injury.

As to magnitude, the record demonstrates that hundreds of thousands of voters depend on 3PVROs to register to vote, especially considering the many hurdles voters face when trying to register by other means. But here, the registration-delivery requirements only indirectly burden would-be voters by imposing tighter deadlines and processing requirements for 3PVROs. This Court does not mean to understate the severity of the burden these restrictions place on some 3PVROs, like Equal Ground, which have found compliance to be cost-prohibitive and have therefore ceased registration efforts. But, for the most part, Plaintiffs have demonstrated only that the registration-delivery requirements have contributed to an increase in costs for 3PVROs. While this may naturally lead to these 3PVROs registering fewer voters, Plaintiffs overstate the magnitude of the injury by conflating the number of voters who had their most recent registration method recorded through a 3PVRO with the number of would-be voters who would ultimately have their First and Fourteenth Amendment rights burdened by the challenged provisions.

---

[9] The challenged provisions are not discriminatory on their face and the Eleventh Circuit rejected this Court's findings that the laws were intentionally discriminatory based on circumstantial evidence.

Moreover, as noted above, this Court is guided by the Eleventh Circuit's re-finding of facts with respect to the State's interest in passing the registration-delivery requirements. *See League of Women Voters of Fla., Inc.*, 66 F.4th at 941 ("As for the registration-delivery provision . . . legitimate motivations did exist."); *id*. at 930–31 (summarizing evidence that purportedly supports nondiscriminatory justifications for passing registration-delivery requirements and noting that "the record makes clear that the supporters' justifications were credible," notwithstanding this Court's credibility determination to the contrary). As such, this Court must weigh the State's justifications—which the Eleventh Circuit has already found to be legitimate and weighty—against an indirect burden on voters who rely upon 3PVROs to register to vote. On balance, this Court cannot say that the registration-delivery requirements unduly burden Plaintiffs' First and Fourteenth Amendment rights in violation of the Constitution. Accordingly, Plaintiffs are not entitled to relief on this claim.

II

As this Court previously found after a lengthy, two-week bench trial, the State of Florida has, with surgical precision, repeatedly changed Florida's Election Code to target whichever modality of voting Florida's Black voters were using at the time. That was not this Court's opinion—it is a fact established by the record in these cases. Even so, following the State of Florida's appeal, this persistent and pernicious

16

practice of targeting the modalities of voting most used by Florida's Black voters has apparently received the stamp of approval in this Circuit.

But just because this Court found that the Florida Legislature intentionally considered race when passing several election restrictions does not mean that Plaintiffs automatically prevail on their *Anderson-Burdick* claims. These claims present a different inquiry. And, as noted before, when this Court balances the burdens and interests at stake, this Court finds that Plaintiffs have not met their burden to prove the drop-box restrictions or the registration-delivery requirements unduly burden their First and Fourteenth Amendment rights. Accordingly, the Clerk shall enter judgment in each of these three cases stating, "Judgment is entered in favor of Defendants with respect to Plaintiffs' remaining claims on remand." The Clerk shall close the files.

**SO ORDERED on February 8, 2024.**

s/Mark E. Walker   
**Chief United States District Judge**