UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA RISING TOGETHER, FAITH
IN FLORIDA, UNIDOSUS, EQUAL
GROUND EDUCATION FUND,
HISPANIC FEDERATION, PODER
LATINX, HAITIAN NEIGHBORHOOD
CENTER SANT LA, and MI FAMILIA
VOTA EDUCATION FUND,

   Plaintiffs,

v.

LAUREL M. LEE, in her official
capacity as Secretary of State of Florida,
et al.,

   Defendants.

Case No. 4:21-cv-00201-MW-MJF

## DECLARATION OF CHARLES F. BEALL, JR.

1. I am over the age of eighteen, competent, and have personal knowledge of the facts set forth in this Declaration.

### I. BACKGROUND AND QUALIFICATIONS

2. I graduated from the University of Virginia School of Law in 1991. While there, I served as a member of the Virginia Law Review.

3. Upon graduating from law school, I was hired by the United States Department of Justice ("DOJ") as part of the Attorney General's Honors Program. I

1

spent five years working at DOJ in Washington, D.C., in the commercial litigation branch of the Civil Division where I handled a combination of government contract litigation and appeals from a variety of federal agencies.

4. In 1996, I returned to my hometown of Pensacola and joined the law firm of Moore, Hill & Westmoreland, P.A. I have been a shareholder in the firm since January 1, 2001, and currently serve as managing partner.

5. I have been a member in good standing of the Florida Bar since 1995 and a member of the bar of this Court since 1996.

6. I handle a wide variety of civil litigation and appeals in state and federal courts. In the past 25 years, I have focused primarily on complex litigation, including defending class actions and other mass tort litigation, representing insureds in hundreds of first-party insurance cases, and handling complicated commercial litigation. I have also handled more than 250 appeals in state and federal courts. I have conducted more than 75 appellate arguments—including 16 in federal courts of appeals—and my appeals have resulted in more than 60 published opinions.

7. Over the past five years, the vast majority of my work has been spent in practice before this Court. In particular, beginning in 2019, I served as primary local counsel for 3M Company in *In re Combat Arms Earplug Products Liability Litigation*, Case No. 3:19-md-2885-MCR-HTC, the largest multi-district litigation in the history of the federal court system. In that capacity, I served as legal and

2

appellate counsel at 12 different jury trials encompassing 27 weeks of trial time. I also briefed and argued countless legal issues before, during, and after those trials.

8. I am board certified in both appellate practice and civil trial by the Florida Bar Board of Legal Specialization—one of just 5 Florida attorneys board certified in both specialties. I am a past chair of the Florida Bar's Appellate Practice Certification Committee, a past member of the Bar's Board of Legal Specialization & Education, and a past president of the Escambia-Santa Rosa Bar Association.

9. I have been retained as an expert witness on attorneys' fees dozens of times during my 27 years of practice in Pensacola.

## II. RETENTION IN THIS MATTER AND MATERIALS REVIEWED

10. In August of 2024, I was retained by the law firm of Holtzman Vogel on behalf of the Secretary of State to provide an expert opinion on the attorneys' fees claimed by the Plaintiffs, Florida Rising Together, Equal Ground Education Fund, Hispanic Federation, Poder Latinx, and UnidosUS (collectively referred to herein as "Florida Rising Together" or "FRT"), and its attorneys in this lawsuit. I have also been retained to provide expert opinions in the three companion cases that were consolidated for trial with this case.

11. To arrive at my opinions, I have reviewed FRT's motion for determination of the amount of attorneys' fees and the exhibits, which included the time records from FRT's counsel and supporting affidavits. I have also reviewed the

voluminous pleadings, motions, and orders from the litigation, relevant portions of the trial transcripts, and the opinion from the United States Court of Appeals for the Eleventh Circuit. I have also spoken with several of the Holtzman Vogel attorneys who represented the Secretary of State and with a member of the Attorney General's office who represented the Attorney General in this matter. Altogether, I have spent dozens of hours conducting this review and preparing this Declaration.

12. I am familiar with the legal authority for determining reasonable attorneys' fees in this Circuit. *See Hensley v. Eckerhart*, 461 U.S. 424 (1984); *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292 (11th. Cir. 1988); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). I reviewed this authority again before arriving at my opinions, along with other relevant Eleventh Circuit opinions applying this authority to specific cases. *See*, *e.g.*, *Villano v. City of Boynton Beach*, 254 F.3d 1302 (11th Cir. 2001); *Foster v. Bd. of School Comm'rs*, 810 F.2d 1021 (11th Cir. 1987); *Popham v. Kennesaw*, 820 F.2d 1570 (11th Cir. 1987).

13. In reaching my opinion, I have considered those authorities and specifically considered the twelve factors enumerated in *Johnson* and repeatedly reaffirmed as relevant by the Eleventh Circuit. *See Caplan v. All Am. Auto Collision, Inc.*, 36 F.4th 1083, 1089-90 (11th Cir. 2022). These factors are:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;

4

(3) the skill requisite to perform the legal service properly;
(4) the preclusion of employment by the attorney due to acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

### III. OPINION AS TO REASONABLE ATTORNEYS' FEES

14. In arriving at my opinions, I have assumed that FRT is entitled to attorneys' fees, as this Court previously ruled. Further, while I believe an award of nominal attorneys' fees would be appropriate in this case given the extremely limited success FRT ultimately achieved, I have assumed, for purposes of this opinion, that the Court's award will be based upon the lodestar.

15. Based upon my experience and training, my knowledge of the authorities cited above, and upon my review of the file, I believe an award of attorneys' fees between $180,000.00 and $220,000.00 would be reasonable. I arrived at this opinion by analyzing the reasonableness of the hourly rates and hours requested, the latter with a particular focus on the results obtained.

#### A. REASONABLE HOURLY RATES

16. FRT has requested rates for its attorneys of between $250.00 and $450.00 per hour, and rates for paralegals and support personnel of between $100.00

5

and $150.0 per hour. I agree that the hourly rates requested here are reasonable and consistent with the prevailing market rate for similar legal services in this District.

### B. REASONABLE NUMBER OF HOURS

17. FRT seeks compensation for 8,552.1 hours incurred by a law firm, Arnold & Porter (which seeks 7,888.9 hours), and three public interest legal organizations, Advancement Project (220 hours), Demos (18.3 hours), and LatinoJustice (424.9 hours). These four organizations, in turn, seek to recover fees for 31 separate lawyers (22 from Arnold & Porter alone), along with 3 legal paralegals or legal assistants.

18. Comparing the hours claimed to what would be reasonable presents a challenge in any case, but this case presented unique challenges.

19. FRT retained excellent, experienced attorneys who produced very good work product in a case that, by all accounts, was hotly contested, and they achieved at least short-term success on their primary claim. They have produced detailed (if generally vague and often block-billed) time records to support the hours requested, and they endeavored to cut time to exercise billing judgment, thereby reducing to some degree the hours sought.

20. The time records themselves are, not surprisingly, voluminous. Combined, the time records encompass 180 pages (167 from Arnold & Porter), with most of the pages including 15 to 25 entries per page, though some include as many

6

as 40 entries. Altogether, I estimated that the time records included at least 3,000 separate entries. I have reviewed these entries and, when possible, compared the entries to the work product they generated (such as a motion for summary judgment). Still, making line-by-line markups to the time records would take multiple days (likely weeks) to accomplish and would be impractical.

21.    Ultimately, the role of an attorneys' fees expert is to "'step[] into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively.'" *Infogroup Inc. v. Office Depot Inc.*, No. 23-CV-80358-AMC/BER, 2024 U.S. Dist. LEXIS 149702, at *5 (S.D. Fla. Aug. 21, 2024) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 184 (2d Cir. 2008)). With that test in mind, the task becomes far less challenging.

22.    Put simply, no reasonable, paying client would agree to pay four different organizations and 31 different lawyers for anything remotely close to the 8,552.1 hours of work FRT seeks here. I do not question whether FRT's attorneys spent the hours they are seeking, but the same result could have been achieved with far fewer attorneys in a fraction of the time claimed here. *See Glassroth v. Moore*, 347 F.3d 916, 920 (11th Cir. 2003) ("It is not unusual for attorneys to spend more time on a case than it reasonably requires"). Several factors played a significant role in this opinion.

7

23. First and foremost, the request to be compensated for 8,552 hours for a single case is simply mind-boggling, especially since the overwhelming majority of the hours—essentially all the material hours except for those related to the motion for attorneys' fees—were incurred in an 11-month period of time. To put that number in perspective, that is roughly the equivalent of 4 attorneys *billing* (not just working) 6.5 hours a day, 7 days a week, for 11 months.

24. In my three decades of experience handling complex litigation, I have never been involved with an individual case that involved anywhere close to this number of hours. In fact, the only matters I have seen that involved hours of this magnitude have been the rarest of mass torts—such as multi-district litigation, class actions, and other "bet-the-company" cases—and those cases have invariably involved multiple plaintiffs and have required several years to complete.

25. To confirm my opinion, I looked back at the attorneys' fees claim made in possibly the most complex and time-consuming matter I have defended outside of multidistrict litigation and class actions. In that case, I helped defend a pharmaceutical company in a case of first impression for a type of injury that had never been brought against the product. The case took 6 years from complaint to trial, involved the production of millions of pages of documents, dozens of depositions, countless discovery disputes, one extraordinary writ, multiple experts on different topics (including medical experts from Harvard, Johns Hopkins, and

Cornell), and depositions in Switzerland. The case concluded with a 14-day jury trial. After all of that, the three firms representing the plaintiff requested fees for less than 5,000 hours of time, or slightly more than half the hours FRT seeks here.

26. Second, based upon the declarations filed in support of their motion, the attorneys who performed work on this matter for FRT are not only highly qualified, but most have extensive experience in voter rights and other constitutional litigation. That necessarily means that they started with a substantial knowledge base of the legal issues involved in this matter, including the relevant case law. In many cases with substantial time involved, much of the time is spent in the early stages learning the critical factual and legal issues needed to argue and try the case. That was not (or should not have been) required here. *See Glassroth*, 347 F.3d at 919-20 (noting that experience and expertise in an area of law "comes [with] knowledge, efficiency, and self-confidence, which should reduce the number of hours necessary" to litigate a case).

27. Third, as mentioned above, FRT has requested fees from four different organizations—three public interest organizations and one of the largest firms in the country. Though retaining these four organizations brought knowledge and experience, it also exponentially increased the time needed to prosecute the case. I routinely work with large national firms on cases and having even two firms involved inevitably increases the hours spent. In those rare cases where my firm has

worked with three or more other firms on the same case, the hours worked invariably expand even more.

28. Fourth, FRT has requested fees for 31 different attorneys in addition to 3 paralegals or support staff from these four separate organizations. I would certainly expect to see multiple attorneys involved in a case of this nature—firms routinely staff important cases with 3-6 attorneys of varying levels of experience, and some cases require more—but 31 is far more than needed, especially given the number of senior-level attorneys assigned to the case by the three legal organizations who represented FRT. In fact, outside of the *Combat Arms Earplug* MDL—which included approximately 300,000 plaintiffs—I have never seen a case staffed with 31 attorneys. This number of attorneys inevitably leads to duplication as well as time spent in coordination and "getting up to speed." Put simply, more attorneys mean more hours.

29. Fifth, the Court consolidated this case for discovery and trial with three other cases also attacking certain aspects of SB 90, two of which also included, in general, the same sweeping challenges FRT brought here. While FRT's attorneys could not rely upon the other parties to do their work, it is equally true that FRT's attorneys did not have to carry the entire burden of prosecuting the case.

30. Finally, I have examined the hours claimed for certain tasks to assess their reasonableness in the context of the case. That analysis further strengthened my

10

opinion that the hours claimed by FRT are grossly excessive. While the voluminous nature of the records precludes a line-by-line analysis, some of my observations are detailed below.

### 1. Pleadings/Pleadings Research and Fact Development

31. FRT seeks 475 hours for the pleadings, which includes 137 hours for "research and fact development" and another 338 for preparing the complaint and amended complaint. (This does not include addressing motions to dismiss, which are listed separately). That is the equivalent of an attorney billing 8 hours a day for 60 days just on the complaint and amended complaint. While the complaints are detailed and well organized, entire lawsuits have been filed and tried in far fewer hours. It is inconceivable that a client would agree to pay anywhere close to 475 hours for pleadings alone.

### 2. Motions for Summary Judgment

32. FRT seeks 1,067.4 hours for filing its own motion for (partial) summary judgment and responding to the Defendants' motions (primarily the Secretary's motion), along with related filings. The motion and response were well written (and the response itself was some 82 pages long), but they could and should have been completed in far less time. *See Fresenius Vascular Care Inc. v. Oakland Park Med. Props., LLC*, No. 21-60621-CIV, 2023 U.S. Dist. LEXIS 116975, at *15-16 (S.D. Fla. July 7, 2023) (finding that 128 hours spent drafting a 22-page motion for

11

summary judgment was excessive because "[i]t is an improper use of billing judgment to bill one's client (or one's opponent) for such a large number of hours expended on one task"). There are several reasons for this opinion.

33. First, I have written well over 1,000 substantive briefs in my career, including more than 350 appellate briefs. I have rarely spent more than 100 hours on any single brief, and most require between 40 and 70 hours. The few that have taken more hours than that have typically involved voluminous records, issues of first impression, or cases in which I was retained with no prior knowledge of the facts or issues solely to draft the brief. While I agree that some briefs will require more than 100 hours, they are, by far, the exception.

34. Second, the attorneys representing FRT are, by their own admission, experts in this field and, presumably, know the relevant case authority. Obviously, each brief requires new work, but FRT's attorneys did not need to spend days researching the basic controlling law. *See Glassroth*, 347 F.3d at 919-20.

35. Third, FRT had already outlined its entire legal theory in its lengthy amended complaint.

40. Finally, in drafting the motion, FRT used more than a dozen different attorneys, which is both unnecessary and counterproductive.

### 3. Pre-trial preparation

41. FRT seeks 1,803.3 hours for pre-trial preparation alone—nearly a full year of work for a 14-day bench trial. That is patently excessive.

### 4. Post-trial brief

42. FRT seeks 627.6 hours for drafting and filing its post-trial brief and findings of fact—which it did in combination with counsel for the NAACP. In other words, it seeks the equivalent of 78 days of full-time work for co-writing a document that tracks the arguments already raised in the complaint and in responding to the Secretary's motion for summary judgment. For the same reasons stated in the discussion of the summary judgment motions, this is multiple times longer than it should have taken to prepare this brief.

### 5. Reduction of hours

43. FRT's attorneys reduced their time as a result, which has certainly helped, but these efforts have not come close to eliminating the problem since the remaining hours are exponentially higher than needed.

44. In similar situations, the United States Court of Appeals for the Eleventh Circuit has authorized district courts to apply across-the-board cuts when the number of hours claimed is unreasonable or excessive, especially when the time records (as here) are voluminous. *See*, *e.g.*, *Caplan*, 36 F.4th at 1094. The amount of the across-the-board reductions vary from case to case, but district courts have

13

reduced the hours claimed by as much as 75 percent on multiple occasions—including at least one 75 percent reduction that the Eleventh Circuit affirmed on appeal. *See id*. at 1094-95; *see also Fresenius Vascular Care*, 2023 U.S. Dist. LEXIS 116975, at *17 (reducing hours by 75 percent because "the number of hours claimed is unreasonably high for this action"); *Opus Grp., LLC v. Int'l Gourmet Corp.*, No. 11-23803, 2013 U.S. Dist. LEXIS 204173, at 24-25 (S.D. Fla. July 26, 2013) (applying 75 percent across-the-board reduction to exclude hours not "reasonably expended" in the case). *See also Zediker v. OrthoGeorgia*, 857 F. App'x 600, 600, 613 (11th Cir. 2021) (affirming and adopting district court order applying across-the-board reduction of 60 percent for "excessive" and "unreasonable" hours spent in a case, irrespective of success).

45. Here, while I believe the hours requested are excessive enough that a reduction of 60 to 75 percent would be justified, I elected to apply a lesser across-the-board reduction of 45 percent to the hours claimed to account for the hotly contested nature of the case. That reduces the hours to 4,703.65 hours, which would result in a total award of $800,039.00 if FRT had achieved a sweeping result in this case. But it did not.

## C. REDUCTION FOR RESULTS OBTAINED

46. When a party has achieved only limited success on its claims and the billing records are too voluminous to engage in an hour-by-hour analysis, courts may

14

reduce the overall award by a percentage to account for the limited success. *See Norman*, 836 F.2d at 1302. I believe that approach is justified here.

47. To describe FRT's success as limited here would be an understatement. Put simply, FRT ultimately did not prevail on the issues that were hardest fought during the trial and in pretrial proceedings—its claims under the Equal Protection Clause and the Voting Rights Act, as well as the *Anderson-Burdick* standard. Instead, it prevailed on only two issues: the compelled speech challenge to the "Registration Disclaimer Provision" in SB 90 and the vagueness challenge to the solicitation provision. But even that success was limited. The former victory was rendered moot before the appeal by legislation repealing the disclaimer provision, and FRT's success on the solicitation provision was limited to just half of the phrase it challenged.

48. I also disagree with FRT's suggestion that it is impossible to differentiate between the time spent on the successful versus the unsuccessful claims. Tellingly, FRT recognized long before trial that the two issues it won differed from the remaining issues. In fact, FRT moved for partial summary judgment only on these two provisions precisely because the other claims "are fact intensive and will need to be adjudicated when trial starts." Doc. 241-1 at 6-7.

49. Ultimately, then, FRT's success in this litigation was de minimis, which could and should result in a nominal award. But even if a more-than-nominal award is justified, the lodestar should be reduced to account for the very limited success.

50. FRT's attorneys appear to recognize that a reduction of the lodestar is appropriate, but they have reduced their claim by either 5 percent (for the public interest organizations) or 50 percent (for Arnold & Porter), and those reductions were also designed to account for duplication of effort and lost efficiency. Respectfully, even if the entire reductions were attributable to FRT's limited success, they are woefully inadequate. I believe a 50 percent reduction (much less a 5 percent reduction) bears no relationship to the conduct of the litigation itself or the result. Not only did FRT prevail on far fewer than half of its distinct claims, but those issues were not the primary focus of FRT's efforts. Not surprisingly, the two issues it won comprised a small minority of the time spent on the case from the inception. As just one example, of the roughly 117 pages of argument in its post-trial brief (not counting its arguments on standing, which apply in some capacity across all issues), FRT devoted only about 16 pages to these two issues. Put another way, had FRT raised only those two issues in its complaint, the case would have required dramatically less discovery, briefing, and trial time. In my opinion, FRT should not receive a windfall because it also raised a host of issues it ultimately lost.

51. The Eleventh Circuit has affirmed a fee award that reduced the lodestar by more than 95 percent due to the party's limited success, even when the successful claims achieved at least some amount of public benefit. *See United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1293 (11th Cir. 2017). District courts have routinely reduced the lodestar by similarly large amounts by focusing on the results obtained. *See Anderson v. Stiefel Aluminum Inc.*, 2013 U.S. Dist. LEXIS 98341, at *6 (M.D. Fla. July 15, 2013) (reducing lodestar by nearly 89 percent due to limited success); *Roldan v. Pure Air Solutions, Inc.*, 2010 U.S. Dist. LEXIS 12779, at *20 (S.D. Fla. Jan. 29, 2010) (reducing lodestar by 85 percent due to limited success).

52. One method District Courts have utilized in determining the percentage of reduction appropriate to account for limited success is to look at the time needed to prove the successful versus the unsuccessful issues. *See id*. The District Court in *Roldan* noted that the successful claims made it to trial only because the unsuccessful claims merited a trial and that the 85 percent reduction "better represents the full value of the legal work required to plead and prove" the successful claims. *See id*.

53. Here, a review of the trial transcripts confirms that the two successful claims encompassed, at most, 3 trial days out of 14, and much of the time was devoted to standing. Thus, a reduction of at least 75 percent is warranted to account for the limited success. That further reduction would result in an award of $200,009.75.

54. Recognizing that attorneys' fees are not an exact science and that an opinion expressed as a range is often more helpful, I believe that fees within approximately 10 percent of these figures (in either direction) would be reasonable. When rounded off, that results in a range between $180,000.00 and $220,000.00. I believe that a reasonable, paying client would agree to pay no more than an amount within the range listed above for the results achieved here.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Charles F. Beall, Jr.